NO. 23-60610

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

**BRETT LORENZO FAVRE,**
*Plaintiff - Appellant*

**V.**

**SHANNON SHARPE,**
*Defendant - Appellee*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI, EASTERN DIVISION
CIVIL ACTION NO.: 2:23-CV-00042-KS-MTP

_____

**BRIEF OF DEFENDANT - APPELLEE SHANNON SHARPE**

_____

D. Michael Hurst, Jr., MS Bar No. 99990
James W. Shelson, MS Bar No. 9693
Mark Fijman, MS Bar No. 99153
**PHELPS DUNBAR LLP**
4270 I-55 North
Jackson, Mississippi 39211
Telephone: 601 352 2300
Email:  mike.hurst@phelps.com
         jim.shelson@phelps.com
         mark.fijman@phelps.com

Mary Ellen Roy, T.A., LA Bar No. 14388
**PHELPS DUNBAR LLP**
365 Canal Street, Suite 200
New Orleans, Louisiana 70130-6534

Telephone: 504 566 1311
Email:  maryellen.roy@phelps.com

**AND**

Joseph M. Terry, D.C. Bar No. 473095
Amy M. Saharia, D.C. Bar No. 918644
Tyler Infinger, D.C. Bar. No. 90002621
Jacob Burnett, D.C. Bar. No. 90015420
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, D.C. 20024
Telephone: 202 434 5000
Email:  jterry@wc.com

**ATTORNEYS FOR APPELLEE,
SHANNON SHARPE**

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1.    Brett Lorenzo Favre, Plaintiff-Appellant;

2.    Shannon Sharpe, Defendant-Appellee;

3.    Daniel R. Benson, Jennifer M. McDougall, Daniel J. Koevary, Amit Ramnik Vora, Kasowitz Benson Torres, LLP, Attorneys for Plaintiff-Appellant;

4.    Eric D. Herschmann; Attorney for Plaintiff-Appellant;

5.    Michael J. Shemper, Michael J. Shemper, PLLC, Attorney for Plaintiff-Appellant;

6.    James Robert "Bob" Sullivan, Jr., Sullivan & Sullivan, PLLC, Attorney for Plaintiff-Appellant;

7.    D. Michael Hurst, Jr., James W. Shelson, Mark Fijman, Mary Ellen Roy, Phelps Dunbar LLP, Attorneys for Defendant-Appellee;

8.    Joseph M. Terry, Amy M. Saharia, Tyler Infinger, Jacob Burnett, Williams & Connolly LLP, Attorneys for Defendant-Appellee;

9.    Fox Corporation;

10.    Fox Sports 1, LLC.

SO CERTIFIED, this the 13th day of March, 2024.


BY:    /s/ D. Michael Hurst, Jr.
          D. Michael Hurst, Jr.
          James W. Shelson
          Mark Fijman
          Mary Ellen Roy
          Joseph M. Terry
          Amy M. Saharia
          Tyler Infinger
          Jacob Burnett

          **ATTORNEYS FOR APPELLEE,**
          **SHANNON SHARPE**

## STATEMENT REGARDING ORAL ARGUMENT

The District Court applied well-established First Amendment law to dismiss this defamation claim.  As the general tenor and context of the challenged broadcast made clear, the allegedly defamatory comments in this case were constitutionally protected rhetorical hyperbole, *i.e.*, loose, figurative language between media commentators about a significant public controversy important to the discourse of our nation. Accordingly, the District Court's judgment should be affirmed. There are also other alternative grounds that are independently sufficient to uphold dismissal, including that Defendant-Appellee Shannon Sharpe's opinions were protected speech based on disclosed factual premises, and that Sharpe was commenting on a public proceeding. While oral argument is not necessary to examine the District Court's routine and well-reasoned application of settled law, Sharpe welcomes the opportunity to present argument if the Court believes oral argument would assist in its resolution of the case.

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PARTIES ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF AUTHORITIES ...............................................................................vi

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION....................................................................3

STATEMENT OF THE ISSUES.........................................................................4

STATEMENT OF THE CASE.............................................................................4

I.      Factual Background ..................................................................................4

        A.      Mississippi Welfare Fraud Scandal.............................................4

        B.      Sharpe's Challenged Commentary...............................................9

II.     Procedural History ................................................................................13

III.    District Court Decision..........................................................................14

SUMMARY OF THE ARGUMENT .................................................................17

STANDARD OF REVIEW ...............................................................................20

ARGUMENT ......................................................................................................22

I.      The District Court Correctly Held that Sharpe's Comments Are
        Constitutionally Protected Speech that Cannot Support a
        Defamation Claim..................................................................................22

        A.      The Challenged Statements Are Rhetorical Hyperbole or
                Loose, Figurative Language, Not Factual Assertions. ........................22

                1.      The First Amendment protects rhetorical hyperbole
                        and loose, figurative language on matters of public
                        concern. ...................................................................................22

iv

    2.    Words such as "steal" and "take" have a rich rhetorical tradition in our Nation as loose, figurative, hyperbolic speech. .................................................26

    3.    The District Court correctly held that the First Amendment protects Sharpe's comments as rhetorical hyperbole and loose, figurative language. .................................................................................29

    4.    The District Court did not mischaracterize or rewrite Sharpe's comments, as alleged by Favre, but rather applied constitutional principles to the exact statements Sharpe made. ..........................................32

    B.    The Tenor and Context of Sharpe's Comments Support the District Court's Conclusion that the First Amendment protects Such Comments as Rhetorical Hyperbole and Loose, Figurative Language. ................................................35

    C.    The Serious Tone of the Broadcast Underscores that Sharpe's Comments are Within the Realm of Rhetorical Hyperbole. ....................................................................38

    D.    Cases Cited by Favre Do Not Support His Position. ..........................40

II.    The Court May Affirm the Judgment on Alternative Grounds. ....................45

    A.    Sharpe's Comments are Protected Opinions Based on Disclosed Factual Premises. ................................................46

    B.    Sharpe's Comments are Privileged Reports of Official Proceedings. ....................................................................51

CONCLUSION ....................................................................54

CERTIFICATE OF SERVICE ........................................................56

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ..............................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Art of Living Found. v. Does*,
  2011 WL 2441898 (N.D. Cal. June 15, 2011)....................................................29

*Baker v. Putnal*
  75 F.3d 190 (5th Cir. 1996) ...............................................................................44

*Bose Corp. v. Consumers Union of United States, Inc.*,
  466 U.S. 485 (1984).....................................................................................20, 45

*Burchett v. Cargill, Inc.*,
  48 F.3d 173 (5th Cir. 1995) ...............................................................................20

*Chamblee v. Miss. Farm Bureau Fed'n*,
  551 F. App'x. 757 (5th Cir. 2014) .....................................................................46

*Clark v. Thibodaux City*,
  787 F. App'x. 198 (5th Cir. 2019) .....................................................................13

*Cooper v. Paragon Sys., Inc.*,
  2008 U.S. Dist. LEXIS 67761 (S.D. Miss. Sept. 5, 2008) ................................21

*Copeland v. Marshall*,
  641 F.2d 880 (D.C. Cir. 1980) (Wilkey, J., dissenting) .....................................28

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013)...........................................................................35

*Ferrer v. Chevron Corp.*,
  484 F.3d 776 (5th Cir. 2007) ......................................................................20, 45

*Fiber Systems, Int'l, Inc. v. Roehrs*,
  470 F.3d 1150 (5th Cir. 2006) ..............................................................40, 41, 42

*Firestone v. Time, Inc.*,
  460 F.2d 712 (5th Cir. 1972) .............................................................................45

*Gales v. CBS Broad., Inc.*,
  2004 WL 1961680 (S.D. Miss. July 9, 2004)....................................................35

*Gardner v. Martino*,
    563 F.3d 981 (9th Cir. 2009) .................................................................37

*Greenbelt Coop. Publ'g Ass'n v. Bresler*,
    398 U.S. 6 (1970) ..............................................................16, 23, 39

*Herring Networks, Inc. v. Maddow*,
    445 F. Supp. 3d 1042 (S.D. Cal. 2020) .................................................25

*Hogan v. Winder*,
    762 F.3d 1096 (10th Cir. 2014) ............................................................23

*Horsley v. Rivera*,
    292 F.3d 695 (11th Cir. 2002) .......................................................23, 38

*Irvin v. Southern Snow Mfg. Inc.*
    517 F. App'x. 229 (5th Cir. 2013) .......................................................13

*Khodorkovskaya v. Gay*,
    5 F.4th 80 (D.C. Cir. 2021) ...........................................................21, 37

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) .............................................................35

*U.S. v. Kramer*,
    768 F.3d 766 (8th Cir. 2014) ...............................................................27

*Lane v. Random House, Inc.*,
    985 F. Supp. 141 (D.D.C. 1995) .........................................................39

*Letter Carriers v. Austin*,
    418 U.S. 264 (1974) ........................................................16, 22, 39

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
    127 F.3d 122 (1st Cir. 1997) ................................................................44

*Lewis v. Fresne*,
    252 F.3d 352 (5th Cir. 2001) ...............................................................20

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank P.L.C.*,
    594 F.3d 383 (5th Cir. 2010) ...............................................................10

*Mandawala v. Ne. Baptist Hosp.*,
   16 F.4th 1144 (5th Cir. 2021) ............................................................20

*Mann v. City of Tupelo*,
   1995 WL 1945433 (N.D. Miss. Apr. 13, 1995).........................................47, 51

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) ............................................................24

*McDonald v. Raycom TV Broad., Inc.*,
   665 F. Supp. 3d 688 (S.D. Miss. 2009) ..............................................51

*McDougal v. Fox News Network, LLC*,
   489 F. Supp. 3d 174 (S.D.N.Y. 2020) ..............................................25

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) ............................................................48

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990)................................................................*passim*

*Mitchell v. Random House, Inc.*,
   703 F. Supp. 1250 (S.D. Miss. 1988) ................................................21

*Moldea v. New York Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994)............................................................43

*Montgomery v. Risen*,
   875 F.3d 709 (D.C. Cir. 2017)............................................................24

*New York Times v. Sullivan*,
   376 U.S. 254 (1964)................................................................2, 20, 22, 32

*Nguyen v. Mai Vu*,
   2018 WL 5622634 (D. Colo. Oct. 30, 2018)......................................28

*Norris v. Hearst Tr.*,
   500 F.3d 454 (5th Cir. 2007) ............................................................7

*Nunes v. Lizza*,
   12 F.4th 890 (8th Cir. 2021) ............................................................48

viii

*Ollman v. Evans*,
  750 F.2d 970 (D.C. Cir. 1984)..............................................................23

*Phantom Touring, Inc. v. Affiliated Publications*,
  953 F.2d 724 (1st Cir. 1992)...........................................................24, 40

*Pittman v. Gannett River States Pub. Corp.*,
  836 F. Supp. 377 (S.D. Miss. 1993) ................................................51, 53

*Rapaport v. Barstool Sports, Inc.*,
  2024 WL 88636 (2d Cir. Jan. 9, 2024) ...........................................37, 49

*Sacchetti v. Optiv Security, Inc.*,
  2019 WL 5390611 (E.D. Tex. July 8, 2019) ........................................35

*Sterling Fin. Inv. Grp., Inc. v. Hammer*,
  393 F.3d 1223 (11th Cir.2004) .............................................................49

*Unelko Corp. v. Rooney*,
  912 F.2d 1049 (9th Cir. 1990) ..............................................................43

*Webster v. Kijakazi*,
  19 F.4th 715 (5th Cir. 2021) .................................................................13

**State Cases**

*Brooks v. Paige*,
  773 P.2d 1098 (Colo. Ct. App. 1988) ...................................................37

*Edmonds v. Delta Democrat Pub. Co.*,
  93 So. 2d 171 (Miss. 1957)....................................................................46

*Ferguson v. Watkins*,
  448 So. 2d 271 (Miss. 1984).............................................................46, 50

*Lawrence v. Evans*,
  573 So. 2d 695 (Miss. 1990)..................................................................35

*Perkins v. Littleton*,
  270 So. 3d 208 (Miss. Ct. App. 2018)...................................................24

**U. S. Constitution**

*First Amendment* ...............................................................................*passim*

**Federal Statutes**

28 U.S.C. § 1291 ...................................................................................4

28 U.S.C. § 1332 ...................................................................................3

**Federal Rules**

Rule 12(b)(6) ...............................................................................*passim*

**Other Authorities**

Thomas A. Barry & Isaiah McKinney, *Stealing from the Poor and
    Giving to the Government?* CATO INSTITUTE (Apr. 26, 2023),
    https://www.cato.org/commentary/stealing-poor-giving-
    government; ...................................................................................27

Oxford University Press. *Steal.* In *Oxford English Dictionary.*
    Retrieved March 13, 2024,
    https://www.oed.com/search/dictionary/?scope=Entries&q=steal. ...................26

Press Release, Mississippi Office of the State Auditor, State Auditor
    Counter-Sues Favre for TANF Funds (Feb. 5, 2024),
    https://www2.osa.ms.gov/news/state-auditor-counter-sues-favre-
    for-tanf-funds/ ..................................................................................5

*Sack on Defamation: Libel, Slander, and Related Problems* § 16:2.1
    (5th ed. 2017) ..................................................................................21

*This WSJ Reporter's Observation of Robin Hoods at the Wall Street
    Protests Crystallizes the Movement in 30-Seconds*, WALL ST. J.
    (Oct. 11, 2011) ................................................................................27

**INTRODUCTION**

This defamation case arises from one of the largest public fraud scandals in Mississippi history—a matter of indisputable public concern. Between 2020 and 2022, the media reported extensively on Plaintiff-Appellant Brett Favre's connection to and role in that scandal, including his receipt of more than $1 million in welfare funds, which came to light through public records and government investigations. In September 2022, *Mississippi Today* reported on a series of newly uncovered text messages that showed Favre working with others to use $5 million in welfare funds to build a new volleyball stadium at Favre's alma mater.

At the time, Defendant-Appellee Shannon Sharpe co-hosted a daily live sports talk show on cable television, during which he and his co-host passionately debated sports-related news in heated terms and with colorful banter. On September 14, 2022, the show hosts discussed the *Mississippi Today* article published the day before, related media reports, and Favre's reported role in the Mississippi welfare scandal.

Sharpe expressed anger and disgust at the news about Favre's reported conduct. Favre claims that Sharpe defamed him when Sharpe commented that Favre, by receiving funds intended for needy families in Mississippi notwithstanding Favre's lucrative NFL career, was "a sorry mofo" who "[stole] from the lowest of the low," "[took] from the underserved," and "stole money from people that really

1

needed that money." Despite viewers being expressly informed during the Broadcast about the media reports and public records on which the hosts based their comments, and that Favre had not been charged with any crimes in the welfare scandal, Favre nonetheless sued, alleging Sharpe's comments defamed Favre because they accused him of "committing serious crimes." ROA.18.

The District Court correctly dismissed Favre's claim. Reflecting our "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964), the First Amendment protects speakers like Sharpe who use hyperbole and rhetorical flourish to express their views on matters of public concern.

When assessed in the context in which they were made—a discussion of public developments in the welfare scandal on a sports debate show—Sharpe's pointed comments about Favre's conduct were well within the purview of free speech, because they were transparently hyperbolic and figurative. The words "steal" and "take" have long and commonly been used non-literally in public discourse to refer to misuse or wrongful diversions of property, including money—just as Sharpe used them here. Favre's suggestion that Sharpe's comments must have implied factual, criminal activity defies both common usage and common sense.  In addition, whether one agrees with Sharpe's comments or not, his views were based

2

on the disclosed factual premises of media coverage and public records describing the scandal.

Applying well-established defamation law, the District Court correctly recognized Sharpe's comments for what they are: Sharpe's expression of his "strong views" about the misuse of welfare funds "for purposes other than helping the underprivileged," not an accusation of actual crimes. ROA.538. As the District Court explained: "Listeners would have recognized Sharpe's statements as rhetorical hyperbole—robust language used to express Sharpe's strong views about the new information that emerged about Favre's participation in the welfare scandal." ROA.538.

Moreover, the District Court's judgment can be affirmed upon any available ground, including those the lower court did not reach. At least two alternative grounds independently support the judgment below: (i) the non-actionable expression of opinion based on disclosed factual premises and (ii) commentary regarding official proceedings.

This Court should affirm the District Court's dismissal of Favre's claim.

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332, because the action involved citizens of different states and the amount in controversy exceeded the sum of $75,000, exclusive of interests and costs. ROA.8-15. This Court

has appellate jurisdiction over an appeal from the final decision of the District Court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the District Court correctly dismissed Favre's complaint on the ground that Sharpe's comments about Favre are rhetorical hyperbole and loose, figurative language that the First Amendment protects from defamation liability.

II.    Whether, in the alternative, the complaint should be dismissed on either of the following grounds:

(a)    Sharpe's comments are protected opinions based on disclosed factual premises; or

(b)    Sharpe's statements are protected reports of official proceedings.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    Mississippi Welfare Fraud Scandal

As the District Court observed, the "factual backdrop of this lawsuit is one of the largest public fund fraud scandals in Mississippi history." ROA.528. More than $77 million in federal Temporary Assistance for Needy Families ("TANF") welfare funds intended to help Mississippi's poorest citizens were unlawfully diverted to politically connected individuals and others for statutorily prohibited purposes. ROA.529. According to an independent forensic audit commissioned by the Mississippi Department of Human Services—and as widely reported in the news

4

media—Favre, a retired NFL Hall of Fame quarterback, was among the recipients of these welfare funds. ROA.168, ROA.529.

In May 2022, Mississippi filed a civil lawsuit seeking to recover the welfare dollars from Favre and his company, Favre Enterprises, as well as many others. ROA.171-237, ROA.252-345. According to the State's initial complaint, Favre received $1.1 million in TANF funds for speaking engagements that he never performed. ROA.219-220.[1] Favre later refunded this money, but he allegedly has never paid the interest owed to the State of Mississippi from the money he was forced to repay.[2] ROA.271, ROA.364.

In December 2022, Mississippi amended its complaint to seek repayment of an additional $5 million in TANF funds that Favre helped to secure, allegedly to satisfy his personal guarantee to fund construction of a volleyball facility at the University of Southern Mississippi ("USM"), of which Favre is an alumnus and where his daughter was a member of the volleyball team. ROA.267-271, ROA.308.

---

[1] Mississippi's original complaint also alleged that Favre and others were engaged in a "sham Agreement" to conceal the fact that $1.7 million in TANF funds were being transferred to a "private, for-profit biotechnology corporation" in which "Favre was the largest outside investor and holder of corporate stock." ROA.210-215. The State's complaint alleged that Favre and others involved in the concealment were jointly and severally liable for $2.1 million. ROA.213.

[2] On February 5, 2024, the Mississippi State Auditor filed a counterclaim against Favre in a pending defamation case filed by Favre against the Auditor to recover $437,000 in unpaid principal and $292,790 in unpaid interest relating to the $1.1 million in TANF funds received by Favre. *See* Press Release, Mississippi Office of the State Auditor, State Auditor Counter-Sues Favre for TANF Funds (Feb. 5, 2024), https://www2.osa.ms.gov/news/state-auditor-counter-sues-favre-for-tanf-funds/.

According to the State, Favre was "unable to convince his friends and connections to donate enough money to cover his obligation to fund the construction of the volleyball facility, and he did not want to pay the costs out of his own pocket." ROA.267.

As the State alleges, Favre turned to a non-profit agency responsible for distributing State welfare funds and ultimately helped to secure a grant of $5 million in TANF funds to fund the volleyball facility. ROA.267-270. In short, the State alleges that Favre caused welfare funds to be diverted from their statutory purpose of serving the State's needy and directed instead toward building a volleyball facility for his daughter's (and his college alma mater's) volleyball team. ROA.267-270.

In 2023, the state court denied Favre's motion to dismiss the State's claims against Favre. ROA.346-349. On top of the State civil litigation, six individuals have so far pled guilty to state and/or federal felony charges in connection with the TANF scandal in Mississippi. ROA.529.

The welfare scandal—and Favre's role in it—has generated substantial media attention. ROA.360-377. Favre's involvement in the scandal first became public in a February 2020 newspaper article in *Mississippi Today* entitled "Embattled welfare group paid $5 million for new USM volleyball center." ROA.350-359. In the years since, local and national news organizations have regularly reported on the ongoing

6

developments in the welfare scandal—and on Favre's involvement in it specifically.[3] ROA.360-377.

Of particular significance here, on September 13, 2022, *Mississippi Today* published an article entitled "Former Governor Phil Bryant helped Brett Favre secure welfare funding for USM volleyball stadium, texts reveal." The article discussed a recent filing in the State's lawsuit against Favre that revealed "[n]ever-before-seen text messages" between Favre and others relating to the funding of the USM volleyball facility. *Mississippi Today* reported that the texts "show that [Favre and others] worked together to channel at least $5 million of the state's welfare funds to build a new volleyball stadium at the University of Southern Mississippi, where Favre's daughter played the sport." The article also reported that "a separate $1.1 million welfare contract Favre received to promote the program—the subject of many national headlines—was simply a way to get more funding to the volleyball project." ROA.383. As alleged in the State's lawsuit, that $1.1 million in TANF funds was for speaking engagements that Favre never performed. ROA.219-220.

---

[3] The record reflects numerous media reports, government press releases, and public record materials about Favre's involvement in Mississippi's welfare scandal published well before Sharpe's comments on the broadcast at issue. As the District Court observed: "***Both parties submitted documents that go beyond the four corners of the Complaint, and neither side takes issue with the Court's consideration of such material.*** The Court will take judicial notice of these various documents, not for the truth of the matter asserted, but rather for purposes of background and what information was in the public sphere." ROA.528 (emphasis added) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.* 547 F.3d 406, 425 (2d Cir. 2008) (judicial filings and news articles); *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (filings in other lawsuits).

7

According to the *Mississippi Today* article, Favre sent texts to Nancy New, then president of a non-profit that distributed TANF funds, who has since pled guilty to state and federal criminal charges in the welfare fraud scandal. As reported by *Mississippi Today*: "'I could record a few radio spots,' Favre texted . . . , according to the new filing, '. . .  and whatever compensation could go to USM.'" ROA.383. The article also featured the following text messages between Favre and New about the welfare funds, which reflect Favre's explicit concern about whether the public could "find out" he was receiving public funds:



ROA.384.

Favre's brief does not even mention these text messages, which formed the basis of the *Mississippi Today* report and the broadcast at issue, and which the District Court referenced in its ruling. ROA.381-393, ROA.537.

## B.     Sharpe's Challenged Commentary

Shannon Sharpe is a retired professional football player and NFL Hall of Fame tight end. ROA.20, ROA.442. When the lawsuit was filed, Sharpe co-hosted a daily live sports debate show on cable television, *Skip and Shannon: Undisputed* ("*Undisputed*"), with fellow sports personality Skip Bayless. ROA.442.[4] Sharpe and Bayless provided commentary on recent sports-related news, giving passionate and sometimes heated opinions for two-and-a-half hours every morning. ROA.442. As anyone who has ever viewed *Undisputed* is aware, Sharpe is a colorful sports personality—not an attorney, prosecutor, or legal analyst.

Favre's complaint against Sharpe arises out of an eleven-minute segment of *Undisputed*'s September 14, 2022 broadcast during which Sharpe and Bayless commented on Favre's widely reported role in the welfare fraud scandal (the "Broadcast").[5]  ROA.403, ROA.404-429. The show's moderator opened the

---

[4] Sharpe now regularly appears on the cable television sports debate program, *First Take*, and on other shows and podcasts.

[5] Sharpe attached as exhibits to his Motion to Dismiss a video recording and transcript of the challenged Broadcast. The transcript is available at ROA.404-429. The video of the Broadcast was originally conventionally filed via physical disk in the District Court and is available there.  *See*

Broadcast with an accurate recap of the *Mississippi Today* news article published the day before: "Yesterday, an investigation by *Mississippi Today* found that Brett Favre, along with the help of a former Mississippi Governor, obtained welfare funds to help build a new volleyball center at the University of Southern Mississippi." ROA.403, ROA.406. Favre has not challenged this statement or alleged that it is false.

After the Broadcast's moderator summarized the latest reporting on this topic, she turned to Sharpe for his reaction. ROA.406. Sharpe responded by expressing his views on the publicly reported allegations against Favre. Favre has sued Sharpe for only the three following comments from the Broadcast:

- "The problem that I have with this situation, you've got to be a sorry mofo to steal from the lowest of the low."

- "Brett Favre is taking from the underserved."

- "[Favre] stole money from people that really needed that money."

ROA.20-21, ROA.403, ROA.407-409.

---

ROA.403. The District Court appropriately considered these materials as "integral to Favre's claim." ROA.528-29 (citing *Meyers v. Textron, Inc.*, 540 Fed. App'x. 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (court considering a 12(b)(6) motion "may take into account documents incorporated into the complaint by reference or integral to the claim")); *see also Lone Star Fund V (U.S.), L.P. v. Barclays Bank P.L.C.*, 594 F.3d 383, 387 (5th Cir. 2010) (in resolving Rule 12(b)(6) motion, court may examine "any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) ("In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated.").

Sharpe expanded on the basis for his comments by reading aloud Favre's text messages quoted in the *Mississippi Today* article: "This is what Brett Favre texted, 'If you were to pay me, is there any way the media can find out where it came from and how much?'" ROA.408. Sharpe and his co-host also discussed the State of Mississippi's ongoing lawsuit against Favre and others involved in the welfare fraud scandal, including the claim that Favre still owed interest on the $1.1 million he had received. ROA.411-412. Bayless noted that the amount of interest owed by Favre was $228,000, and "to your point, the Mississippi Department of Human Services had to file a civil lawsuit against Brett Favre because he had not paid back the interest he owed on the 1.1 million he was fraudulently given for giving no speeches." ROA.411-412.[6] Sharpe observed that these funds were "supposed to go to the most underserved." ROA.412. Sharpe further remarked that, although he would like to give a donation to his own alma mater, he would not do that by "tak[ing] from Georgia's poorest that are most underserved." ROA.421. He continued: "I'm not trying to be philanthropic and try to show everybody I am while I steal from one – I

---

[6] The issue of the State Auditor seeking payment of the interest on the $1.1 million from Favre had also been widely reported by the media prior to the September 14, 2022 Broadcast. On September 1, 2022,  NBC News reported the State Auditor's demand for the $228,000 interest payment from Favre. *See* ROA.364 ("Favre has repaid the fees, although not the $228,000 in interest the auditor also demanded."). ESPN likewise reported on September 13, 2022, the day before the Broadcast, that Favre had failed to repay the interest on the $1.1 million. *See* ROA.377 ("Then, in May, the Mississippi Department of Human Services filed a civil lawsuit against Favre because he had not paid back interest on the $1.1 million that amounted to $228,000.").

PD.44735853.1

rob Peter to pay Paul so people look at me, man, look at what Shannon Sharpe did."
ROA.422.

Sharpe acknowledged Favre's assertion that "he didn't know" the funds he received were only supposed to go to poor families. ROA.408. Sharpe's co-host also expressly informed viewers that "he [Favre] has not been criminally charged" with any offense, ROA.420, and that Favre was facing only the State of Mississippi's civil lawsuit. ROA.411-412. Indeed, neither Sharpe nor his co-host ever said that Favre committed a crime or engaged in unlawful conduct.

Over the course of the Broadcast, in reference to other conduct by Favre, the hosts called Favre "a sleazeball," "shady," "gross[]," and a "diva," and accused Favre of holding the Green Bay Packers "hostage" and getting away with "near murder on the football field."[7] ROA.413, ROA.415-418.

The Broadcast closed with the show's moderator relaying that "Yahoo Sports reports that the FBI is looking into [the allegations] and has actually questioned Brett Favre already about it." ROA.426. Favre does not dispute this report or that these allegations were widely reported.

---

[7] In the Broadcast, some of the statements referenced express unflattering comments by Favre's biographer regarding Favre's involvement in the welfare scandal. ROA.418-419.

## II.    Procedural History

On February 9, 2023, Favre filed his lawsuit in Mississippi state court. ROA.17-24. Sharpe timely removed the case to the U.S. District Court for the Southern District of Mississippi based on diversity jurisdiction. ROA.8-15.

Favre's complaint alleged these three comments by Sharpe were defamatory:

- "The problem that I have with this situation, you've got to be a sorry mofo to steal from the lowest of the low."

- "Brett Favre is taking from the underserved."

- "[Favre] stole money from people that really needed that money."

ROA.17, ROA.20-21.[8] According to the complaint, these statements were defamatory because they "accused Favre of committing serious crimes." ROA.18; *see also* ROA.22.

Sharpe moved to dismiss the case on multiple independent grounds. ROA.163-434, ROA.435-463. One basis was that Sharpe's comments about Favre are rhetorical hyperbole and loose figurative language that is protected speech under the First Amendment and cannot support a defamation claim. ROA.445-449.

---

[8] Favre's brief appears to improperly attempt to enlarge the pleadings to include other alleged defamatory comments he claims Sharpe made. Favre Br. 9, 24-25. Any grievance Favre may now have as to other statements that he did not challenge in the complaint is waived. *See Webster v. Kijakazi*, 19 F.4th 715, 720 (5th Cir. 2021) ("Our court adheres to the general rule that 'arguments not raised before the district court are waived and cannot be raised for the first time on appeal.'"); *Irvin v. Southern Snow Mfg. Inc.* 517 Fed. App'x. 229, 231 (5th Cir. 2013) (appellant waived argument by failing to "raise it clearly and develop it adequately" before the district court); *Clark v. Thibodaux City*, 787 Fed. App'x. 198, 202–03 (5th Cir. Sept. 19, 2019) (dismissal affirmed where plaintiff failed to timely seek amendment of complaint during litigation or after being served a 12(b)(6) motion).

13

Another ground was that Favre failed to state a defamation claim under Mississippi law because the views Sharpe expressed were based on (a) disclosed and publicly reported information and (b) official proceedings. ROA.449-453.

## III.    District Court Decision

On October 30, 2023, the District Court granted the motion to dismiss with prejudice and issued judgment for Sharpe. ROA.528-539, ROA.540. The District Court concluded that Sharpe's comments about Favre were "unactionable, as they are mere rhetorical hyperbole," and noted that it therefore did need not to address the other grounds for dismissal raised by Sharpe. ROA.532.

The District Court recognized that a court considering a defamation claim must first determine whether the language in question is actionable—in this case, the three comments Sharpe made regarding the news reports of Favre's receipt of TANF funds intended for the poor. ROA.531, ROA.533.

The District Court then stressed the societal importance of freedom of discussion and observed that "because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability." ROA.534. Quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990), the District Court recognized that "statements that cannot reasonably be interpreted as stating actual facts about an individual are protected,

14

thus assuring that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of this Nation." ROA.534.

The District Court thus identified the dispositive question as whether "a reasonable factfinder could conclude that the statements Sharpe made on the air would imply an assertion that Favre actually stole money from the poor." ROA.535. The District Court answered that question in Sharpe's favor, concluding that "[l]isteners would have recognized Sharpe's statements as rhetorical hyperbole— robust language used to express Sharpe's strong views about the new information that emerged about Favre's participation in the welfare scandal." ROA.538. The court observed that, based on publicly available information, "it appears to be widely believed that the money obtained by Favre for himself and USM came from welfare funds," which "were intended to go to poverty-stricken families." ROA.537. "In that context," the Court held, viewers would understand Sharpe's use of the words "steal," "taking" and "stole" to refer "figuratively" to the diversion of TANF funds "for purposes other than helping the underprivileged." ROA.538.

As the District Court explained:

> The reference to "taking" and "stole" figuratively refers to the diverting [of] funds from the TANF for purposes other than helping the underprivileged. Similarly, Sharpe's use of the words "people really needed that money," the "lowest of the low," and "the underserved," again are

examples of protected, colorful speech referring to needy families in Mississippi.

ROA.538.   Applying Supreme Court caselaw to the facts, the District Court held:

> Although the funds may have come from the State of Mississippi, such TANF funds were intended to go to poverty-stricken families, not to fund the construction of a college volleyball facility. In that context, just as the Supreme Court has held that saying a negotiator engaged in "blackmail" or calling a non-union employee a "traitor" is constitutionally-protected rhetorical hyperbole and loose, figurative language, the Court finds that Sharpe's use of the words "steal," "taking," and "stole" in connection with Favre's actions is non-actionable speech.

ROA.537-538 (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 14 (1970); *Letter Carriers v. Austin,* 418 U.S. 264, 284-86 (1974)).

Favre now accuses the District Court of "outright mischaracterization," of having "rewritten" the challenged comments, and of having "substituted a rhetorical and hyperbolic statement" for Sharpe's actual comments. Favre Br. 3, 11, 17. Yet as these quotations from the District Court opinion demonstrate, the lower court simply and properly applied long-established constitutional principles to the ***verbatim*** language that Favre challenged in holding that Sharpe's words were not actionable.

The District Court reinforced this conclusion by pointing to the broader context of the Broadcast. As the District Court explained, *Undisputed* is not an outlet for original news reporting, but is instead a "debate format sports entertainment talk show with lively, pointed banter." ROA.538. Accordingly, the Court concluded,

"[t]he context in which Sharpe's remarks were made—including the tenor of the Broadcast as a whole, the format of the program and its audience, ***and the fact that viewers were told Favre was not charged with a crime***—forecloses Favre's claim that a reasonable viewer would have thought Sharpe was actually accusing him of committing 'larceny.'" ROA.538-39 (emphasis added).

Because the Court dismissed the complaint on the ground that Sharpe's speech was protected rhetorical hyperbole and loose, figurative language rather than literal accusations of criminal activity, it did not reach the other grounds that Sharpe raised in his motion to dismiss. ROA.532.

Favre timely filed a Notice of Appeal. ROA.541-43.

## SUMMARY OF THE ARGUMENT

The District Court applied well-established First Amendment law to dismiss Favre's defamation claim. For multiple reasons, this Court should affirm the judgment below.

The District Court correctly held that the First Amendment protects Sharpe's challenged statements as "rhetorical hyperbole" and "loose, figurative language" relating to matters of public concern. Comments that are "rhetorical hyperbole" or "loose, figurative language" relating to matters of public concern "receive full constitutional protection" from defamation liability. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20-21 (1990). This principle requires dismissal of defamation cases involving

statements that, taken literally, would accuse an individual of committing a crime. The words "steal" and "take" have a rich rhetorical tradition in American debate and public discourse. Speakers use the words "steal," "take," and synonyms such as "rob" figuratively to criticize individuals who acquire or direct the spending of money in ways the speaker believes to be unfair. Such language cannot support a defamation claim where the tenor and context of the challenged statements makes clear that the use was rhetorical and hyperbolic or loose and figurative.

The District Court correctly concluded that Sharpe's statements are in line with this rhetorical tradition and dismissed Favre's claim. In context, Sharpe's comments could not be understood by reasonable viewers to accuse Favre of literally committing the crime of theft or larceny. Instead, as the District Court held, Sharpe used the phrases "stealing" and "taking" in their rhetorical, figurative sense to express his outrage concerning the widely reported allegations about Favre's role in the massive Mississippi welfare scandal. In so holding, the District Court did not "rewrite" the challenged statements, as alleged by Favre. Rather, the District Court did exactly what Favre urged by taking at face value his argument that Sharpe's comments accused Favre of criminal wrongdoing, and then explaining why no reasonable viewer could regard those remarks as literal statements of fact.

In addition, the District Court correctly held that the tenor and context of Sharpe's statements—made on a live and lively sports commentary show—

confirmed that the statements are non-actionable rhetorical hyperbole and loose, figurative language. As the District Court explained, any reasonable viewer would know that "*Undisputed* is not a news outlet where viewers expect genuine initial reporting of events." ROA.538. Favre's argument that Sharpe could not have engaged in rhetorical hyperbole because Sharpe's "tone, demeanor, and language were serious" during the segment about Favre fundamentally misunderstands defamation law. Serious tones and topics predominate in rhetorical hyperbole cases. Protection for such statements does not turn on whether they were delivered in jest.

Finally, the cases Favre relies on do not support reversal. In each case, the court held that the challenged statements could reasonably be construed as factual assertions, either because the speaker's statements reflected they had access to information inaccessible to others or because the broader context in which the statements were made showed they were factual in nature. Contrary to Favre's argument, the *Milkovich* case actually supports affirmance of the District Court's decision.

Moreover, this Court may also affirm the District Court's judgment on additional grounds that the District Court did not reach. These alternative bases supporting dismissal are: (A) Sharpe's comments are protected opinions based on disclosed factual premises, and (B) Sharpe's statements are protected reports of

official proceedings. If the Court exercises its discretion to consider these alternative arguments, the judgment below should be affirmed on these grounds as well.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court ruling granting a motion to dismiss under Rule 12(b)(6). *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021) (affirming dismissal of defamation claim) and may affirm "on any basis supported by the record," *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780-81 (5th Cir. 2007).[9] In cases like this one, which implicate core First Amendment concerns, the appellate court's review is plenary to reduce the likelihood of "'a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)). The *Bose* rule also recognizes a heightened need for vigilance and consistency when that standard is supplied by the Constitution, particularly by the First Amendment. *Bose*, 466 U.S. at 503–04; *see also AIDS Action Comm. of Massachusetts, Inc. v. Massachusetts Bay Transp. Auth.*, 42 F.3d 1, 7 (1st Cir. 1994)

---

[9] Favre cites *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001), for the proposition that on a Rule 12(b)(6) motion, "any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." Favre Br. 13-14. *Lewis*, however, relied on *Burchett v. Cargill, Inc.*, 48 F.3d 173, 176 (5th Cir. 1995), a fraudulent joinder case in which this Court cautioned against "pretrying a case to determine removal jurisdiction." While this Court has cited the language from *Lewis* in dicta, the cited language is more accurately a fraudulent joinder standard than a Rule 12(b)(6) standard. Indeed, Favre does not cite *any* case in which this Court applied this language to avoid deciding ambiguous legal questions on a motion to dismiss. In any event, the law in this case unambiguously favors dismissal.

20

("*De novo* review of the trial court's application of a First Amendment standard to the facts before it 'ensures that the federal courts remain zealous protectors of First Amendment rights.'") (citations omitted).

Contrary to Favre's claim that Rule 12(b)(6) motions are "rarely granted," Favre Br. 13 (citation omitted), such motions are granted with "relative frequency" in defamation cases, where the content of the allegedly defamatory statement is before the court at the motion-to-dismiss stage. *Sack on Defamation: Libel, Slander, and Related Problems* § 16:2.1 (5th ed. 2017). "A court can, at the motion-to-dismiss stage, conclude that [the] challenged speech could not reasonably be understood to communicate actual facts about a person." *Khodorkovskaya v. Gay*, 5 F.4th 80, 84 (D.C. Cir. 2021). Early dismissal is especially favored in cases of protected speech, where allowing unmeritorious claims to proceed would otherwise chill First Amendment discussion on matters of public concern. *See, e.g.*, *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988) ("[T]he nature of a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit."), *aff'd*, 865 F.2d 664 (5th Cir. 1989); *Cooper v. Paragon Sys., Inc.*, 2008 U.S. Dist. LEXIS 67761, at *3 (S.D. Miss. Sept. 5, 2008). Courts considering a motion to dismiss a defamation claim will "routinely" address "issues such as whether the statement at bar is capable of a defamatory meaning, ... whether it is protected opinion, and whether the suit is barred by privilege." *Mitchell*, 703 F. Supp. at 1258

n.10 (citation omitted). Dismissal of defamation suits for failure to state a claim occurs "with relative frequency." *Id*. (dismissing with prejudice).

## ARGUMENT

I.  **The District Court Correctly Held that Sharpe's Comments Are Constitutionally Protected Speech that Cannot Support a Defamation Claim.**

A.  **The Challenged Statements Are Rhetorical Hyperbole or Loose, Figurative Language, Not Factual Assertions.**

1.  **The First Amendment protects rhetorical hyperbole and loose, figurative language on matters of public concern.**

The First Amendment protections in defamation cases are rooted in the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan,* 376 U.S. 254, 270 (1964). Consistent with this principle, "rhetorical hyperbole" and "loose, figurative" language relating to matters of public concern "receive full constitutional protection." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20-21 (1990); *see also Letter Carriers v. Austin,* 418 U.S. 264, 284-86 (1974) (describing a union ***"scab"*** as a ***"traitor"*** could not support a defamation action because the language was used "in a loose, figurative sense" that was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members"). As the Supreme Court has explained, loose, hyperbolic speech is non-actionable because statements "must be provable as false before there can be liability under state defamation law." *Milkovich,* 497 U.S. at 19.

22

Protection of robust and colorful commentary provides "assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of this Nation." *Id.* at 20-21. Consistent with these principles, courts regularly dismiss defamation claims based on statements using rhetorical hyperbole and loose language—even where the statements at issue, taken ***literally***, falsely accuse the plaintiff of a serious crime.[10]

For example, the Supreme Court has held that a defendant's use of the word ***"blackmail"*** to describe the plaintiff's negotiating conduct was not defamatory because, in context, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 14 (1970); *see also Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014) ("[A]ccusations of ***extortion*** are a familiar rhetorical device. We all know of colloquial or hyperbolic uses of the term."); *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (television host calling plaintiff an ***"accomplice to murder"*** was non-actionable rhetorical hyperbole

---

[10] Favre cites *Ollman v. Evans*, 750 F.2d 970, 980 (D.C. Cir. 1984), as support for his claim that an "accusation of a crime" may be actionable in defamation. Favre Br. 19. *Ollman* does not undermine the District Court's holding here. It simply stands for the unremarkable proposition that an accusation of a crime may, ***in context***, "give rise to clear factual implications." 750 F.2d at 980. Here, by contrast, Sharpe's use of the words "steal" and "took" did not imply the actual commission of crimes—instead, they were the kind of "loosely definable" and "variously interpretable" rhetorical phrases that *Ollman* found are non-actionable. *Id.*

23

"expressing his belief that [plaintiff] shared in the moral culpability for [an individual's] death, not as a literal assertion that [plaintiff] had, by his actions, committed a felony"); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 908 (9th Cir. 2002) (terms "***bank robber***," "***heist***," "***crime***," and "***theft***" in connection with intellectual property dispute are non-actionable "rhetorical hyperbole"); *Montgomery v. Risen*, 875 F.3d 709, 714 (D.C. Cir. 2017) (characterization of software sold to the government as a *"hoax"* is too "loose, figurative or hyperbolic" to be considered defamatory); *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724 (1st Cir. 1992) (describing theatrical touring production as a ***"rip-off, a fraud"*** was not actionable defamation).

State law is similar: Mississippi courts recognize that loose figurative language is constitutionally protected. *See Perkins v. Littleton*, 270 So. 3d 208, 217–18 (Miss. Ct. App. 2018) ("the First Amendment protects 'imaginative expression' or 'rhetorical hyperbole'" and "no reasonable listener would have understood the radio ad's brief reference to [Plaintiff] as charging him with a crime" by using the word "conspiracy").

"Talking head" shows such as the Broadcast, featuring passionate debates and discussions, are especially fertile ground for such protected loose or hyperbolic commentary. Reasonable viewers know that on cable television, "pundits debat[e] the latest political controversies" and provide "pitched commentary" that is non-

actionable speech protected by the First Amendment rather than "factual representations." *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 184 (S.D.N.Y. 2020). Thus, for example, a court held that Fox News host Tucker Carlson's use of the word "extortion" on the "Tucker Carlson Tonight" show, in connection with a former model and actress, constituted rhetorical hyperbole—in the court's words, "exaggeration," "non-literal commentary," or "simply bloviating for his audience"—and did not accuse the plaintiff of committing a crime. *Id.* Noting that "commentary talk shows like the one at issue here . . . often use 'increasingly barbed' language to address issues in the news," the court concluded that Carlson was "remarking on hypocrisy he perceives" and that his "statement on matters of public concern" deserved the highest protection. *Id.* at 183 (quotation omitted).

Similarly, in *Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042 (S.D. Cal. 2020), MSNBC anchor Rachel Maddow was sued over her on-air comments that another cable news outlet, One America News Network ("OAN"), "really literally is paid Russian propaganda." *Id.* at 1046. Maddow was commenting on a news article in *The Daily Beast* that reported that one of OAN's political reporters was "simultaneously writing for" and "on the payroll of the Kremlin's official propaganda outlet, Sputnik." *Id.* at 1045-46. In holding that Maddow's statement was not a literal factual assertion, the court examined the broadcast's context. Noting that Maddow "fairly described" the underlying article, and "added in her colorful

commentary and opinions," as "[v]iewers expect her to do," the court concluded that viewers would understand the statement as "Maddow's opinion and exaggeration of the *Daily Beast* article." *Id.* at 1050 (alteration omitted).

### 2. Words such as "steal" and "take" have a rich rhetorical tradition in our Nation as loose, figurative, hyperbolic speech.

Just like "extortion," "traitor," and "blackmail," the words "steal" and "take" have a rich rhetorical tradition in our Nation. As an initial matter, the word "steal" does not necessarily connote a "serious crime," or indeed any crime at all. The dictionary definition of "steal" (from the Oxford English Dictionary Online) that Favre cites in his brief (Favre Br. 17) illustrates the point: it makes no mention whatsoever of any unlawful conduct or the commission of a crime and instead explicitly refers "in a wider sense" to "tak[ing] away dishonestly."[11]

Consistent with that definition, words like "steal," "take," and synonyms such as "rob" are used in everyday language figuratively ("highway robbery" or "takes the cake")—in fact, more so than more narrowly-circumscribed words like "extortion" or "traitor." In the specific context here, "steal" and "take" broadly connote using, directing, or receiving money in ways the speaker believes to be

---

[11] Moreover, it seems unlikely that the average viewer of Sharpe's commentary consulted the Oxford English Dictionary while tuning in. Sharpe's viewers are likely more familiar with colloquial uses of the word steal (such as to steal a base or a heart) than with the Oxford English Dictionary's definitions.

26

wrong.[12] Indeed, in the District Court, Favre acknowledged that if Sharpe had accused a hypothetical athlete who signed a lucrative contract of "stealing" from the team, "no reasonable listener could believe that Sharpe was accusing the player of committing a crime." ROA.481. Favre's own admission that accusing someone of stealing can be rhetorical hyperbole "in some circumstances", ROA.481, proves the point: Context matters.

The figurative phrase "rob Peter to pay Paul" (which Sharpe also used in the challenged Broadcast) is also part of our popular lexicon. Dictionaries define "rob Peter to pay Paul" to mean "[t]o deprive one person in order to satisfy another," Chambers Dictionary (13th ed. 2016), or "take something away from one person to pay another, leaving the former at a disadvantage," New Oxford Am. Dictionary 1510 (3d ed. 2010).

Courts, the media, and public figures alike regularly use this phrase for rhetorical effect and not to accuse others of criminal conduct. *See, e.g.*, *Franks v. Bowman Transp*. Co., 424 U.S. 747, 781 (1976) (Burger, J., concurring) ("I cannot join in judicial approval of 'robbing Peter to pay Paul'"); *U.S. v. Kramer*, 768 F.3d 766, 772 (8th Cir. 2014) (prosecutor did not "insinuate violence (robbery)" during

---

[12] *See, e.g.*, Thomas A. Barry & Isaiah McKinney, *Stealing from the Poor and Giving to the Government?* CATO INSTITUTE (Apr. 26, 2023), https://www.cato.org/commentary/stealing-poor-giving-government; *This WSJ Reporter's Observation of Robin Hoods at the Wall Street Protests Crystallizes the Movement in 30-Seconds*, WALL ST. J. (Oct. 11, 2011) ("To steal from the rich to give to the poor is, at least in part, the goal that protesters hope to further …. ").

PD.44735853.1

closing statement by using phrase "Robbing Peter to pay Paul" because it "is a figure of speech that has no specific ties to violence"); *Metro Shouldn't Rob Peter to Pay Paul*, Wash. Post (Feb. 9, 2024); *One Month Until NFL Free Agency: Three Packers on Best Available List*, Sports Illustrated (Feb. 13, 2024) ("With NFL free agency set to officially begin in exactly one month, there will be no need for Green Bay Packers general manager Brian Gutekunst to rob Peter to pay Paul."). No reasonable reader would understand these statements to accuse their subjects of literal crimes, just as no reasonable listeners would understand Sharpe's statements in context as anything but idiomatic rhetoric.[13]

Given this rhetorical tradition, it is little wonder that courts in defamation cases have held that the word "steal" and its synonyms do not necessarily connote the crimes of theft or larceny and instead represent non-actionable hyperbole. *See, e.g.*, *Mattel*, 296 F.3d at 908 (terms "***bank robber***," "***heist***," "***crime***," and "***theft***" in connection with intellectual property dispute are non-actionable "rhetorical hyperbole"); *Nguyen v. Mai Vu*, 2018 WL 5622634, at *6 (D. Colo. Oct. 30, 2018), *report and recommendation adopted*, 2018 WL 6603955 (D. Colo. Nov. 15, 2018)

---

[13] The image of Robin Hood, taking from the rich to give to the poor, or "Robin Hood in Reverse," taking from the poor to give to the rich, are commonly invoked figuratively. *See, e.g.*, *Copeland v. Marshall*, 641 F.2d 880, 920 n.32 (D.C. Cir. 1980) (Wilkey, J., dissenting) ("This might be characterized as the Robin Hood approach, taking from rich Uncle Sam to benefit attorneys for the deserving poor."); CNBC, *'Robin Hood in Reverse': The History of a Phrase* (Aug. 7, 2012) (describing Nixon's 1971 "New Economic Policy" as "robbing the poor to pay the rich"). In context, similar accusations of "stealing" or "robbing" do not connote crimes, but rather outrage at conduct that advantages one group over another.

(use of "*'robbed'* or *'stole'* to describe the unlawful retention of funds" not defamatory in context of heated family dispute); *Art of Living Found. v. Does*, 2011 WL 2441898, at *7 (N.D. Cal. June 15, 2011) (in context, blog-post accusations that plaintiff "obtained money from participants on *false, deceitful declarations*" and statement that "if you ... want to *launder your black money* ... then AOL is for you" were rhetorical hyperbole).

Most recently, in *Su v. World Kuk Sool Ass'n*, a district court ruled that "statements implying that Su is a *'con man'* or a *'liar'* who *'steal[s] money from the unsuspecting'"* are "reasonably understood to be 'classic rhetorical hyperbole which cannot reasonably [be] interpreted as stating actual facts.'" 2023 WL 5498731, at *8 (N.D. Cal. Aug. 23, 2023). The court found the statements to be "simply too loose and figurative" to be understood as anything but opinion, and found the plaintiff's defamation claims insufficient as a matter of law. *Id.*

> **3.   The District Court correctly held that the First Amendment protects Sharpe's comments as rhetorical hyperbole and loose, figurative language.**

The District Court correctly recognized that Sharpe's statements fell within this rhetorical tradition and thus dismissed Favre's claim. Sharpe and his co-host were discussing the Mississippi welfare scandal and Favre's role in it, including the text messages revealed just the day before, in which Favre expressed concern about whether the media could find out where payments to him "came from and how

much." ROA.408 Favre's role in the scandal, including his acknowledged and undisputed receipt of TANF funds intended for Mississippi's poor, were the subject of extensive media coverage. The State had sued to recover TANF funds from Favre and others, and Favre has not challenged Sharpe's observation that Favre had not paid the State interest on the funds that he returned.

In that context, any reasonable viewer would understand Sharpe's comments that Favre would have to be "a sorry mofo to steal from the lowest of the low," "is taking from the underserved," and "stole money from people that really needed that money" as hyperbole expressing Sharpe's moral outrage that Favre received TANF funds intended to serve needy families in Mississippi. Sharpe and his co-host had already set the rhetorical scene, calling Favre "a sleazeball," "shady," "gross[]," and a "diva." ROA.413, 415-18. Any reasonable viewer would understand the statements that Favre "stole" or "took" to be exaggerated and figurative speech conveying Sharpe's indignation, not as standalone factual assertions conveying criminal activity.

The language used in the rest of the challenged broadcast buttresses the fact that Sharpe was deploying colorful and animated language not for literal truth or as legal proclamation, but figuratively and for heightened rhetorical effect. Sharpe expressly equated his accusation of "steal[ing]" with the figurative phrase "rob[bing] Peter to pay Paul"— a statement to which Favre does not object. *See* ROA.422 ("I'm

30

not trying to be philanthropic and try to show everybody I am while I steal from one – I rob Peter to pay Paul so people look at me, man, look at what Shannon Sharpe did."). In other words, he expressed his view that Favre had acted wrongly in receiving public funds that were intended for others. That Sharpe did so in emotional, figurative terms, adjacent to other emotional, figurative terms, does not strip his speech of First Amendment protection—it confirms it.

The District Court thus correctly held under *Milkovich* and its progeny that, when properly viewed in their "broad context," Sharpe's comments could not reasonably be construed in a literal sense. ROA.538. As the court explained: "Listeners would have recognized Sharpe's statements as rhetorical hyperbole— robust language used to express Sharpe's strong views about the new information that emerged about Favre's participation in the welfare scandal." ROA.538. Sharpe's comments about Favre's reported involvement in the welfare scheme, expressed in critical terms, during a spirited discussion on a cable sports debate show, are textbook examples of protected speech.

Thus understood, Sharpe's comments cannot be proven true or false and therefore cannot form the basis of a defamation claim. Whether Favre is a "sorry mofo," ROA.407, obviously is not provably true or false. So too, whether Favre's receipt of TANF funds intended for underserved Mississippi families amounts to

PD.44735853.1

figuratively "stealing from the poor" (and giving to the rich—and their alma maters) is a subjective view not subject to being proven true or false.

Sharpe's comments are precisely the kind of "uninhibited, robust, and wide-open" speech on matters of public concern that the First Amendment was designed to protect. *Milkovich*, 497 U.S. at 20 (quoting *Sullivan*, 376 U.S. at 270). Assertions that the rich are stealing from the poor, or vice versa, are an accepted example of vigorous debate on important issues. Sharpe's heated statements contributed to that discourse on a matter of tremendous importance to the State of Mississippi and the Nation.[14]

> **4.    The District Court did not mischaracterize or rewrite Sharpe's comments, as alleged by Favre, but rather applied constitutional principles to the exact statements Sharpe made.**

In an unusual attack, Favre accuses the District Court of "outright mischaracterization"—that is, of having "rewritten" the challenged comments and "substituted a rhetorical and hyperbolic statement" for Sharpe's actual statements. Favre Br. 3, 12, 17. ("In essence, the district court infused Sharpe's statements with a rhetorical and hyperbolic flourish of its own making." *Id.* at 12.) In particular,

---

[14] Favre notes that in his defamation suit against the Mississippi State Auditor, the Auditor's motion to dismiss Favre's claims was denied. Favre Br. 16. Different statements made by a different entity in a different context, and in a separate case with separate defenses, are irrelevant here. Indeed, Favre concedes the Auditor "never argued that his statements were rhetorical hyperbole." *Id.* A state auditor reporting on an official investigation would be expected to make provably factual statements as opposed to the co-host of a sports debate show on cable television.

Favre complains about a single statement in the District Court opinion that "no reasonable person listening to the Broadcast would think that Favre actually went into the homes of poor people and took their money." ROA.538. Plucking that phrase out of context, Favre accuses the District Court of misunderstanding Favre's claim. The District Court did no such thing.

Favre misleadingly focuses his argument on the first part of that sentence, but selectively omits in his argument the full sentence from the District Court opinion, which reads: "Here, no reasonable person listening to the Broadcast would think that Favre actually went into the homes of poor people and took their money—*that he committed the crime of theft/larceny against any particular poor person in Mississippi*." ROA.538 (emphasis added). The bold/italicized portion of the sentence is absent from the portions of Favre's brief accusing the District Court of mischaracterizing his claim. *See* Favre Br. 12, 17. As the full sentence shows, the District Court correctly understood Favre to be claiming that Sharpe accused Favre of crimes. *See* ROA.18, 22.

The District Court's formulation crystallizes why Favre's defamation claim cannot survive. Favre argued throughout his brief below that the statements at issue must be interpreted as *literal* accusations of criminal wrongdoing. The District Court did exactly that—in this sentence and others throughout its order—and considered whether a reasonable viewer could in fact have understood the statements about

33

"stealing" and "taking" to mean Favre committed an unlawful act of taking (*i.e.*, theft or larceny). In the context of the Broadcast, and referencing the ***actual*** comments made by Sharpe, the District Court properly held the comments could not be construed literally as making factual statements alleging the crimes of theft or larceny: "The reference to 'taking' and 'stole' figuratively refers to the diverting [of] funds from the TANF for purposes other than helping the underprivileged." ROA.538. Far from "rewriting" Favre's allegations, the District Court accepted them as true and explained why, even under Favre's own framework, they are non-actionable as a matter of law.

Moreover, throughout the opinion, the District Court correctly framed the question as whether Sharpe figuratively characterized Favre's receipt of welfare funds intended for the poor as "stealing" or whether, on the other hand, Sharpe said that Favre committed a crime, such as theft or larceny, by literally stealing from poor people. And the Court further explained that "the fact that viewers were told Favre was not charged with a crime" "forecloses Favre's claim that a reasonable viewer would have thought Sharpe was actually accusing him of committing 'larceny.'" ROA.539.

34

**B.    The Tenor and Context of Sharpe's Comments Support the District Court's Conclusion that the First Amendment protects Such Comments as Rhetorical Hyperbole and Loose, Figurative Language.**

The District Court correctly held that, in addition to the specific lexical setting of Sharpe's words that signal figurative usage, the broader context of Sharpe's statements on a cable television sports debate show reinforced that his statements are non-actionable hyperbole. "Context is critical because 'it is in part the settings of the speech in question that makes their … nature apparent, and which helps determine the way in which the intended audience will receive them.'" *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir. 2013). Context includes "the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." *Knievel v. ESPN*, 393 F.3d 1068, 1077 (9th Cir. 2005); *see also Gales v. CBS Broad., Inc.*, 2004 WL 1961680, at *5 (S.D. Miss. July 9, 2004) (alleged "defamatory communications of television media defendants … are considered in the context of the entire broadcasted news report"); *Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) ("said-to-be-offending words must be set in the context of the entire utterance. Their complexion draws color from the whole"); *Sacchetti v. Optiv Security, Inc.*, 2019 WL 5390611, at *8 (E.D. Tex. July 8, 2019) ("A court must assess the full context of the allegedly defamatory statement in order to determine if it may be the basis for a defamation claim.").

PD.44735853.1

The District Court properly placed Sharpe's rhetorical hyperbole and "robust language" in appropriate perspective and context of the Broadcast's format. The District Court found that any reasonable viewer would know that "*Undisputed* is not a news outlet where viewers expect genuine initial reporting of events" but is instead "a debate format sports entertainment talk show with lively, pointed banter . . ." ROA.538-539 (citing *Washington v. Smith*, 80 F.3d 555, 557 (D.C. Cir. 1996) (sports "columnists frequently offer intemperate denunciations of coaches' play-calling or strategy, and readers know this and presumably take such railings with a grain of salt"). Sharpe and his co-host's banter was indeed "lively" and "pointed." In addition to Sharpe's statement calling Favre a "sorry mofo," Sharpe and his co-host called Favre "a sleazeball," "shady," "gross[]," and a "diva," and accused him of holding the Green Bay Packers "hostage" and getting away with "near murder on the football field." ROA.413, ROA.415-418.

The broader context of the Broadcast confirms that Sharpe used loose, figurative, and hyperbolic language to express his subjective views. The moderator introduced the Broadcast by summarizing the *Mississippi Today* article published the day before, and then asked Sharpe to comment. ROA.406. In other words, the moderator provided the relevant facts and then asked Sharpe to express his views on those facts. After Sharpe and his co-host made their comments, the moderator closed the Broadcast with the undisputed fact that the FBI had questioned Favre. ROA.426.

36

Consistent with the District Court decision, other courts similarly have recognized that sports-related programs are known forums for loose, colorful language and exaggeration. *See Gardner v. Martino*, 563 F.3d 981 (9th Cir. 2009) (talk show with drama, hyperbolic language, opinionated arrogant hosts, and heated controversy reduces audience's expectation of learning an objective fact); *Brooks v. Paige*, 773 P.2d 1098, 1101 (Colo. Ct. App. 1988) (comments made in context of "live television broadcast of a local sports talk show" with a "sports-minded audience" were "not deliberate or reckless falsehoods, but merely rhetorical hyperbole"), *cert. denied* (Colo. 1989). "Some types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion" or fiction, "not fact." *Khodorkovskaya*, 5 F.4th at 85. Sports-related talk shows filled with emotional, hyperbolic, give-and-take banter between co-hosts is one such type of speech, as a review of the full transcript or Broadcast confirms.

Most recently, in *Rapaport v. Barstool Sports, Inc.*, 2024 WL 88636 (2d Cir. Jan. 9, 2024), the Second Circuit upheld the dismissal of a defamation claim by actor Michael Rapaport against the sports media company, Barstool. What began as a business dispute evolved into a "hostile, vulgar and hyperbolic" internet-based feud, which included statements by Barstool personalities that: (1) Rapaport is a racist and a fraud, (2) that he stalked and physically abused his ex-girlfriend, and (3) that he has herpes. *Id.* at *1. In affirming the dismissal, the Second Circuit agreed with the

district court's analysis that the statements' context and the forum in which they were made rendered them non-actionable. As the Second Circuit explained, "the statements were largely laden with epithets, vulgarities, hyperbole, and non-literal language and imagery," were "delivered in the midst of a public and very acrimonious dispute," and were "published on … platforms where audiences reasonably anticipate hearing opinionated statements." *Id*. at *3. Here, Sharpe's statements were similarly laden with hyperbole, were made in the midst of a heavily reported public corruption scandal involving Favre, and were made on a platform in which viewers expect to hear opinionated comments.

### C.    The Serious Tone of the Broadcast Underscores that Sharpe's Comments are Within the Realm of Rhetorical Hyperbole.

On appeal, Favre argues that the District Court erred in its assessment of the Broadcast's broader context. In particular, Favre claims that Sharpe could not have engaged in rhetorical hyperbole because the "tone, demeanor, and language were serious" in the segment about Favre and because, after the Favre segment, the show's moderator turned to a more "light-hearted" topic. Favre Br. 20; *see also* ROA.427. But the notion that rhetorical hyperbole can somehow only exist in a jocular, jovial, or humorous setting is baseless and unsupported by any cited authority. Serious tones and topics are commonplace in rhetorical hyperbole cases.

For example, in *Horsley v. Rivera*, the Eleventh Circuit held that television host Geraldo Rivera's statement, during an interview with an anti-abortion activist

plaintiff, that the plaintiff was an "accomplice to murder" was non-actionable rhetorical hyperbole. 292 F.3d at 702. The interview concerned the murder of a physician who performed abortions. The Eleventh Circuit observed: "The fact that the parties were engaged in an emotional debate on a highly sensitive topic weighs in favor of the conclusion that a reasonable viewer would infer that Rivera's statement was more an expression of outrage than an accusation of fact." *Id.* Likewise, Sharpe's moral outrage over the misuse of welfare funds is no less an expression of rhetorical hyperbole because his tone was serious rather than jocular.

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995), provides another example of a less than "light-hearted" rhetorical hyperbole. In *Lane*, the court held that the First Amendment protected as rhetorical hyperbole an advertising promotion of conspiracy theories about the Kennedy assassination that included the phrase "guilty of misleading the American public" next to the plaintiff's picture. *Id.* at 151-52; *see also Greenbelt*, 398 U.S. at 13-14 (accusation of blackmail during a heated city council debate); *Letter Carriers*, 418 U.S. at 284-286 (describing a union "scab" as a "traitor" amid contentious union dispute).

No authority requires that hyperbole be limited to jokes or frivolous topics rather than serious ones. The First Amendment protects debate of all tones on issues of public importance. *Milkovich*, 497 U.S. at 20. With these authorities and similar caselaw in mind, the District Court properly recognized that in the context of the

unfolding welfare scandal, including Favre's receipt of TANF funds, and his texts soliciting money from a non-profit that distributed welfare funds, Sharpe's passionate comments were constitutionally protected hyperbole. ROA.537-538.

### D.   Cases Cited by Favre Do Not Support His Position.

Finally, Favre's efforts to muster supporting caselaw are unavailing. Favre relies heavily on, but misreads, *Milkovich*, 497 U.S. 1, and *Fiber Systems, Int'l, Inc. v. Roehrs*, 470 F.3d 1150 (5th Cir. 2006). In both cases, the speaker's statements suggested they had access to information not accessible to others. Because the statements were based on the speakers' asserted *personal* knowledge, they would "reasonably [be] interpreted as stating actual facts about an individual." *Milkovich*, 497 U.S. at 20; *see also Phantom Touring, Inc*, 953 F.2d at 731 (barring suit where nothing in challenged articles indicated that the author "had more information" about the defamatory allegations "than was reported in the articles" and readers implicitly were invited to draw their own conclusions).

In *Milkovich*, a newspaper column charged that a high school wrestling coach had lied about his behavior regarding a brawl at a meet. The column's author informed his readers that he was in "a unique position" to know that the coach had lied because he had personally observed the relevant events, both as a spectator at the meet, and as an eyewitness to the coach's allegedly contradictory testimony to a state athletic association. 497 U.S. at 4-5. The Supreme Court concluded that the

clear import of the article was "that [Milkovich] 'lied at the hearing after having given his solemn oath to tell the truth,'" and held that "[t]his is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression." *Id.* at 21.

Contrary to Favre's assertions, *Milkovich* does ***not*** require reversal, but rather mandates affirmance of the District Court's ruling. Unlike in *Milkovich*, where the article's author based his comments on his professed eyewitness status, Sharpe did not possess or claim to possess any personal or "unique" knowledge or to have done any original reporting of his own—he was simply providing his take on the reporting in the *Mississippi Today* article.

*Fiber Systems* involved former officers of a defense contractor suing their former company, a competitor, over statements accusing them of being thieves and stealing intellectual property. 470 F.3d at 1154-55. The company chairman and another employee, both speaking on behalf of the company, explicitly stated as fact to their customers/vendors that the former officers were "thieves or have stolen property." *Id.* at 1161-62. Additional contextual evidence of the extremely literal nature of the company's accusations included: (1) the filing of a police report alleging computer theft by the former company officers, and (2) the company's lawyers and chairman sending correspondence to a U.S. Military installation stating

that the former officers had "misappropriated and stole[ ]" trade secrets, and that trade secrets were "unlawfully distributed" by the officers' new company to the installation. *Id.* at 1155, 1165, 1168.

This Court recognized that "a false allegation of theft could be made in a context that renders it nondefamatory," an inquiry that would turn on the "surrounding circumstances." *Id.* at 1163 (quotation omitted). But the Court concluded that, ***on the facts of that case***, the statements to customers/vendors constituted ***literal*** accusations of misappropriation of the company's intellectual property. *Id.* at 1164. The surrounding circumstances, discussed above, did not "reveal anything from which a person of ordinary intelligence would derive a noncriminal implication." *Id.* at 1164 & n.12. Even Favre admits that, in *Fiber Systems*, the Court held that the "surrounding circumstances" can present factors that alter the meaning of allegations of theft and that the "context" of the statements in that case showed the accusation of theft was literal. Favre Br. 11, 16.

In contrast to *Fiber Systems*, where company officials' factual assertions of trade secret theft were made in the context of corroborating formal criminal charges and official reporting to the U.S. Military, here Sharpe's comments were based on an article in *Mississippi Today* published the day before the Broadcast and in the setting of a sports commentary program. The article reported on the unfolding facts about Favre's involvement in the welfare scandal and the court filings in the State's

civil lawsuit against Favre, which the Broadcast's moderator summarized at the start of the program. ROA.381-393. Unlike in *Milkovich*, Sharpe did not profess any direct, personal knowledge about Favre's role in the welfare scandal—he was simply providing his view on the reporting in the *Mississippi Today* article. That Sharpe did not know (and did not purport to know) firsthand what Favre did underscores the fact that viewers of the Broadcast would not have understood Sharpe to be literally accusing Favre of theft. *See Moldea v. New York Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) ("Because the reader understands that [the challenged statement] represent[s] the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." (citation and internal quotation marks omitted)).

The remaining cases cited by Favre are equally unhelpful to him. In *Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990), an on-air statement by the late *60 Minutes* commentator Andy Rooney that the auto windshield treatment Rain-X that "didn't work," was based on Rooney's ***firsthand self-professed personal use*** of the product. *Id.* at 1051. As in *Milkovich*, the Ninth Circuit held that "a factfinder could conclude that Rooney's statement that Rain-X "didn't work" implied an assertion of "objective fact," *id.*, in marked contrast to Sharpe's commentary on a newspaper

article he did not write and about which he possessed no more information than any other member of the public who read the article.

Favre's reliance on *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997), is similarly misguided. In that case, the manager of a Wal-Mart store made a statement to a reporter that a local store, Levinsky's, was "trashy" and that when a person called Levinsky's, "you are sometimes put on hold for 20 minutes – or the phone is never picked up at all." *Id.* at 126. The First Circuit held that the word "trashy" "belongs squarely in the category of protected opinion*.*" *Id.* at 130. In contrast, the First Circuit held the specificity of the statement from a business competitor about customers getting put on hold removed the protection of rhetorical hyperbole: "we believe that a reasonable listener could interpret the '20 minutes' comment as a statement of fact about Levinsky's business practices."[15] *Id.* at 131. Here, Sharpe made no such fact-specific reference that suggested personal knowledge of undisclosed facts; the Broadcast and Sharpe's comments made clear he was commenting on a newspaper article.[16]

---

[15] Favre also cites *Levinsky's* for the proposition that a court should resist the temptation to replace or distort what was actually stated with a more innocuous alternative. Favre Br. 17-18. In *Levinsky's*, however, the First Circuit held that an extremely time-specific factual comment was not rhetorical hyperbole, unlike here where the District Court clearly addressed and properly analyzed each *verbatim* statement in the Broadcast.

[16] Favre's reliance on this Court's ruling in *Baker v. Putnal* 75 F.3d 190, 196 (5th Cir. 1996), is even more peculiar. *Putnal* is not even a defamation case, but rather a Section 1983 case involving a police shooting, where reversal was based on the district court erroneously adopting the

## II.     The Court May Affirm the Judgment on Alternative Grounds.

This Court may affirm the judgment below solely on the basis that the challenged statements are non-actionable rhetorical hyperbole. But additional grounds exist to dismiss Favre's complaint, including that: (A) Sharpe's comments are protected opinions based on disclosed factual premises, and (B) Sharpe's statements are protected reports of official proceedings. While the District Court did not reach these bases for dismissal in light of its ruling on rhetorical hyperbole, this Court has discretion to affirm the judgment below "on any basis supported by the record." *Ferrer*, 484 F.3d at 780-81. Because courts are compelled in First Amendment cases to "make an independent examination" so as not to "intru[de]" upon "free expression," *Bose*, 466 U.S. at 499, review of the First Amendment issues is the "broadest possible under the law." *Firestone v. Time, Inc.*, 460 F.2d 712, 718–19 (5th Cir. 1972). If the Court chooses to exercise its discretion to consider those alternative arguments, the judgment below should be affirmed for those reasons as well.

---

defendants' facts over the plaintiffs' contradictory narrative, which clearly the District Court here did not do.

### A. Sharpe's Comments are Protected Opinions Based on Disclosed Factual Premises.

The judgment below should be affirmed because the challenged statements reflect Sharpe's opinions on publicly disclosed and widely reported facts about Favre's role in the welfare fraud scandal.

It is well-established that statements of opinion are actionable in defamation "***only if*** they clearly and unmistakably imply the allegation of ***undisclosed*** false and defamatory facts as the basis for the opinion." *Ferguson v. Watkins*, 448 So. 2d 271, 275-76 (Miss. 1984) (emphasis added); *accord Chamblee v. Miss. Farm Bureau Fed'n*, 551 F. App'x 757, 761 (5th Cir. 2014) (affirming dismissal of defamation claim under Mississippi law). Where, as here, the underlying factual basis of an allegedly defamatory opinion is disclosed, even "contemptuous language" and "unfair" criticism regarding the reported facts cannot be defamatory. *Ferguson*, 448 So. 2d at 273.

In addition, the "fair comment privilege" of Mississippi defamation law has historically provided broad protection for editorial commentary such as Sharpe's when the underlying factual basis of the speaker's opinions pertains to public affairs. *See Edmonds v. Delta Democrat Pub. Co.*, 93 So. 2d 171, 173–74 (Miss. 1957) (citation omitted) (editorial "was fair comment because it gave to the reader the factual basis for the critical comments, . . . the criticism was in the form of opinions

46

of the editorial writer; and it related to a matter in which the public had a valid and lively interest.").

These principles require dismissal of Favre's complaint. It is undisputed that Mississippi's welfare fraud scandal, and Favre's involvement in the scandal, are matters of great public concern. These topics were already the subject of widespread media coverage and original reporting by the time the Sharpe offered his commentary on the previously reported facts. ROA.350-359, ROA.360-362, ROA.363-370.

Moreover, the Broadcast "clearly and unmistakably" informed viewers of the reported factual basis for Favre's involvement in the welfare scandal by opening the Broadcast with an explicit reference to the *Mississippi Today* article. *Mann v. City of Tupelo,* 1995 WL 1945433, at *12 (N.D. Miss. Apr. 13, 1995); *see also* ROA.403, ROA.406. Sharpe then expressed his views on those reported facts and set forth the underlying factual bases supporting those opinions, which included Favre's own text messages asking whether the media could find out where the public monies he was paid "came from and how much," media reports about the State's civil lawsuit against Favre alleging that he had not paid the interest on the welfare money Favre reimbursed the State allegedly to give speeches Favre did not give, Favre's biographer's public criticisms of Favre over the welfare scandal, and additional

PD.44735853.1

reporting by news outlets such as Yahoo Sports that the FBI had questioned Favre.
ROA.403, ROA.408, ROA.411-412, ROA.417-420, ROA.421, ROA.426.

Favre does not dispute the disclosed factual basis for Sharpe's commentary
but argues that the challenged comments are nonetheless actionable because "Sharpe
made statements of fact, not opinions." Favre Br. 23. Once again, this argument
ignores the full context in which Sharpe's statements about Favre being a "sorry
mofo" and "stealing" and "taking" appeared, for all the reasons discussed in Part I.
At no point did Sharpe claim to possess facts unknown to viewers about Favre's
conduct—nor would reasonable viewers have thought he did.

Favre also quibbles with the precise words used to summarize the facts
underlying Sharpe's opinions, and with various alleged "inaccuracies" and
"omissions" in the Broadcast's characterizations of the facts. Favre Br. 24-25. As an
initial matter, Favre has not previously claimed any of these additional statements as
false or defamatory. He cannot now enlarge (or salvage) his defective complaint by
identifying supposed inaccuracies in the Broadcast that he never mentioned in his
complaint. *See Nunes v. Lizza*, 12 F.4th 890, 896 (8th Cir. 2021) ("But Nunes failed
to identify that statement as allegedly defamatory in his complaint, and we decline
to consider the issue for the first time on appeal."); *Michel v. NYP Holdings, Inc.*,
816 F.3d 686, 705–06 (11th Cir. 2016) ("Michel cannot now use his briefing to add
new [defamation] allegations and argue that those new assertions support his cause

of action."); *Sterling Fin. Inv. Grp., Inc. v. Hammer*, 393 F.3d 1223, 1226 (11th Cir.2004) ("The law in our circuit is clear that arguments not presented in the district court will not be considered for the first time on appeal.").

In any event, Favre's self-serving assertions and defenses related to his role in the welfare scandal are misdirected. None of these supposed inaccuracies would transform Sharpe's protected statements of opinion into actionable defamation. These include Sharpe's initial observation that Favre had not repaid the $1.1 million to the State (which his co-host immediately corrected, R.412, leaving no possible confusion for viewers); and Bayless's reference to the fact that Favre received $1.1 million for "giving no speeches" (a statement that Favre acknowledges was based directly on allegations from the State's civil lawsuit). Favre Br. 24-25.

None of the alleged inaccuracies in the Broadcast change the legal conclusion that Sharpe's heated characterizations of Favre's conduct as "stealing" or "taking" were his subjective opinions about Favre's securing welfare funds intended for needy families. *See Rapaport*, 2024 WL 88636, at *4 ("[T]he district court correctly concluded that '[a] reasonable viewer would understand Portnoy's comments to be conveying his (erroneous) understanding of the charges described in the article that was simultaneously presented to the audience, and thus the comments are protected opinions.'") (quoting *Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240, at *18 (S.D.N.Y. Mar. 29, 2021)).

Finally, Favre argues that Sharpe did not provide copious additional details about the particulars of the welfare fraud scandal and that Favre had denied knowing the funds he received were welfare funds.[17] But that is not what the law requires. Instead, a speaker must only state the factual premises on which the opinion is based which may, as here, include a synopsis of a developing matter of public concern. Under Favre's skewed notion of defamation law, citizens could not comment on the role of a public figure such as Favre in a massive public scandal without presenting an exhaustive review of every detail of a multi-year investigation—an unworkable premise in the world of public commentary. No law supports Favre's extraordinary assertion that a documentary's worth of background must be provided before protected on-air opinions are expressed. *See generally Ferguson*, 448 So. 2d 271.[18]

As the Mississippi Supreme Court explained in *Blake v. Gannett Co.*, no claim for defamation will lie where the facts "in th[e] article leave, to the reader, the role of accepting or rejecting the appellees' opinion." 529 So. 2d 595, 605 (Miss. 1988). Here, the Broadcast provided viewers with the information needed for them to decide whether or not to accept Sharpe's opinions about Favre's widely reported role

---

[17] In fact, Sharpe did acknowledge Favre's assertion that "he didn't know" the source of the funds he was receiving. R.408.

[18] Favre misleadingly cites *Blake v. Gannett Co.* as support for the untenable proposition that speakers must supply comprehensively complete facts before giving their opinion. Favre Br. 24. *Blake* says nothing of the sort and does not require any particular quantification of factual disclosure.

in the welfare fraud scandal. The First Amendment and Mississippi law require nothing more.

**B.      Sharpe's Comments are Privileged Reports of Official Proceedings.**

Sharpe's comments are entitled to further protection under state law—and are thus non-actionable—because the disclosed factual basis for Sharpe's comments was drawn from official proceedings. Under Mississippi law, statements concerning official proceedings are shielded from defamation liability so long as, "when considered in context, it is clear that the [challenged statements are] quoting, paraphrasing or otherwise drawing upon official documents or proceedings." *Pittman v. Gannett River States Pub. Corp.,* 836 F. Supp. 377, 384-85 (S.D. Miss. 1993).

Whether the official proceedings privilege applies to a particular publication is a matter for the court to decide. *See McDonald v. Raycom TV Broad., Inc.*, 665 F. Supp. 3d 688, 690 (S.D. Miss. 2009) (citing *Pittman,* 836 F. Supp. at 382). That Sharpe's comments were "drawing upon official documents or proceedings" is clear from the face of the Broadcast. The Broadcast "clearly and unmistakably" disclosed the underlying factual basis supporting Sharpe's comments, which included other news outlets' primary reporting about court filings in the State's lawsuit against Favre, as well as direct references to official proceedings. *Mann*, 1995 WL 1945433, at *12; *see also* ROA.403, ROA.406, ROA.408, ROA.411, ROA.417-419,

ROA.426. Indeed, Favre acknowledges that certain statements in the Broadcast, which he now claims were inaccurate, were drawn directly from pleadings in the State's civil lawsuit. Favre Br. 25 (Bayless's statement that Favre received $1.1 million "for giving no speeches" was a "reference to [an] allegation in the MDHS litigation").

At the time of Sharpe's comments, the State's Complaint alleged that Favre received over $1 million in diverted welfare funds for speeches that he allegedly never made and participated in other improper use of TANF funds. ROA.219-220. The State's original Complaint also included allegations of Favre's involvement in the transfer of TANF funds to a biotechnology corporation in which Favre was the largest outside investor and holder of corporate stock, and the State's efforts to recover those funds. ROA.210-215. There is no dispute that these "official documents" from the State's litigation reflect public officials accusing Favre of receiving welfare funds that were intended for poor people. Other documents entered into the record during the State's lawsuit, including the text messages featured in the *Mississippi Today* article, indicated that Favre was involved in the diversion of other welfare funds toward the construction of USM's new volleyball facility. ROA 381-93. The District Court observed that "from the reports in the public arena after government investigations, forensic audits, civil litigation, Favre's text messages, and Favre's own implicit admission by returning $1.1 million to the State, it appears

to be widely believed that the money obtained by Favre for himself and USM came from welfare funds." ROA.537.

Sharpe's vigorous comments that Favre was "steal[ing]" or "taking" from the needy families of Mississippi explicitly drew upon these widely publicized findings and allegations by the State.  ROA.219-220, ROA.267-274. Favre's argument that he received TANF funds that other people allegedly stole (Favre Br. 26) may be a potential defense in his litigation with the State of Mississippi, but it does not change the fact that Sharpe's "fair abridgment" of the State proceedings render his statements non-actionable here.

Favre further contends that Sharpe's comments are not protected because the Broadcast did not detail every fact that could be perceived as favorable to Favre and because he has not been charged with a crime. Favre Br. 26. But *Pittman* makes clear that it "is not necessary that [a media report] be exact in every immaterial detail," and that "a denial is only a small factor in determining whether the entire article is fair." 836 F. Supp. at 383, 385 n. 13. And once again, the Broadcast explicitly informed viewers that Favre had not been criminally charged and that Favre claimed "he didn't know" the diverted funds were welfare funds. ROA.420; 408.

Favre's argument boils down to an assertion that unless he is formally charged with a crime, no one has the right to debate or discuss Favre's role in Mississippi's welfare scandal.  That position is anathema to the First Amendment and Mississippi

defamation law. The law protects Sharpe's right to comment on the State proceedings and investigations into the misspent welfare funds while they are ongoing, even though not all the evidence has come out and the ultimate disposition is unknown.

## CONCLUSION

The District Court correctly held that Sharpe's commentary on his live, sports entertainment talk show was rhetorical hyperbole, and could not be reasonably understood as an accusation that Favre committed the crimes of theft or larceny. Moreover, Sharpe's spirited commentary and personal indignation was based on disclosed facts about a highly reported scandal and matters found in the public record. Mississippi's public welfare scandal is exactly the type of public issue that warrants constitutionally protected debate that is "uninhibited, robust, and wide-open" and not subject to efforts to stifle such public discourse.

For the foregoing reasons, the District Court's dismissal with prejudice should be affirmed.

Dated: March 13, 2024.

Respectfully submitted,

BY:  /s/ D. Michael Hurst, Jr.

       D. Michael Hurst, Jr., MS Bar No. 99990
       James W. Shelson, MS Bar No. 9693
       Mark Fijman, MS Bar No. 99153
       **PHELPS DUNBAR LLP**
       4270 I-55 North
       Jackson, Mississippi 39211
       Telephone: 601 352 2300
       Email:mike.hurst@phelps.com
           jim.shelson@phelps.com
           mark.fijman@phelps.com


       Mary Ellen Roy, T.A., LA Bar No. 14388
       **PHELPS DUNBAR LLP**
       365 Canal Street, Suite 200
       New Orleans, Louisiana 70130-6534
       Telephone: 504 566 1311
       Email: maryellen.roy@phelps.com

       Joseph M. Terry, D.C. Bar No. 473095
       Amy M. Saharia, D.C. Bar No. 918644
       Tyler Infinger, D.C. Bar. No. 90002621
       Jacob Burnett, D.C. Bar. No. 90015420
       **WILLIAMS & CONNOLLY LLP**
       680 Maine Avenue SW
       Washington, D.C. 20024
       Telephone: 202 434 5000
       Email: jterry@wc.com

       **ATTORNEYS FOR APPELLEE**
       **SHANNON SHARPE**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was filed on this 13th day of March, 2024 with the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

Respectfully submitted,

BY:  /s/ D. Michael Hurst, Jr.

D. Michael Hurst, Jr., MS Bar No. 99990
James W. Shelson, MS Bar No. 9693
Mark Fijman, MS Bar No. 99153
**PHELPS DUNBAR LLP**
4270 I-55 North
Jackson, Mississippi 39211
Telephone: 601 352 2300
Email:mike.hurst@phelps.com
     jim.shelson@phelps.com
     mark.fijman@phelps.com

Mary Ellen Roy, T.A., LA Bar No. 14388
**PHELPS DUNBAR LLP**
365 Canal Street, Suite 200
New Orleans, Louisiana 70130-6534
Telephone: 504 566 1311
Email: maryellen.roy@phelps.com

Joseph M. Terry, D.C. Bar No. 473095
Amy M. Saharia, D.C. Bar No. 918644
Tyler Infinger, D.C. Bar. No. 90002621
Jacob Burnett, D.C. Bar. No. 90015420
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, D.C. 20024

PD.44735853.1

Telephone: 202 434 5000
Email: jterry@wc.com

**ATTORNEYS FOR APPELLEE**
**SHANNON SHARPE**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 12,990 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced typeface, including serifs, using Word, in Times New Roman 14-point font, except for the footnotes, which are in proportionally-spaced typeface, including serifs, using Word in Times New Roman 12-point font.

BY:    /s/ D. Michael Hurst, Jr.
D. Michael Hurst, Jr.
James W. Shelson
Mark Fijman
Mary Ellen Roy
Joseph M. Terry

**ATTORNEYS FOR APPELLEE, SHANNON SHARPE**

Dated: March 13, 2024.

58