# KASOWITZ BENSON TORRES LLP

AMIT R. VORA
DIRECT DIAL: (212) 506-1834
DIRECT FAX: (212) 500-3454
AVora@kasowitz.com

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

July 14, 2024

**VIA CM/ECF**

Mr. Lyle W. Cayce
Clerk of the Court
U.S. Court of Appeal for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

> **Re:** ***Favre v. Sharpe***, **No. 23-60610**
> **Letter Pursuant to Fed. R. App. P. 28(j) and 5th Cir. R. 28.4**

Dear Mr. Cayce:

Favre writes to notify the panel of *Amin v. NBCUniversal Media LLC*, 2024 WL 3188768 (S.D. Ga. June 26, 2024), which bears on points raised at oral argument. There, defendant-NBC published statements that "everyone" treated by the plaintiff-gynecologist at a detention facility had "received a hysterectomy," and that he was a "uterus collector." Although the statements were laden with "emotion[]," the court held that they were not non-actionable "rhetorical hyperbole": they were "capable of being proved false," and the plaintiff could (and did) "prove that he did not collect uteri," prevailing on falsity at summary judgment. *Id.* at *17-18.

Here, too, Sharpe's statements that Favre stole funds are capable of being proved false. Sharpe's response that he was figuratively referring to Favre's unlawfully diverting and receiving funds is unavailing because that conduct, too, can be stealing, which does not require asportation or force. ROA.381 (*Mississippi Today* employing *steal* literally, not figuratively: "officials," not Favre, "***stole*** millions in welfare funds") (emphasis added); Doc. 48 at 4 (*steal* means *misappropriate*). Even if stealing is distinct, Sharpe did not accuse Favre of diverting and passively receiving funds; he repeatedly accused Favre of stealing, taking, and refusing to return funds. Ultimately, Favre could and would prove that he did not steal funds and, like Amin, prevail on falsity. He has not unlawfully diverted and received funds; he has not stolen funds. Doc. 48 at 24.

Equally unavailing is Sharpe's response that he was opining on disclosed facts. Even if they are opinions (they are not), Sharpe's statements, like NBC's, are actionable because the disclosure's inadequacy "implies a knowledge of facts which [led] to the conclusion" that Favre stole. *Amin*, 2024 WL 3188768, at *18 (citing *Milkovich*); Restatement (Second) of Torts § 566 (1977) cmt. c (inadequate disclosure "***therefore implies*** … undisclosed facts on which the opinion

# Kasowitz Benson Torres llp

Mr. Lyle W. Cayce
July 14, 2024
Page 2

is based," rendering it actionable, reconciling *Ferguson*) (emphasis added); Doc. 48 at 21-22. In any event, "[a]ny charge of specific misconduct … should be treated as a statement of fact," regardless of disclosure. *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 67 (2d Cir. 1980) (citation omitted).

Respectfully submitted,

*/s/ Amit R. Vora*

Amit R. Vora

Cc: All counsel of record

2024 WL 3188768
Only the Westlaw citation is currently available.
United States District Court, S.D.
Georgia, Waycross Division.

Dr. Mahendra AMIN, M.D., Plaintiff,

v.

NBCUNIVERSAL MEDIA, LLC, Defendant.

5:21-CV-56
|
Signed June 26, 2024

**Attorneys and Law Firms**

Scott Robert Grubman, Chilivis Grubman, LLP, Atlanta, GA;
Stacey Godfrey Evans, Tiffany N. Watkins, John Amble
Johnson, Stacey Evans Law, Atlanta, GA, for Plaintiff.

Amanda B. Levine, Pro Hac Vice, Elizabeth A. McNamara,
Pro Hac Vice, Leena Charlton, Pro Hac Vice, Davis Wright
Tremaine LLP, New York, NY, Eric Bierbauer, Pro Hac Vice,
Taylor M. Carter, Pro Hac Vice, NBCUniversal Media, LLC,
New York, NY, Benjamin H. Brewton, Balch & Bingham,
LLP, Augusta, GA, Cynthia L. Counts, Fisher Broyles LLP,
Atlanta, GA, Jena Lombard, Balch & Bingham, LLP, Atlanta,
GA, Robert Bates Lovett, Fisher Broyles, LLP, Savannah,
GA, for Defendant.

## ORDER

LISA GODBEY WOOD, JUDGE

**\*1** Before the Court are cross motions for summary
judgment filed by Plaintiff Dr. Mahendra Amin, dkt. no. 122,
and Defendant NBCUniversal Media, LLC ("NBC"), dkt.
no. 127. The motions have been thoroughly briefed and are
ripe for review. Dkt. Nos. 122, 127, 153, 155, 176, 181,
196, and 197. For the reasons stated below, both motions are
**GRANTED in part** and **DENIED in part**.

## BACKGROUND

NBC published multiple reports about allegations
that Plaintiff, Dr. Mahendra Amin, performed mass
hysterectomies on female detainees at an Immigration and
Customs Enforcement ("ICE") facility in Georgia. NBC
reported allegations that Dr. Amin performed hysterectomies
that were unnecessary, unauthorized, or even botched. Dr.
Amin then brought this case, asserting that NBC defamed him
under Georgia law.

## I. Plaintiff Treated Detained Women at an ICE Detention Facility.

Plaintiff is an obstetrician gynecologist. Dkt. No. 153-50 ¶
3. As part of his practice, Plaintiff provided medical care
to women detained by ICE at the Irwin County Detention
Center ("ICDC" or the "facility"). Dkt. No. 156-1 ¶ 1. Plaintiff
treated women at the facility for around three-and-one-half
years. Id. Plaintiff provided a range of gynecological services,
including hysterectomies. Id. ¶¶ 1–2. Yet, Plaintiff performed
only two hysterectomies on women detained at the facility.
Id. ¶ 2.

Before Plaintiff could perform a procedure on a detainee,
ICE had to approve the procedure. Id. ¶ 10. While the
parties disagree over whether ICE properly approved the two
hysterectomies performed by Plaintiff, they agree that the
medical records for both hysterectomy patients show ICE
authorization. Id. ¶¶ 29, 32. The two hysterectomy patients
also signed informed consent forms for their procedures. Id.
¶¶ 30, 33. NBC, however, disputes that these women provided
their informed consent. Id.

## II. Plaintiff was Implicated in a Whistleblower Letter Complaining of Conditions at the Facility.

On September 14, 2020, Project South, an advocacy
organization, released a letter titled: "Re: Lack of Medical
Care, Unsafe Work Practices, and Absence of Adequate
Protection Against COVID-19 for Detained Immigrants and
Employees Alike at the Irwin County Detention Center."
Dkt. No. 136-2. This letter was addressed to the Inspector
General of the Department of Homeland Security ("DHS"),
the Officer for Civil Rights and Civil Liberties at DHS, the
Acting Director of the Atlanta ICE Field Office, and the
Warden of the ICDC. Id. at 2. Project South also released this
whistleblower letter to the media. Dkt. No. 156-1 ¶ 35.

The whistleblower featured in the letter was a former
nurse at the facility named Dawn Wooten. Dkt. No. 136-2.
Wooten served as the main source of information for the
letter. Id. Most of the whistleblower letter discusses a lack
of COVID-19 precautions at the ICDC. Dkt. No. 136-2.
Relevant here, the letter also "raise[d] red flags regarding the
rate at which hysterectomies [were] performed on immigrant

women under ICE custody at ICDC." Id. at 3. Citing unnamed
detained women and Wooten, the letter contained shocking
allegations about "high rates of hysterectomies done to
immigrant women." Id. at 19. The letter stated that the facility
sent "many women to see a particular gynecologist outside
the facility." Id. The letter did not name Dr. Amin.

**\*2** Regarding the improper treatment allegations, the letter
mentioned that "a detained immigrant told Project South that
she talked to five different women detained at ICDC between
October and December 2019 who had a hysterectomy
done." Id. This detainee further stated: " 'When I met
all these women who had had surgeries, I thought this
was like an experimental concentration camp. It was like
they're experimenting with our bodies." Id. at 20. The letter
then quoted Wooten as saying: "Everybody he sees has
a hysterectomy—just about everybody." Id. Wooten then
described an incident of a faulty hysterectomy. Id. Speaking
on behalf of the other nurses at the ICDC, Wooten explained:

> We've questioned among ourselves
> like goodness he's taking everybody's
> stuff out .... That's his specialty, he's
> the uterus collector. I know that's
> ugly ... is he collecting these things
> or something[?] ... Everybody he sees,
> he's taking all their uteruses out or he's
> taken their tubes out.

Id. The whistleblower letter also raised concerns over
informed consent for hysterectomies. Id. The letter quoted
Wooten as saying, " '[t]hese immigrant women, I don't think
they really, totally, all the way understand this is what's going
to happen depending on who explains it to them.' " Id.

On the same day Project South released the whistleblower
letter, the *Associated Press* published a news report on the
allegations. Dkt. No. 153-50 ¶ 25. Other news organizations
also reported on the whistleblower letter that day. Id. ¶¶ 26–
29. The organizations included *Law & Crime, Law360, Daily
Beast, VICE, Business Insider, The Guardian*, and the *Atlanta
Journal Constitution*. The reports published by these outlets
repeated the allegations contained in the whistleblower letter.
Id. These reports were published before any NBC reports or
broadcasts. Id. ¶ 29. The following day, on September 15,
2020, even more news organizations reported on the letter's
allegations. Id. ¶¶ 34–39. These outlets included CBS News,

*Forbes, Prism, The Intercept, The Augusta Chronicle, The
Hill*, and *HuffPost*. Id. Of the articles published by these
outlets on September 14 and 15, 2020, only two named Dr.
Amin. Id. ¶¶ 36–37.

On September 15, 2020, the medical director of the ICE
Health Service Corps issued a statement about the allegations.
Dkt. No. 51-7 at 2. This statement explained:

> The accusations will be fully
> investigated by an independent
> office, however, ICE vehemently
> disputes the implication that detainees
> are used for experimental medical
> procedures .... According to U.S.
> Immigration and Enforcement (ICE)
> data, since 2018, only two
> individuals at Irwin County Detention
> Center were referred to certified,
> credentialed medical professionals at
> gynecological and obstetrical health
> care facilities for hysterectomies
> in compliance with National
> Commission on Correctional Health
> Care (NCCHC) standards. Based on
> their evaluations, these specialists
> recommended hysterectomies. These
> recommendations were reviewed by
> the facility clinical authority and
> approved .... All medical professionals
> certainly have a duty to report any
> issues of concern through appropriate
> channels, such as making a report
> to the Department of Homeland
> Security Office of Inspector General
> (OIG); however, it is unfortunate that
> those involved in this report have
> chosen to first go to the media with
> their allegations, without allowing
> the government to examine or take
> appropriate action. Out of respect for
> the process of matters pending before
> the OIG, ICE does not comment
> prematurely on reported allegations,
> and ICE intends to fully cooperate with
> any resulting investigation by the OIG.

Id.

### III. NBC Reporters Researched the Story.

**\*3** NBC began publishing articles about the whistleblower letter on the afternoon of September 15, 2020. Dkt. No. 153-50 ¶ 50. The first two NBC articles republished much of the original *Associated Press* article but added some updated information, such as the ICE statement. Id. ¶¶ 50–52. NBC later published a third article that day focusing exclusively on alleged gynecological abuse at the facility. Id. ¶ 56. Jacob Soboroff and Julia Ainsley, two acclaimed NBC immigration reporters, researched and wrote this article. Id. ¶¶ 56–61. Soboroff and Ainsley's research for this third article formed the basis for the research used in MSNBC's broadcasts. Dkt. No. 156-1 ¶ 52.

Ainsley and Soboroff spoke to multiple sources during their investigation of the whistleblower letter's allegations. Id. Soboroff interviewed Dawn Wooten herself. Dkt. No. 153-50 ¶ 68. Wooten's interview was consistent with the allegations in the whistleblower letter. See Dkt. No. 133-3. She also told Soboroff that she did not know the name of the gynecologist, did not know what happened when the detainees visited the gynecologist, and did not know how many women had undergone procedures. Id. When Soboroff asked Wooten how many women had spoken with her about their gynecological procedures, Wooten answered: "I've had several women. I don't have an exact count. Over the years that I've been there, out of the eight year time frame ... several women .... I don't have an answer." Id. at 16. Ultimately, Soboroff found Wooten to be a credible source of information. Dkt. No. 153-50 ¶ 69.

Other sources provided information that contradicted some of the letter's claims. One source, an immigration lawyer named Sarah Owings, told Soboroff that she and her colleagues were not finding evidence of a large numbers of hysterectomies at this early stage of the investigation. Dkt. No. 122-26 at 48:2–5, 118:1–6. She did tell Soboroff, however, that she and her colleagues were "finding evidence that something was deeply wrong in how these women were being treated" and that further investigation was needed. Id. at 48:6-7, 118:6–9.

Another source, Ben Osorio, the attorney for one ICDC detainee who had had a hysterectomy, told Ainsley that "the documents indicated that the need for [his client's] hysterectomy was necessitated by cancer." Dkt. No. 122-27 at 5. He also told Ainsley that given "the allegations in the whistleblower report, [he was] questioning everything at

that point." Id. Osorio believed that he informed Ainsley of another client at the facility who thought she had received a hysterectomy. Id. at 9–10. Osorio, however, told Ainsley that he "didn't have records to confirm that yet." Id. at 10.

Ainsley and Soboroff also contacted Dr. Amin, ICE, and LaSalle Corrections, the operator of the ICDC. Dkt. No. 153-50 ¶ 85. The reporters included this fact in the third NBC article published on September 15, 2020. Id.

Ainsley and Soboroff also texted one another over the course of their investigation. Dkt. No. 153-3. On September 14, Soboroff texted Ainsley that it "[d]oesn't sound like they have much beyond the complaint which is the whistleblowers account" and that this "[d]oesn't mean it didn't happen but [it's] harder to prove." Id. at 2. Soboroff also told Ainsley that Andrew Free, an attorney source, "is urging us to make the framing about a crooked doctor ... but also a system with little oversight ... [w]hich is what the whistleblower is saying." Id. at 6. Ainsley agreed with this. Id. Ainsley later texted that she was "dying to know the truth." Id. at 13. Soboroff replied that Andrew Free told Soboroff that Free "heard mixed things about Wooten .... But whoever she is and what her deal is[,] she exposed what sounds like a crazy situation." Id. Ainsley then asked: "Do we think [the lawyer sources] conspired at all?" Id. Soboroff said he did not and that there were other sources of information that corroborated the story. Id. Ainsley replied: "But only two hysterectomies? Or do you think they only referred those and he did others?" Id. at 14. Soboroff answered: "I think it's possible .... Or likely .... Lots of lawyers saying it." Id. The reporters agreed that they should receive input from NBC's Standards group. Id. at 3.

### IV. NBC Standards Reviewed the Information Obtained by NBC's Reporters.

**\*4** Before NBC published Ainsley and Soboroff's article—and before any MSNBC reports aired—NBCUniversal News Group Standards ("Standards") reviewed the article. Dkt. No. 153-50 ¶ 86. "Standards is a group of veteran journalists within the NBCU News Group that reviews certain articles and scripts for the News Group to help ensure that they meet News Group's journalistic standards." Id. ¶ 87. Chris Scholl, the senior deputy head of Standards, reviewed Ainsley and Soboroff's article. Id. ¶ 86.

Scholl was initially hesitant to publish the article, saying in an email:

As I've been mulling, my concern is all we have is a public whistleblower complaint in which she provides no evidence to back up her claims. ICE makes essentially the same point, and it appears a valid one. She has no direct knowledge of what she's claiming, is unable to name the doctor involved (if I understood correctly), and we are unable to verify any of it or determine whether there really is a story here. Essentially, it boils down to a single source—with an agenda—telling us things we have no basis to believe are true. At the least, we would have to note all of that in our reporting, but then it's worth asking why we are reporting it in the first place. I think we need more of our own independent reporting before going with this. ICE's statement alone doesn't get us there.

Dkt. No. 134-2 at 2. Ainsley responded that she "just had an off the record convo with ICE and they said they are working on getting us data on the number of hysterectomies performed at this facility. They believe that data will negate her claims." Dkt. No. 134-3 at 4. After speaking to more sources and gathering more information, Ainsley sent Standards the text of the article. Id. at 4–5. Scholl believed that the two reporters had "obtained a lot more information that independently supported the allegations in the Whistleblower Complaint." Dkt. No. 134 at 5. Scholl approved the article for publication. Id. at 7. Standards also attached reporting guidance to the article. Dkt. No. 153-50 ¶ 101. This guidance stated:

Note when reporting this story that we have reached out to the company (LaSalle Corrections) and have not received a response, and reflect ICE's statement. Also, note that we reached out to Dr. Amin. Remember: these are allegations—not established facts—relayed to us by attorneys, not the women directly. Our reporting needs to reflect that.

Id.

**V. NBC Broadcast the Story via MSNBC and Social Media.**

**A. First Broadcast: *Deadline: White House* (September 15, 2020)**

NBC's first broadcast of the whistleblower letter's allegations occurred on September 15, 2020 on MSNBC's show *Deadline: White House* with Nicolle Wallace. Dkt. No. 156-1 ¶ 50. Wallace began this segment of the show with: "We are following breaking news today. It's about an alarming new whistleblower complaint that alleges, quote, high numbers of female detainees, detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody." Dkt. No. 130-8 at 11. During this report, the headline banner that appeared on the screen said: "WHISTLEBLOWER: HIGH NUMBER OF HYSTERECTOMIES AT ICE DETENTION CTR." Dkt. No. 130-7 at 01:34:00–01:41:00. The show's report consisted of Wallace's interview of Ainsley and Soboroff's interview of Wooten. Id. The show also identified Dr. Amin by name. Dkt. No. 130-8 at 11.

Along with the headline banner, Plaintiff claims portions of multiple statements from the show were defamatory. Dkt. No. 49. The full statements are as follows:

**\*5**   • Wallace: "We are following breaking news today. It's about an alarming new whistleblower complaint that alleges, quote, high numbers of female detainees, detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody." Dkt. No. 130-8 at 11.

• Wallace: "The nurse says that detained women told her they didn't fully understand why they were undergoing hysterectomies and that one doctor in particular raised red flags among the nurses at the facility." Id.

• Ainsley: "Some said that they came back bruised, that he was overly harsh, they called him abusive in some of the allegations that the lawyers told us." Id.

• Ainsley: "And in at least two cases, there were women who were told that they needed a hysterectomy because

they had cancer. One of these women, her medical records [do] not indicate that she ever had a biopsy to indicate that she had cancer. In another case, a lawyer told me that his client had a hysterectomy because she was told she had stage four cervical cancer. And after the hysterectomy, when she went to an oncologist, the oncologist said, you do not have cancer. So, these are alarming allegations about this doctor. I personally called the doctor's office. As soon as I identified myself as a reporter, I heard a click, the phone hung up. Clearly, there are people reaching out with the same questions we have today." Id.

- Soboroff interviewing Wooten: "You're quoted in the complaint as saying, 'That's his specialty, he's the uterus collector.' Is that how people refer to this doctor?" Id. at 12.

- Wooten: "That's how the detainees referred to this physician. They referred to him as—I had a detainee that asked me, she said, well, what is he doing, Ms. Wooten? Collecting all of our uteruses? And I just looked at her puzzled because I didn't have an answer." Id.

- Ainsley: "It seemed like they were getting way too much care from a gynecologist and perhaps doing very unnecessary procedures and not enough of what you would need in a short-term detention situation. We know that they aren't supposed to stay longer than six months. Why were they getting so much care on this one area?" Id. at 13.

The show also displayed a statement from ICE on the screen: "U.S. Immigration and Customs Enforcement (ICE) does not comment on matters presented to the Office of the Inspector General, which provides independent oversight and accountability within the U.S. Department of Homeland Security." Dkt. No. 130-7 at 01:38:00–01:38:25. The statement also said that "ICE takes all allegations seriously and defers to the OIG regarding any potential investigation and/or results. That said in general, anonymous, unproven allegations, made without any fact-checkable specifics, should be treated with the appropriate skepticism they deserve." Id.

The *Deadline: White House* report relied on the research conducted by Ainsley and Soboroff. Dkt. No. 153-50 ¶ 164. Wallace and her staff also reviewed an article from *Law & Crime* that republished the whistleblower letter's allegations. Dkt. No. 130 at 3. The show's producers communicated

with Standards about reporting on the allegations before the broadcast. Id. at 6. Finally, Wallace herself observed that then-Speaker of the House Nancy Pelosi had issued a statement on the allegations of mass hysterectomies at the ICDC, which Wallace understood "as a sign that the government was taking the Whistleblower Complaint seriously." Id. at 5.

**B. Second Broadcast:** *All In With Chris Hayes* **(September 15, 2020)**

 **\*6** NBC's second broadcast of the allegations occurred on MSNBC's show *All In With Chris Hayes*. Dkt. No. 156-1 ¶¶ 57–58. Before the show aired, Alexander Price, a segment producer for *All In*, conducted investigative reporting. Dkt. No. 132 at 1–2. Price spoke to Andrew Free as a source. Dkt. No. 132-3. Free told Price that he had "heard from five different immigration lawyers with multiple clients who have either had hysterectomies for which they did not get informed consent or who have medical battery accused by this physician. It is an open secret in the town that you don't go to him." Id. at 5. Free shared other lurid accounts of alleged gynecological mistreatment. Id. at 5–9. Free told Price that he represented only two women, the same detainee clients as Ben Osorio. Id. at 15. Free estimated that fourteen to fifteen women possibly had hysterectomies at the ICDC, but that he was "in various stages of getting those people ... vetted and checked out and ... listening to their story, seeing if they're going to be able to tell it ... seeing if it's backed up by any [medical] records .... And someone who's looked at them and said, yeah, this is bullshit." Id. at 16.

Free informed Price: "In terms of the hysterectomies, I'm aware of it happening at some other facilities, but I don't have solid enough— ... when I hear forced sterilization, I want to see some fucking documents .... I'm not going to take somebody's word for it." Id. at 19. Free also said: "I've been awaiting that confirmation ... [E]verything I'm saying is based on either an immigration lawyer telling me that their client had this happening and they've seen the documents, or I've seen the documents myself ... or I've talked to a person." Id. The call ended with Free agreeing to send Price any additional information or relevant contacts. Id. at 35. Later, Price texted Free and asked if the show could characterize what Free told Price as " 'tonight we spoke with a lawyer who represents two women who had this procedure done, and tells us that as many as 15 women were given hysterectomies, and that number is growing.' " Dkt. No. 132-5. Free responded: "Not hysts. 'Full or partial hysts or other procedures for which no medical indication existed.' " Id. Free also sent Price medical records for one client and said "I'm ... on the hook for 1 hyst

so far. And that's the one I can prove." Dkt. No. 132-6. Price then used this information for the September 15, 2020 *All In* report. Dkt. No. 132.

As the show began, Chris Hayes provided a teaser for the upcoming report, saying that the broadcast would feature "shocking whistleblower allegations of atrocities at an ICE detention center including forced hysterectomies on women who don't need them. Tonight, the whistleblower nurse herself joins me live." Dkt. No. 131-2 at 2. Hayes later started the show's segment on the allegations with: "Yesterday, we learned about a whistleblower, a nurse working at a Georgia ... ICE facility, leveling honestly ghastly allegations. Chief among them that women in that facility, migrant women, say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility." Id. at 12. On the screen, headlines appeared from articles by *The Atlanta Journal Constitution, The Daily Beast, The Cut,* and *Law360.* Dkt. No. 153-50 ¶ 181. Hayes spoke of reports from attorneys alleging many women at the facility had received unnecessary hysterectomies. Id. ¶¶ 184–86. During this segment, the headline banner on the screen said: "COMPLAINT: MASS HYSTERECTOMIES PERFORMED ON WOMEN AT ICE FACILITY." Dkt. No. 131-1 at 00:31:55–00:40:50. Hayes also interviewed Wooten and her attorney during this portion of the show. Id.

Together with the screen headline displayed during the show, Dr. Amin claims that portions of the following statements were defamatory:

- Hayes: "Yesterday, we learned about a whistleblower, a nurse working at a Georgia Immigrations and Customs Enforcement, ICE facility, leveling honestly ghastly allegations. Chief among them that women in that facility, migrant women, say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility, which again, is privately run." Dkt. No. 131-2 at 12.

- **\*7** • Hayes: "We've been chasing this story all day along with some of my colleagues here at NBC. Tonight, we can report a lawyer named Benjamin Osorio representing women at that very facility, told NBC News that indeed two of his clients received hysterectomies they believe may have been unnecessary." Id.

- Hayes: "And tonight, we here on ALL IN spoke with another attorney who represents two different women who claim they also had unnecessary hysterectomies

while detained at this facility. That lawyer tells us that as many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed." Id.

- Wooten: "You have detained women—I had several detain[ed] women on numerous occasions that would come to me and say, Miss Wooten, I had [a] hysterectomy, why? I had no answers as to why they had those procedures. And one lady walked up to me here this last time ... and she said, 'what is he? Is he the uterus collector? Does he collect uteruses?' " Id. at 13.

- Wooten: "And I asked her, what does she mean. And she says, 'everybody that I've talked to has had a hysterectomy.' And you just don't know what to say. I mean, I don't—I don't have an answer for why they would come to me and they would say, 'is he a uterus collector?' " Id.

- Wooten's Lawyer: "And with the number of cases that Ms. Wooten and others alluded to, there's a lot—there's a large population of these—of these women, immigrants who've had this—who have been mistreated in this way, assaulted. And should—you know, there's a pool there that could come forward. Let's hope they do." Id. at 15.

Hayes also included a statement from ICE on the matter. Dkt. No. 153-50 ¶ 189. That statement, displayed on the screen, read:

> The accusations will be fully investigated by an independent office, however, ICE vehemently disputes the implication that detainees are used for experimental medical procedures .... [S]ince 2018, only two individuals at Irwin County Detention Center were referred to certified, credentialed medical professionals at gynecological and obstetrical health care facilities for hysterectomies.

Id. at 93. After reading this aloud, Hayes commented, "[o]f course, the 'referred' is the question here." Dkt. No. 133-1 at 00:33:00–00:33:17. Hayes also reported on a statement issued by LaSalle Corrections: "LaSalle Corrections has a zero tolerance policy for any kind of inappropriate behavior

in our facilities and takes all allegations of such mistreatment seriously. Our company strongly refutes these allegations and any implications of misconduct at the ICDC." Id. at 00:33:17–00:33:32. The broadcast did not name Dr. Amin. Dkt. No. 153-50 ¶ 197.

### C. Fourth [1] Broadcast: *The Rachel Maddow Show* (September 15, 2020)

The fourth broadcast of the allegations occurred on *The Rachel Maddow Show* on September 15, 2020. Dkt. No. 156-1 ¶ 61. Maddow opened her show with: "It was not the first Trump administration scandal. It was certainly, certainly, certainly not the last." Dkt. No. 133-7 at 2. She then provided commentary on the Trump Administration's family separation policies and the then-Director of the Office of Refugee Resettlement. Id. at 2–4. Maddow stated: "But the reason I'm bringing it all up again tonight is because now we have arrived at the next chapter in this same story. And I'm not going to dance around it. I'm just going to say it, and I guess we should have seen it coming, but still, it's a shock." Id. at 5. Maddow then began reporting on the whistleblower's allegations. Id. During this segment, Maddow read portions of the whistleblower letter, played a recording of Soboroff's interview of Wooten, and interviewed Soboroff. Id. at 5–11.

**\*8** Plaintiff claims that portions of the following statements from the show were defamatory:

• Maddow: "A nurse who works at an ICE detention facility in Georgia has just contributed to a whistleblower complaint. She says that in her time working at this ICE detention facility, it's a detention center in Irwin County, Georgia. She says that immigrant women at that facility have told her they have routinely been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies[.] [J]ust to underscore that, the allegation here is that this is a federal facility and they have been sending immigrant women in their care, in their custody to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it." Id. at 5.

• Maddow: "From the complaint [ ], quote, a detained [ ] immigrant told Project South that she talked to five different women detained at the Irwin County detention center between October and September 2O19, five different women, between October, November and December 2O19, over that three-month period, five different women who had had a hysterectomy done.

When she talked to them about the surgery, the women, quote, reacted confused when explaining why they had one done." Id.

• Maddow: "The detainee said, quote, when I met all these women who had the surgeries I thought this was, like, an experimental concentration camp[,] it was like they're experimenting with our bodies." Id.

• Maddow: "The nurse who contributed to this whistleblower complaint explains it like this, quote: Everybody this doctor sees has a hysterectomy, just about everybody. He's even taken out the wrong ovary on one detained immigrant woman. She was supposed to get her left ovary removed because she had a cyst on the left ovary he took out the right one. She was upset. She had to go back to take the left and she wound up with a total hysterectomy[;] she still wanted children. She has to go back home now and tell her husband that she can't bear kids. She says she was not all the way out under anesthesia and heard the doctor tell the nurse that he took out the wrong ovary." Id. at 5–6.

• Maddow: "The nurse says she and her fellow nurses, quote, questioned among ourselves, like, goodness, he's taking everybody's stuff out, that's his specialty[,] he's the uterus collector. She says, quote, I know that's ugly. Is he collecting these things or something? Everybody he sees he's taking all their uteruses out or he's taking their tubes out, what in the world?" Id. at 6.

• Maddow: "According to this nurse, this whistleblower, she alleges in this complaint that on several occasion, women told her that this doctor performed hysterectomies, removed the uteruses of these refugee women for no medical reason without their proper informed consent." Id. at 6.

• Maddow: "According to NBC's reporting, one of the lawyers represents two women who were detained at the facility who say they received hysterectomies that they believe may have been unnecessary. Another lawyer represents a woman who says she went to this doctor's office for an exam. The exam left her with bruising." Id. at 7.

**\*9** • Maddow: "And to be clear, the complaints here from these women and their lawyers who are speaking on their behalf is essentially that they—not that they never should have been sent out to see a gynecologist, but, rather, whatever was going on with them, they did

not understand that the treatment was going to be a hysterectomy and then in some cases the allegation here is that the hysterectomies, whether or not the women consented to them in the first place, they were not medically necessary." Id. at 9.

• Soboroff: "And there are other allegations of other procedures including pap smears where women are told you've got ovarian cysts or cancer, and that turned out not to be the case and those procedures happened anyway." Id.

• Soboroff: "And I think, you know, this—this statement that they considered him the uterus collector is graphic, it's hard to listen to, but that's what they're talking about, according to Ms. Wooten, inside this facility, and she's not the only one saying so." Id. at 10.

The show included statements from Dr. Amin, ICE, and LaSalle Corrections. Dkt. No. 153-50 ¶¶ 232–34, 239–40. The ICE and LaSalle Corrections statements were identical to those aired on previous programs. Id. Plaintiff's statement, displayed on screen, said: "We are aware of the whistleblower's allegations as they relate to Dr. Amin, and vigorously deny them ... We look forward to all of the facts coming out and are confident that, once they do, Dr. Amin will be cleared of any wrongdoing." Id. at 113.

Maddow and her staff relied on Ainsley and Soboroff's previous reporting. Id. ¶ 247. Maddow herself, however, initially questioned reporting on the allegations. Dkt. No. 133-1. In a preproduction meeting, a producer for the show said that the "hysterectomy part [of the whistleblower letter] is largely based on [Wooten] and anon[ymous] accounts." Id. at 3. Maddow commented that there was "a lot of jumping to conclusions around the complaint ... I don't want to assume it's true[,] but if it is we should definitely do it. Unsure if we should leave room in the show or not." Id. at 4. Another producer replied that Soboroff "said yes its legit." Id. When deposed, Maddow noted that her comments in the preproduction meeting reflected her desire to gather additional information so that her team could "arrive at reasonable informed conclusions about the merits of the complaint." Dkt. No. 153-60 at 65:10–24.

**D. Fifth Broadcast:** *All In With Chris Hayes* **(September 17, 2020)**
The last broadcast at issue occurred during the September 17, 2020 episode of *All In With Chris Hayes*. Dkt. No. 156-1 ¶

64. Alexander Price conducted further research in preparation for this show. Dkt. No. 153-50 ¶¶ 257–58. Price spoke to Ben Osorio. Dkt. No. 132-11. Osorio told Price about a detainee client at the ICDC who had a hysterectomy to treat cancer, but then went to a cancer treatment center where a doctor told her she was "fine." Id. at 10. Regarding this client, Osorio told Price: "So we're still trying to get those records .... But I don't think we have a full, complete picture yet." Id. Price also spoke on a call with Hayes himself and Scholl from Standards about the content of the show. Dkt. No. 132-15.

In this call, Scholl told the group that "We don't know if the doctor did anything wrong here .... In fact, the guy has a pretty clean record." Id. at 5. Scholl also said, "I think, that the key here with this story is we don't have access ... to the doctor himself .... And that I think is a really important thing to say outright, right? We don't know his side of the story here. And we're not capable to assess from a medical standpoint whether or not the decisions made were legit." Id. at 7. Scholl then spoke about Wooten: "And the whistleblower has no direct knowledge of this stuff .... [S]he kind of has a beef, right? She's got a whole separate agenda here .... [S]he brought it to light, right? She filed a complainant [sic] and then that kind of coalesced the lawyers and here we are." Id. at 8. As to televising the accusations, Scholl said: "We would have to approach this with a great deal of [ ] transparency with viewers and say, look, we don't know the truth." Id.

**\*10** Hayes responded that his "understanding of the story is that the reason it went viral [ ] is that it was, like, conjured the worst kind of like Third Reich, ... sort of ... Jim Crow, Mississippi Hospital history .... [W]hich is not the case here." Id. at 10. Scholl agreed: "Well, we don't have it. Yeah. I mean, we don't know. Well, we don't know." Id. Hayes then discussed the whistleblower letter: "you've got a secondhand, a very, very, you know, wildly provocative quote in a recorded whistleblower complaint by a woman with no factual, firsthand knowledge." Id. at 12. He added: "I honestly discounted the whole thing when I saw it go viral because I didn't know the source and ... there was some skepticism among folks in the immigrant rights community as well, and there is less skepticism the more people they talked to." Id. at 12–13. Scholl agreed with Hayes and said: "we are looking at one, maybe two complaints ... in a pool of God knows how many patients he has seen." Id. at 13. In the end, the group agreed that a "degree of skepticism" was needed for the show's report. Id.

The *All In* report consisted of Hayes interviewing Congresswoman Sheila Jackson Lee and an anonymous woman claiming to have had a hysterectomy while detained at the facility. Dkt. No. 153-50 ¶ 272. The headline banner displayed on the screen stated: "INVESTIGATION ORDERED INTO CLAIMS OF UNNEEDED MEDICAL PROCEDURES ON IMMIGRANT WOMEN." Id. at 133. Plaintiff contends that a portion of the following statement from this broadcast was defamatory:

> Hayes: "We've been bringing you the story of allegations of medical procedures performed on immigrant women without—many without consent at an ICE detention facility in Georgia. Now, there is now a formal inquiry into those allegations in the Department of Homeland Security's Office of the Inspector General." Dkt. No. 131-5 at 13.

### E. Social Media Posts

Plaintiff also claims that three social media posts constitute defamation. Dkt. No. 49 ¶¶ 9, 220. Those posts are as follows:

- Twitter Post from September 17, 2020: "Learn more about the three women claiming they have received unnecessary hysterectomies here: on.msnbc.com/2FJlvra." Dkt. No. 122-29 at 3.

- Twitter Post from September 17, 2020: "Three women claim they received unnecessary hysterectomies at ICE facility. 'I felt like I had no right to say anything. Dr. Amin just told me, you're gonna get a hysterectomy done, and schedule an appointment for that. I had no say on this.' on.msnbc.com/2FJlvra." Dkt. No. 122-30 at 3.

- Facebook Post from September 21, 2020: "Nurse Dawn Wooten alleges mass hysterectomies performed at Georgia facilities: 'I had several detained women on numerous occasions that would come to me and say, "Ms. Wooten, I had a hysterectomy. Why?" I had no answers as to why they had those procedures.' " Dkt. No. 122-31 at 3.

### VI. Government Agencies Launched Investigations into the Allegations.

As is evident from NBC's reports, government agencies launched investigations into the allegations soon after the media published the whistleblower letter. These agencies included ICE, DHS, the Georgia Composite Medical Board, and the Department of Justice. Dkt. No. 153-50 ¶¶ 107, 113, 125, 127. Each of these investigations began on or after September 15, 2020. Id. Soon after, ICE ordered LaSalle Corrections to cancel any upcoming appointments with Plaintiff while ICE conducted its investigation. Id. ¶ 111. No reports from the four agency investigations exist in the record. The record does show, however, that ICE terminated its contract with LaSalle Corrections regarding the ICDC on October 7, 2021. Id. ¶ 135.

### VII. The United States Senate Launched its Own Investigation.

In May 2021, the United States Senate Permanent Subcommittee on Investigations, of the Committee on Homeland Security and Government Affairs ("Senate Committee"), began its own investigation into the whistleblower letter's allegations. Id. ¶ 136. The Senate Committee conducted an exhaustive investigation, interviewing seventy witnesses and reviewing over 541,000 pages of records over an eighteen-month period. Dkt. No. 136-68 at 22. The Senate Committee subpoenaed Plaintiff to sit for a deposition, but Plaintiff declined pursuant to his Fifth Amendment privilege against self-incrimination. Dkt. No. 153-50 ¶ 138. On November 15, 2022, the Senate Committee released its report, titled "Medical Mistreatment of Women in ICE Detention" ("Senate Report"). Dkt. No. 136-68.

**\*11** The Senate Report concluded: "Female detainees appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures." Id. at 9. The Senate Committee

> identified a [ ] pattern of potentially excessive medical procedures. Dr. Amin was a clear outlier in both the number and types of procedures he performed compared to other OB-GYNs that treated ICE detainees. ICDC housed roughly 4% of female ICE detainees nationwide from 2017 to 2020. Dr. Amin accounted for roughly 6.5% of total OB-GYN visits among all ICE detainees in the same time period. However, he performed nearly one-third of certain OB-GYN procedures on ICE detainees across the country between 2017 and 2020

and more than 90% of some key procedures.

Id. at 11. These procedures included: laparoscopies to excise lesions ("94% of all such procedures conducted on all ICE detainees"); Depo-Provera injections ("93% of all such injections provided by all OB-GYN specialists to ICE detainees"); limited pelvic exams ("92% of limited pelvic exams conducted on all ICE detainees"); and dilation and curettage ("D&C") procedures ("82% of all D&C procedures conducted by all OB-GYN specialists treating ICE detainees"). Id.

The Senate Committee also found: "There appears to have been repeated failures to secure informed consent for offsite medical procedures performed on ICDC detainees." Id. at 9. The medical experts and ICDC detainee witnesses both informed the Senate Committee that "there was a lack of informed consent in many instances" and that "Dr. Amin did not explain or answer questions regarding examinations, medication administration, or surgical procedures he performed on" detainees. Id. at 18.

"The Subcommittee did not substantiate the allegations of mass hysterectomies on ICDC detainees. Records indicate that Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019. Both procedures were deemed medically necessary by ICE." Id. at 9. Put another way, the Senate Committee "did not substantiate the allegation that ICDC detainees underwent 'high rates' of unauthorized hysterectomies." Id. at 23. The Senate Report concludes that "the Subcommittee found this allegation [that Dr. Amin performed mass hysterectomies on ICDC detainees] to be false." Id. at 27.

## VIII. Plaintiff's Present Suit Against NBC.

On August 21, 2021, Plaintiff demanded that NBC retract the statements from the four MSNBC broadcasts. Dkt. No. 153-50 ¶ 305. He claimed that the statements were false and defamatory. Id. ¶ 306. NBC did not retract the statements. Id. ¶ 311. This case followed. Id. ¶ 315.

Plaintiff filed this one-count defamation suit against NBC on September 9, 2021. Dkt. No. 1. Plaintiff filed his first amended complaint on May 3, 2022. Dkt. No. 49. On May 17, 2022, NBC moved for judgment on the pleadings. Dkt. No. 52. The Court granted this motion in part and denied it

in part. Dkt. No. 59. In short, the Court found that one of the broadcasts—the September 16, 2020 episode of *All In With Chris Hayes*—was covered by Georgia's public interest privilege and that multiple statements from other broadcasts were unactionable as opinions. Id. at 66–67.

Thirty-nine NBC statements remain in this case.[2] Plaintiff moves for partial summary judgment on thirty statements. Dkt. No. 122. Specifically, Plaintiff "moves for summary judgment as to the following elements of his defamation claim: (1) the Statements were false; (2) the Statements were defamatory; (3) the Statements were 'of and concerning' Dr. Amin; (4) NBCUniversal published the Statements to a third party; and (5) the Statements are actionable even in the absence of special harm." Id. at 7. Plaintiff also moves for summary judgment on multiple affirmative defenses raised by NBC. Id. at 7–8. NBC moves for summary judgment on Plaintiff's defamation claim in its entirety. Dkt. No. 127.

## LEGAL AUTHORITY

### I. Summary Judgment

**\*12** The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in [her] pleadings. Rather, [her] responses ... must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

## II. Cross Motions for Summary Judgment

The filing of cross motions for summary judgment does not change the Rule 56 standard. See 3D Medical Imaging, Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017); Westport Ins. v. VN Hotel Grp., LLC, 761 F. Supp. 2d 1337, 1341 (M.D. Fla. 2010) (citing Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007)). The same standard applies to cross motions for summary judgment just as if only one party had moved for summary judgment and "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Yager v. Lockheed Martin Corp., No. 1:14-CV-1548, 2016 WL 319858, at *3 (N.D. Ga. Jan. 26, 2016). "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004).

## DISCUSSION

## I. Defamation in Georgia, Generally

"Under the First Amendment there is no such thing as a false idea .... But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). Thus, the legitimate state interest underlying the law of defamation is "the compensation of individuals for the harm inflicted on them by defamatory falsehood." Id. at 341. "[T]he individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.' " Id. (quoting Rosenblatt v. Baer, 383 U.S. 75, 92 (1966) (Stewart, J., concurring)).

**\*13** Under Georgia law, a claim for defamation has four elements: "(1) a false and defamatory statement concerning

the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." ACLU, Inc. v. Zeh, 864 S.E.2d 422, 427 (Ga. 2021) (internal quotation marks omitted) (quoting Mathis v. Cannon, 573 S.E.2d 376, 380 (Ga. 2002)). Two forms of defamation are relevant here: libel and slander.

Libel is the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). "Libel per se consists of a charge that one is guilty of a crime, dishonesty, or immorality, and the words must be defamatory on their face." Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225 (11th Cir. 2002) (citations omitted). If a publication is not libel per se, it may still be libel by innuendo. Reece v. Grissom, 267 S.E.2d 839, 841 (Ga. Ct. App. 1980). "The office of an innuendo is to explain that which is of doubtful or ambiguous meaning in the language of the publication, but cannot enlarge the meaning of words plainly expressed therein." Park & Iverson v. Piedmont & A. L. Ins., 51 Ga. 510, 513 (1874). In other words, "[i]nnuendo means only that where words are capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, which of the two meanings will be attributed to it by those to whom it is addressed or by whom it may be read." Reece, 267 S.E.2d at 841 (citation omitted). That said,

> Innuendo is not a device whereby non-libelous words are made actionable. Unless the words of the alleged defamation are themselves susceptible of the libelous innuendo no cause of action is stated; any harmful innuendo which may result not from the ambiguity of the words themselves but from the readers' subjective reaction to truthful words of an unambiguous and non-libelous nature is not an actionable defamation.

Id. The publication of libelous material is a prerequisite to recovery. O.C.G.A. § 51-5-1(b). "A libel is published as soon

as it is communicated to any person other than the party libeled." O.C.G.A. § 51-5-3.

Slander—also known as oral defamation—occurs by:

> (1) Imputing to another a crime punishable by law; (2) Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society; (3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or (4) Uttering any disparaging words productive of special damage which flows naturally therefrom.

O.C.G.A. § 51-5-4(a). If a plaintiff proves a violation of paragraphs (1), (2), or (3) of this Code section, "damage is inferred." O.C.G.A. § 51-5-4(b). This is known as "slander per se." Cottrell v. Smith, 788 S.E.2d 772, 781 (Ga. 2016). To succeed under paragraph (4), "special damage is essential to support an action." O.C.G.A. § 51-5-4(b).

As to imputing a crime, "[t]o constitute slander per se, ... the words at issue must charge the commission of a specific crime punishable by law. Where the plain import of the words spoken impute no criminal offense, they cannot have their meaning enlarged by innuendo." Dagel v. Lemcke, 537 S.E.2d 694, 696 (Ga. Ct. App. 2000). "Indeed, the statement must give the impression that the crime is actually being charged against the individual and couched in language as might reasonably be expected to convey such meaning to a hearer of the statement." Cottrell, 788 S.E.2d at 781 (citing Taylor v. Calvary Baptist Temple, 630 S.E.2d 604, 607 (Ga. Ct. App. 2006)). "[A] vague statement or even a derogatory one does not amount to slander per se when a person cannot reasonably conclude from what is said that the comments are imputing a crime to the plaintiff." Id.

**\*14** Regarding defamation in reference to a trade, profession, or office,

> the kind of aspersion necessary to come under this phase of the rule of slander per se must be one that is especially injurious to the plaintiff's reputation because of the particular demands or qualifications of plaintiff's vocation. The words must either be spoken of the plaintiff in connection with his calling or they must be of such a nature such as to charge him with some defect of character or lack of knowledge, skill, or capacity as necessarily to affect his competency successfully to carry on his business, trade, or profession.

Id. at 781–82 (alterations adopted and internal quotation marks omitted) (quoting Bellemeade, LLC v. Stoker, 631 S.E.2d 693, 695 (Ga. 2006)). Statements "imputing to a business or professional man ignorance or mistake on a single occasion and not accusing him of general ignorance or lack of skill [are] not actionable per se." Chung v. JPMorgan Chase Bank, N.A., 975 F. Supp. 2d 1333, 1349 (N.D. Ga. 2013) (citing Barna Log Homes of Ga., Inc. v. Wischmann, 714 S.E.2d 402, 405 (Ga. Ct. App. 2011)). An accusation that a professional "in a single instance was guilty of a mistake, impropriety or other unprofessional conduct does not imply that he is generally unfit." Id. Rather, the statement must attack the injured party's general capacity to effectively carry out his profession. Id.

Truth is a complete defense to libel and slander claims. See O.C.G.A. § 51-5-6 ("The truth of the charge made may always be proved in justification of an alleged libel or slander."). Further, "[t]o support a defamation action, a statement must be one of objective fact. Non-literal commentary that cannot reasonably be interpreted as stating actual facts about an individual is not actionable." Bryant v. Cox Enters., 715 S.E.2d 458, 469 (Ga. Ct. App. 2011) (footnote omitted); see also Bollea v. World Championship Wrestling, Inc., 610 S.E.2d 92, 96 (Ga. Ct. App. 2005) ("[I]f the allegedly defamatory statement could not be reasonably understood as describing actual facts about the plaintiff or actual events in which he participated, the publication will not be libelous." (citation omitted)). To determine whether a statement is one of objective fact, a court must "examine the statement in its totality in the context in which it was uttered or published." Bollea, 610 S.E.2d at 469 (internal quotation marks omitted) (quoting Ollman v. Evans, 750 F.2d 970, 1000 (D.C. Cir. 1984)).

Amin v. NBCUniversal Media, LLC, Slip Copy (2024)

Finally, "[e]very repetition of a slander originated by a third person is a willful publication of it, rendering the person so repeating it liable to an action, and it is no defense that the speaker did not originate the slander, but heard it from another, even though he in good faith believed it to be true." Ivester v. Coe, 127 S.E. 790, 792 (Ga. Ct. App. 1925). "Talebearers are as bad as talemakers." Id. (internal quotation marks omitted).

## II. Element One: A False and Defamatory Statement Concerning Plaintiff

The first element of Plaintiff's defamation claim requires that NBC's statements were false, defamatory, and about Plaintiff. See ACLU, 864 S.E.2d at 427. NBC does not dispute that its statements were "of and concerning" Plaintiff. Dkt. No. 156-1 at 25. The question now is whether the statements were false and defamatory.

### A. Falsity

#### 1. Overview

**\*15** "[T]he burden to prove that a published statement is false rests squarely with the plaintiff." Bryant, 715 S.E.2d at 463 (citations omitted); see also Phila. Newspapers v. Hepps, 475 U.S. 767, 775–76 (1986) (explaining that defamation plaintiffs "must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant"). Plaintiff must prove falsity by clear and convincing evidence. Wolf v. Ramsay, 253 F. Supp. 2d 1323, 1353 (N.D. Ga. 2003).

A statement is considered false if "it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced." Bryant, 715 S.E.2d at 463 (internal quotation marks and footnote omitted). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." Masson v. New Yorker Mag., Inc., 501 U.S. 496, 517 (1991) (quotation marks omitted); see also Parekh v. CBS Corp., 820 F. App'x 827, 834 (11th Cir. 2020) ("[A] statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." (citation omitted)). "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." Lucas v. Cranshaw, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008) (internal quotation marks and footnote omitted). If a publication is "substantially accurate" and

published "in good faith," a media defendant "has a complete defense." Id. "As long as facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth." Id.

The falsity inquiry "turns on whether the 'gist' of the publication is false." Turner v. Wells, 879 F.3d 1254, 1269 (11th Cir. 2018) (citing Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1108 (Fla. 2008) ("[W]hile defamation law shields publishers from liability for minor factual inaccuracies, 'it also works in reverse, to impose liability upon the defendant who has the details right but the "gist" wrong.' Simply put, 'if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.' " (quoting W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 116, at 117 (5th ed. Supp. 1988)))). "Whether the publication is defamatory becomes an issue of fact for the jury only where the publication is susceptible of two reasonable interpretations, one of which is defamatory." Id. (citations omitted).

Generally, opinions are not considered statements of fact. N. Atlanta Golf Operations, LLC v. Ward, 870 S.E.2d 814, 818–19 (Ga. Ct. App. 2022). "This is because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false. As a result, a plaintiff who claims that a published opinion defamed him will generally be unable to carry his burden of proving" falsity. Cottrell, 788 S.E.2d at 781 (internal quotation marks omitted) (quoting Gettner v. Fitzgerald, 677 S.E.2d 149, 153 (Ga. Ct. App. 2009)). An individual cannot be sued for expressing his opinion of another, "however unreasonable the opinion or vituperous the expressing of it may be." Gast v. Brittain, 289 S.E.2d 63, 64 (Ga. 2003) (internal quotation marks and citations omitted). Further, statements of "rhetorical hyperbole" or "obviously exaggerated and unprovable assertions" are not actionable as defamation. Grace v. Lowery, 860 S.E.2d 159, 162 (Ga. Ct. App. 2021); Atlanta Humane Soc'y v. Mills, 618 S.E.2d 18, 25 (Ga. Ct. App. 2005).

**\*16** "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Gertz, 418 U.S. at 339–40 (footnote omitted). After all, "the ultimate good desired

is better reached by free trade in ideas ... the best test of truth is the power of the thought to get itself accepted in the competition of the market." Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

There is, however, no blanket defamation exception for any statement that might be labelled an opinion. Gast, 589 S.E.2d at 64 (citing Milkovich v. Lorain J. Co., 497 U.S. 1, 18 (1990)). "An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false." Id. (footnote omitted). As explained by the Supreme Court,

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

Milkovich, 497 U.S. at 18–19.

### 2. Analysis

#### i. Statements that have been proved false.

Multiple statements are verifiably false. The undisputed evidence has established that: (1) there were no mass hysterectomies or high numbers of hysterectomies at the facility; (2) Dr. Amin performed only two hysterectomies on female detainees from the ICDC; and (3) Dr. Amin is not a "uterus collector." The Court must look to each of the statements in the context of the entire broadcast or social media post to assess the construction placed upon it by the average viewer. See Bryant, 715 S.E.2d at 466; Cranshaw, 659 S.E.2d at 615. Doing so, the undisputed evidence establishes that multiple NBC statements are false.

Viewed in their entirety, the September 15, 2020 episodes of *Deadline: White House, All In With Chris Hayes*, and *The Rachel Maddow Show* accuse Plaintiff of performing mass hysterectomies on detainee women. It does not matter

that NBC did not make these accusations directly, but only republished the whistleblower letter's allegations. If accusations against a plaintiff are "based entirely on hearsay," "[t]he fact that the charges made were based upon hearsay in no manner relieves the defendant of liability. Charges based upon hearsay are the equivalent in law to direct charges." Davis v. Macon Tel. Publ'g Co., 92 S.E.2d 619 (Ga. Ct. App. 1956). NBC charged Plaintiff with performing high numbers of hysterectomies at the facility. NBC argues that the "gist" of these broadcasts was that Plaintiff was accused of conducting "unnecessary and unconsented-to medical procedures on detainees at ICDC, including large numbers of hysterectomies." Dkt. No. 127 at 19 (alterations adopted). But the focus of these three broadcasts was not on unnecessary or unconsented-to "medical procedures." The focus was on "mass hysterectomies" and "high numbers of hysterectomies," performed without necessity and consent, at the facility. This is reinforced by MSNBC's own headlines: "WHISTLEBLOWER: HIGH NUMBER OF HYSTERECTOMIES AT ICE DETENTION CTR." and "COMPLAINT: MASS HYSTERECTOMIES PERFORMED ON WOMEN AT ICE FACILITY." Dkt. No. 130-7 at 01:34:00–01:41:00, Dkt. No. 131-1 at 00:31:55– 00:40:50.

**\*17** The focus of these broadcasts was not on unnecessary gynecological procedures generally, but on a far more newsworthy story of mass hysterectomies. The *Deadline: White House* segment on this story lasted around seven minutes. Dkt. No. 130-7 at 01:34:14–01:41:00. The show dedicated less than one minute to discussing gynecological procedures other than hysterectomies. Id. at 01:39:10– 01:40:07. And even during that portion of the show, the "high number of hysterectomies" headline remained on the screen. Id. The *All In With Chris Hayes* segment lasted around nine-and-one-half minutes. Dkt. No. 131-1 at 00:31:22–00:40:50. No medical procedures other than hysterectomies were even mentioned. Id. The "mass hysterectomies" headline was on screen for almost the entire broadcast. Id. The *Rachel Maddow Show* segment lasted around fifteen-and-one-half minutes. Dkt. No. 133-6 at 00:07:00–00:22:30. The show included only two mentions of procedures other than hysterectomies. Id. First, Maddow stated: "[Wooten] says that immigrant women at that facility have told her they have routinely been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies." Dkt. No. 133-7 at 5. She then immediately pivoted back to the allegation that "this is a federal facility and they have been sending immigrant women in their

care, in their custody to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it." Id. Second, Soboroff spoke of "other allegations of other procedures including pap smears where women are told [they had] ovarian cysts or cancer, and that turned out not to be the case and those procedures happened anyway." Id. at 9. As Soboroff said this, the headline on screen read: "WHISTLEBLOWER SPEAKS OUT ABOUT ALLEGATIONS THAT DOCTOR IN DETENTION FACILITY PERFORMED UNNECESSARY HYSTERECTOMIES." Dkt. No. 133-1 at 00:18:00–00:18:30.

An average viewer watching the three broadcasts would understand that Plaintiff was accused of performing mass hysterectomies that were unnecessary and without consent. Given this, multiple statements "would have a different effect on the mind of the viewer from that which the pleaded truth would have produced." Bryant, 715 S.E.2d at 463. These are Statements 5, 6, 9, 14, 15, 16, 23, 25, 26, 27, 28, and 34.[3] See Appendix I.

Statements 5, 6, 9, 14, 16, 26, 27, and 34 are all substantially the same. Each is an allegation that Plaintiff is a "uterus collector." Statements 15, 23, 25, and 28 are also nearly identical and allege that everyone or nearly everyone Plaintiff treated received a hysterectomy. NBC argues that these statements "are opinion or rhetorical hyperbole—*i.e.* 'loose figurative language'—and are not actionable." Not so.

While opinions and hyperbole are typically non-actionable, they become actionable when they are capable of being proved false. Gast, 589 S.E.2d at 64. Statements 5, 6, 9, 14, 15, 16, 23, 25, 26, 27, 28, and 34 meet this requirement.

Statements that Plaintiff is a "uterus collector," that people referred to him as a uterus collector, and that he was collecting the uteri of detained women "state or imply defamatory facts about the plaintiff that are capable of being proved false." Gast, 589 S.E.2d at 64. Further, statements that nearly everyone Plaintiff treated had a hysterectomy or that Plaintiff's specialty was "taking everybody's stuff out" state facts that can be proved false. These statements are not mere subjective assessments of Plaintiff over which reasonable minds could differ. They are also not simply rhetorical hyperbole or obviously exaggerated statements that are unprovable. See Mills, 618 S.E.2d at 25.

Viewing these statements in context, it is clear they were made as statements of fact. In her MSNBC interviews, Wooten emotionally and seriously provided these statements. NBC treated the statements with equal gravitas. The focus of the broadcasts was on mass, unnecessary, and unconsented-to hysterectomies performed on detained women. The statements operated as factual support for the allegations. The statements provided proof that a high number of unnecessary hysterectomies took place at the facility. Without the context of the broadcasts, the statements that Plaintiff was a uterus collector or that nearly everyone he treated had a hysterectomy could be construed as absurdist, possibly even comical, commentary. But when put in context of a story about a rogue doctor removing the reproductive organs of detained women without justification, the statements take on a factual role. They become capable of being proved false.

**\*18** Returning to the "John Jones is a liar" example created by the Supreme Court, saying "Dr. Amin is a uterus collector" and "Dr. Amin performs a hysterectomy on every detainee patient he sees" implies a knowledge of facts which lead to the conclusion that Dr. Amin in fact collects uteri or performs hysterectomies on all his patients. Milkovich, 497 U.S. at 18–19. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." Id. NBC's statements did just that.

The statements were not unprovable subjective assessments of Plaintiff. That distinguishes this case from other cases where courts have found statements to be non-actionable. In Mills, for example, the Georgia Court of Appeals held that "referring to [the director of a humane society] as 'Mr. Kill' is ... incapable of being proved false, because the [humane society] under his leadership indeed killed a significant number of animals yearly; in [the defendant's] opinion ... that number is too large and could be reduced by improving adoption procedures." 618 S.E.2d at 24–25. In Swanson Towing & Recovery, LLC v. Wrecker 1, Inc., the court found statements that the plaintiff "had no morals" and was "mean, vulgar, [and] demeaning" to be non-actionable opinions because they were subjective, unprovable assessments. 802 S.E.2d 300, 305–06 (Ga. Ct. App. 2017). And in Gast, the Georgia Supreme Court concluded that accusations a Boy Scout troop leader was "immoral" and did not live his life according to the ideals of the Boy Scouts were non-actionable opinions because they could not "reasonably be interpreted, according to the context of the entire writing in which the

opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false." 589 S.E.2d at 64 (footnote omitted).

Here, the relevant statements were not moral assessments of Plaintiff. The statements were not Wooten's subjective, personal beliefs about Plaintiff's character. The statements are verifiable assertions of fact and are, therefore, actionable. Compare Infinite Energy, Inc. v. Pardue, 713 S.E.2d 456, 460 (Ga. Ct. App. 2011) (finding that where published statements about a plaintiff were based on quantifiable facts, the statements could be proved false) with Frank v. Fine, No. 6:23-cv-2043, 2024 WL 473718, at *3 (M.D. Fla. Jan. 5, 2024) (applying Florida law and finding that "being called a Nazi or coward are not verifiable statements of fact that would support a defamation claim"). Plaintiff can prove that he did not collect uteri or perform hysterectomies on nearly every detainee he treated. He can also prove that he did not have a reputation as the "uterus collector" with detainees at the facility. In fact, Plaintiff has done just that.

The undisputed evidence proves that Statements 5, 6, 14, 15, 16, 23, 25, 26, 27, and 28 are materially false. The extensive medical reports, witness testimony, and Senate Report prove that Plaintiff did not perform hysterectomies on every detainee patient or nearly every patient he treated. Dkt. No. 136. And no evidence exists to support the assertion that Plaintiff collected uteri or had a reputation as a "uterus collector." The evidence shows that one detainee at the facility heard Plaintiff referred to as the "uterus collector," but that this began *after* news outlets covered the whistleblower letter. Dkt. No. 153-119 at 60. Other detainee witnesses never heard him described as such at the facility. Dkt. Nos. 153-67 at 3, 153-68 at 3, 153-69 at 3–4, 153-70 at 5, 153-71 at 3. These statements are materially false because they have a different effect on the mind of the viewer and are far more damaging to Plaintiff's reputation than "that which the truth would have produced." Project Veritas v. CNN, Inc., 591 F. Supp. 3d 1322, 1333 (N.D. Ga. 2022) (alterations adopted and internal quotation marks omitted). Plaintiff's motion for summary judgment on the issue of falsity for Statements 5, 6, 14, 15, 16, 23, 25, 26, 27, and 28 is **GRANTED**. [4] NBC's motion for summary judgment on the issue of falsity for Statements 5, 6, 9, 14, 15, 16, 23, 25, 26, 27, 28, and 34 is **DENIED**.

**ii. Statements that are capable of being proved false.**

**\*19** Multiple statements are capable of being proved false. Thus, a jury must decide their veracity. The statements that can be proved false are Statements 1, 2, 3, 4, 7, 8, 10, 12, 13, 17, 18, 19, 20, 21, 24, 29, 31, 32, 33, 37, 38, and 39. See Appendix I.

Statements 1, 8, 13, 17, 18, 21, and 39 are materially similar in that they accuse Plaintiff of performing mass hysterectomies or a high number of hysterectomies at the ICDC. See id. These statements can be proved false. While Plaintiff has proved that he did not perform mass hysterectomies, the Court concludes that a jury must, nevertheless, decide whether these statements are false. The Court makes this finding because these seven statements could be assigned a non-defamatory interpretation when viewed in context.

NBC argues that "the 'sting' of the libel does not turn on the number of procedures performed, whether it was two, four, or 'mass' procedures; it is whether Dr. Amin performed unnecessary invasive gynecological procedures, including hysterectomies and other procedures that could affect fertility." Dkt. No. 127 at 22. NBC is correct that the gist of a publication does not depend on the number of times an incident occurred. See Stange v. Cox Enters., 440 S.E.2d 503, 507 (Ga. Ct. App. 1994). As then-Judge Gorsuch once explained:

> it is not enough for the plaintiff to show that the defendant got some innocuous detail wrong; the plaintiff must show that the challenged defamatory statement is not just false but material. A report that the defendant committed 35 burglaries when he actually committed 34 isn't enough to warrant relief. Neither is a report that mistakenly says that the plaintiff stabbed a man in Cheyenne, Wyoming when he really stabbed a man from Cheyenne, Wyoming. Unless a statement contains a material falsehood it simply is not actionable.

Bustos v. A&E TV Networks, 646 F.3d 762, 764 (10th Cir. 2011) (citations omitted). The tort of defamation protects the plaintiff's public reputation. See id. at 765; Gertz, 418 U.S. at 341. Courts, therefore, "assess the materiality of a

*Amin v. NBCUniversal Media, LLC, Slip Copy (2024)*

misstatement by comparing the damage it has done to the plaintiff's public reputation to the damage the truth would have caused." Bustos, 646 F.3d at 765.

The NBC statements are material. The issue here is not that NBC reported that Plaintiff treated ICE detainees when he actually treated state prisoners, or that he performed the procedures at his office when he actually performed them at a hospital. NBC did not get some innocuous details wrong. The alleged falsehoods are a night-and-day difference from the alleged truth. The damage done to Plaintiff's reputation by the accusations that he physically hurt women, that he removed women's reproductive organs without their consent, and that he performed unnecessary hysterectomies and medical procedures is materially different from any damage the pleaded truth would have caused—Plaintiff's assertion that he did not injure any patients, always acted with consent, and performed only medically necessary procedures. See Bryant, 715 S.E.2d at 463. NBC's statements are "likely to cause reasonable people to think significantly less favorably about the plaintiff than they would if they knew the [pleaded] truth." Bustos, 646 F.3d at 765. The statements that have been proved false and the statements that are capable of being proved false fall in this category of materiality.

 **\*20** The gist of the three September 15 broadcasts and the September 21 Facebook post is not that Plaintiff "performed unnecessary invasive gynecological procedures, including hysterectomies." Dkt. No. 127 at 22. The focus is almost exclusively on mass hysterectomies that were unnecessary or unauthorized, with some attention given to other gynecological procedures. And so, while the sting of the defamation here does not turn on the number of procedures performed, it does turn on whether Plaintiff performed unnecessary or unauthorized hysterectomies and gynecological procedures.

A jury could conclude that Plaintiff performed unnecessary and unauthorized gynecological procedures, including the two hysterectomies. A jury could also conclude that these accusations were materially false. Determining falsity will require weighing the credibility of Plaintiff, his patients, and medical experts. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255.

The same rationale applies to Statements 2, 3, 4, 7, 10, 12, 13, 19, 20, 24, 29, 31, 32, 33, 37, and 38. See Appendix I. These statements generally accuse Plaintiff of treating patients improperly or performing procedures without informed consent and authorization. These statements can also be proved false as they "would have a different effect on the mind of the viewer from that which the pleaded truth would have produced." Bryant, 715 S.E.2d at 463. There is a dispute of material fact surrounding the quality of care provided by Plaintiff. The evidence is in conflict as to whether Plaintiff received informed consent and authorization for every hysterectomy or procedure performed. There is also a dispute over whether Plaintiff incorrectly performed some procedures or mistreated his patients. These disputes require jury resolution.

A jury could determine that Statements 1, 2, 3, 4, 7, 8, 10, 12, 13, 17, 18, 19, 20, 21, 24, 29, 31, 32, 33, 37, 38, and 39 are false under the clear and convincing evidence standard. Plaintiff and NBC's motions for summary judgment are, therefore, **DENIED** as to these statements.

### iii. Statements that are incapable of being proved false.

Multiple statements are non-actionable as defamation because they cannot be proved false. These are Statements 11, 22, 30, 35, and 36.

Statements 11 and 30 are non-actionable opinions. Unlike the statements discussed above, the gist of Statement 11 and 30 is a subjective assessment. Two women who received hysterectomies believed their procedures "may have been unnecessary." Dkt. No. 131-2 at 12. Unlike the statements that Plaintiff was a "uterus collector" or performed hysterectomies on nearly every patient he treated, Statement 11 and 30 express a subjective belief that cannot be proved false. An individual's belief that a medical procedure may have been unnecessary cannot be proved or disproved. Upon seeing conclusive evidence that their procedures were necessary, the speakers of these statements may, nevertheless, hold to their subjective beliefs that the procedures were unnecessary.

Statement 22 is also a non-actionable opinion because it is a subjective assessment. The detainee making this statement likened the facility to a concentration camp and the procedures to scientific experiments. Dkt. No. 133-7 at 5. The statement is a hyperbolic analogy rather than a statement of fact. Similar to the statements in Mills referring to a humane society director as "Mr. Kill," Statement 22 is incapable of

being proved false. See 618 S.E.2d at 24–25. As part of his work at the ICDC, Plaintiff indeed performed many types of gynecological procedures. In the speaker's mind, that fact made the ICDC similar to a concentration camp and the procedures like experiments. Plaintiff cannot prove that the speaker's subjective beliefs are wrong. Again, this is unlike the "uterus collector" and "everyone Plaintiff sees receives a hysterectomy" allegations. Those statements can be proved false. Plaintiff either did or did not collect uteri. Plaintiff either did or did not have a reputation as the "uterus collector" at the facility. Plaintiff either did or did not perform hysterectomies on all or nearly all his patients. Those statements are quantifiable and verifiable. A clearly exaggerated statement based on a speaker's personal interpretation of the world around her cannot be proved false. See Grace, 860 S.E.2d at 162; Mills, 618 S.E.2d at 25. To the speaker of this statement, any procedure ranging from a finger prick to a medically necessary hysterectomy may constitute an experiment. Proof that Plaintiff's procedures were necessary, consented-to, and appropriate will not negate a subjective belief that the facility was like an "experimental concentration camp" or that the procedures were like experiments.

*21 Statements 35 and 36 are also not actionable because the gist of the statements can be justified. See Mason, 501 U.S. at 517. These two statements were featured in the September 17, 2020 episode of *All In With Chris Hayes*. Dkt. No. 131-5. The gist of this show is markedly different from the gist of the other three broadcasts. The September 17 episode was not about the whistleblower letter's allegations themselves, but the investigation opened into those allegations. Dkt. No. 131-5 at 13–15. This segment of the show began with Hayes saying that "there is now a formal inquiry into those allegations in the Department of Homeland Security's Office of the Inspector General." Id. at 13. Hayes reminded the viewers that the allegations were about "medical procedures performed on immigrant women ... without consent." Id. Hayes discussed the new investigations and also spoke of a previous case against Plaintiff involving Medicare and Medicaid claims. Id. at 13–14. The average viewer would not understand this broadcast to be accusing Plaintiff of performing mass hysterectomies or unnecessary procedures. The focus of this show was on the investigations into Plaintiff's conduct. Even the headline displayed on the screen was about these investigations. Dkt. No. 153-50 at 133. The show also focused on the previous Medicare and Medicaid claims against Plaintiff, which had nothing to do with the whistleblower complaint's allegations. Dkt. No. 131-5 at 14. Every statement made by Hayes in this portion of

the show has been proved true. Hayes was correct about investigations into Plaintiff regarding the allegations and about the previous claims against Plaintiff. Dkt. No. 153-50 ¶¶ 78, 80, 113. While the show repeated some of the possibly false allegations made in the whistleblower letter, it did this in the context of discussing the investigation. Unlike the other three broadcasts, the whistleblower allegations were repeated not as statements of fact but as explanatory references to understand the scope of the Homeland Security investigation.

Statements 11, 22, 30, 35, and 36 are not actionable as defamation. NBC's motion for summary judgment as to these five statements is **GRANTED**. Plaintiff's motion for summary judgment on falsity for these statements is **DENIED**.

## B. Defamatory

### 1. Overview

For a defamation claim to succeed, a statement must not only be false but also defamatory. ACLU, 864 S.E.2d at 427. Under Georgia law,

> the question whether a particular publication is libelous, that is, whether the published statement was defamatory, is a question for the jury. However, if the statement is not ambiguous and can reasonably have but one interpretation, the question is one of law for the judge. The trial judge should read and construe the publication as a whole, and thereafter may find that it is not defamatory, that it is defamatory, or that it is ambiguous and the question is one for a jury.

Mead v. True Citizen, 417 S.E.2d 16, 17 (Ga. Ct. App. 1992) (internal quotation marks and citations omitted); see also Hoffman-Pugh, 312 F.3d at 1225. "[I]n considering whether a writing is defamatory as a matter of law, we look not at the evidence of what the extrinsic circumstances were at the time indicated in the writing, but at what construction would be placed upon it by the average reader." Macon Tel. Pub. Co. v. Elliot, 302 S.E.2d 692, 694 (Ga. Ct. App. 1983). When a publication's words are capable of two meanings, one of

which is actionable defamation and the other not, "it is for the jury to say, under all the circumstances surrounding its publication, which of the two meanings will be attributed to it by those to whom it is addressed or by whom it may be read." Id. at 695 (internal quotation marks omitted) (quoting Reece, 267 S.E.2d at 841).

**2. Analysis**

Plaintiff argues that NBC's statements are defamatory because they meet the requirements for libel and two types of slander per se—imputing a crime and charges in reference to a trade or profession. Dkt. No. 122 at 20–21. The statements do not impute crimes to Plaintiff. Whether the statements are libelous or slander per se because they make charges against Plaintiff in reference to his trade or office are matters that must be decided by a jury.

To constitute slander per se by imputing a crime, NBC's statements must have given the impression that Plaintiff was actually being charged with a crime. Cottrell, 788 S.E.2d at 781. They do not. At oral argument, the Court asked Plaintiff's counsel: "Is it your contention presently that the statements led someone to believe that [Plaintiff] was actually charged with a crime?" Plaintiff's counsel replied: "I wouldn't go that far." Dkt. No. 194 at 24:10–13. Plaintiff argues that NBC's statements describe acts that could constitute criminal offenses. Dkt. No. 122 at 23. But this is not enough. The statements must have been clear that Plaintiff had committed a specific criminal offence. Dagel, 537 S.E.2d at 696; Cottrell, 788 S.E.2d at 781. In Wade v. Wood, for instance, the defendant posted on social media that the plaintiffs had committed criminal extortion and he provided details substantiating this claim. No. 1:22-cv-1073, 2024 WL 1075482, at *2 (N.D. Ga. Mar. 12, 2024). The court found that these statements were slander per se because they asserted that the plaintiffs were guilty of a crime. Id. at *6. This case is different. NBC did not accuse Plaintiff of violating any criminal laws. An average person hearing or reading the statements could not construe the statements to mean that Plaintiff had committed a crime or was being charged with a crime.

**\*22** A jury could conclude that the statements are slander per se because they make charges against Plaintiff in reference to the medical profession. The "plain import of the words spoken" by NBC could constitute slander per se. Palombi v. Frito-Lay, 526 S.E.2d 375, 377 (Ga. Ct. App. 1999) (internal quotation marks and citation omitted). NBC's statements make accusations against Plaintiff in reference to the medical

profession. The statements reference how he conducts his practice, how he treats patients, and the quality of care he provides his patients. When a professional's reputation and competency are essential to the operation of his business, statements injuring his reputation or charging him with incompetency constitute slander per se. See Bellemeade, LLC, 631 S.E.2d at 695–96. As explained by Georgia's Supreme Court: "a charge that a physician stole the land of a certain person does not defame the physician with reference to his profession, while to say of a merchant whose credit is necessary to the operation of his business that he is insolvent or does not pay his bills on time would be libelous." Id. at 695 (internal quotation marks and citation omitted). NBC's statements go to the heart of Plaintiff's medical practice. A jury could determine that the statements were injurious to his medical reputation or charged him "with some defect of character or lack of knowledge, skill, or capacity as necessarily to affect his competency successfully to carry on his business." Id. A jury, looking at the statements in context, could also determine that the statements were not "injurious on their face" or required extrinsic proof to show their meaning. See Elliot, 302 S.E.2d at 696 ("Defamatory words which are actionable per se are those which are recognized as injurious on their face—without the aid of extrinsic proof.").

A jury could also conclude that the statements are libelous because they injured Plaintiff's reputation and exposed him to "public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a).

Plaintiff and NBC's motions for summary judgment on whether the statements were defamatory are, therefore, **DENIED**.

**III. Element Two: Unprivileged Publication**

**A. Overview**

To satisfy the second element of defamation, Plaintiff must prove NBC made an unprivileged communication to a third party. ACLU, 864 S.E.2d at 427. NBC does not dispute that it published the statements to third parties. Dkt. No. 156-1 at 26. The Court must now determine whether the statements were privileged.

Certain communications are considered privileged under Georgia defamation law. O.C.G.A. § 51-5-7. Georgia recognizes absolute and conditional privileges. Saye v. Deloitte & Touche, LLP, 670 S.E.2d 818, 821 (Ga. Ct. App. 2008) (citations omitted). Two conditional privileges are

relevant here: the fair report privilege and the public interest privilege.

First, the fair report privilege protects "fair and honest reports" of judicial, legislative, and court proceedings. O.C.G.A. § 51-5(5), (6). This includes "fair, impartial, and accurate news accounts" of government administrative agencies. Morton v. Stewart, 266 S.E.2d 230, 233 (Ga. Ct. App. 1980) (citing 45 A.L.R. 2d 1296, 1305). Reports must be "neutral reportage," meaning that they are both impartial and accurate. See Lawton v. Ga. TV Co., 456 S.E.2d 274, 277 (Ga. Ct. App. 1995); see also McCracken v. Gainesville Trib., Inc., 246 S.E.2d 360, 362 (Ga. Ct. App. 1978) ("What is demanded is 'neutral reportage.' " (citation omitted)). Under Georgia law, there is "no indication that the republisher has any burden except fairness, honesty, and accuracy." McCracken, 246 S.E.2d at 277. A media outlet can also inject some of its own editorial opinions in its reporting, so long as the reporting remains impartial and accurate. Mathews v. Atlanta Newspapers, Inc., 157 S.E.2d 300, 303–04 (Ga. Ct. App. 1967). Finally, a report need not "be exact in every immaterial detail .... It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." Lawton, 456 S.E.2d at 277.

Second, Georgia's public interest privilege protects "[s]tatements made in good faith as part of an act in furtherance of the ... entity's right of ... free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern as defined in [O.C.G.A. § 9-11-11.1(c)]." O.C.G.A. § 51-5-7(4). O.C.G.A. § 9-11-11.1(c)(2)–(4) defines an act in furtherance of free speech to include "[a]ny written or oral statement ... made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"; "[a]ny written or oral statement ... made in ... a public forum in connection with an issue of public concern"; or "[a]ny other conduct in furtherance of the exercise of the constitutional right of ... free speech in connection with a public issue or an issue of public concern."

**\*23**  "In every case of privileged communications, if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action." O.C.G.A. § 51-5-9. A conditional privilege protects the speaker from liability for the communication unless the communication is made with actual malice. McCraken, 246

S.E.2d at 362 ("The characteristic feature of absolute, as distinguished from conditional, privilege is that in the former the question of malice is not open, all inquiry into good faith is closed." (internal quotation marks and citations omitted)). "A conditional privilege is lost if maliciously made ... even though the source of the communication is quoted ..., for the law holds that 'talebearers are as bad as talemakers.' " Id. (quoting Ivester, 127 S.E. at 792).

### B. Analysis

#### 1. The fair report privilege does not apply.

The Court previously ruled that the fair report privilege does not apply to NBC's reports. Dkt. No. 59 at 9. The Court finds no reason to change this ruling.

NBC's broadcasts and social media posts were not reports of court or legislative proceedings. Instead, NBC argues, the reports concerned quasi-judicial proceedings regarding the whistleblower letter. Dkt. No. 127 at 23. Whether a proceeding is of a judicial or quasi-judicial character "depends upon the subject of the inquiry. It is judicial to punish for infraction of, or to enforce, an existing rule." Morton, 266 S.E.2d at 233 (alterations adopted and internal quotation marks omitted) (quoting Se. Greyhound Lines v. Ga. Pub. Serv. Comm'n, 181 S.E. 834, 845 (Ga. 1935)). "[I]t is the nature of the act to be performed rather than the office, board, or body which performs it, that determines whether or not it is the discharge of a judicial or a quasi-judicial function." Se. Greyhound Lines, 181 S.E. at 837 (internal quotation marks and citations omitted). "Administrative proceedings by governmental agencies to discipline, remove from office, or revoke a license, are quasi-judicial in nature and are entitled, as a minimum, to a qualified privilege." Morton, 266 S.E.2d at 233.

NBC argues that ICE disciplined Plaintiff when it instructed LaSalle Corrections to terminate its relationship with Plaintiff. Dkt. No. 127 at 24. But the evidence does not support this argument. True, ICE directed LaSalle Corrections to cancel any upcoming appointments with Plaintiff, but it provided no reasons why. Dkt. No. 136-51. The ICE directive did not come following an investigation or as part of a formal finding. Id. The directive came via a confidential email from an ICE employee to an ICDC employee. Id. ICE could have sent this directive for many reasons—to minimize media attention, as a precautionary measure, or even to punish Plaintiff. The evidence, however, does not show that this

*Amin v. NBCUniversal Media, LLC, Slip Copy (2024)*

email was sent as part of an administrative proceeding by ICE or DHS to discipline Plaintiff.

Morton provides a clear illustration of when the fair report privilege applies. In Morton, Georgia's Court of Appeals found that the Georgia Composite State Board of Medical Examiners, which had the power to investigate and discipline physicians, exercised quasi-judicial functions when it received letters complaining of abuses and investigated members of the Board in response. 266 S.E.2d at 232–33. Fair and impartial reports about these proceedings were, thus, privileged. Id. NBC has not provided evidence that ICE or DHS had the power to discipline Plaintiff or revoke his medical license. Without evidence of a judicial or quasi-judicial proceeding, the fair report privilege does not apply.

### 2. The public interest privilege applies.
The Court also previously found that Georgia's public interest privilege applies. Dkt. No. 59 at 15. Again, the Court finds no reason to disturb this ruling.

**\*24** NBC's broadcasts and social media posts satisfy the requirements of O.C.G.A. § 51-5-7(4). First, NBC's statements were made in connection with an issue under consideration or review by an executive body. See O.C.G.A. § 9-11-11.1(c)(2). This privilege is not limited to pending matters under consideration. Hawks v. Hinely, 556 S.E.2d 547, 549–50 (Ga. Ct. App. 2001). "Excluding the petition itself that initiates a 'proceeding' to address matters of public concern ... would defeat a central purpose of the statute." Id. at 550. Because the whistleblower letter caused DHS and ICE—executive agencies—to launch investigations, it is irrelevant that the investigations began after the letter's release.

Second, NBC's statements satisfy the requirements of O.C.G.A. §§ 9-11-11.1(c)(3) and 9-11-11.1(c)(4). NBC's statements were made in a public forum in connection with an issue of public concern. O.C.G.A. § 9-11-11.1(c)(3). The statements were also made in furtherance of NBC's constitutional right of free speech in connection with a public issue and an issue of public concern. O.C.G.A. § 9-11-11.1(c)(4). NBC's statements, broadcasts, and social media posts concerned the treatment of ICE detainees in a federally funded facility. Each of the contested statements were made in connection with issues of public concern.

NBC's statements are privileged, but this privilege is conditional. As a result, Plaintiff must prove that the

statements were made with malice. See McCraken, 246 S.E.2d at 362.

## IV. Element Three: Fault

### A. Overview
The applicable level of fault in a defamation case depends on (1) whether the plaintiff is a private or public figure and (2) whether the defendant's statements are conditionally privileged. See Ward, 870 S.E.2d at 820.

A plaintiff who is a private figure need only prove that the defendant acted with ordinary negligence, while a public figure plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice. Infinite Energy, Inc., 713 S.E.2d at 461. Public figures

> have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

Gertz, 418 U.S. at 345. For a plaintiff to qualify as a public figure, there must be "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society." Id. at 352. Neither party contends that Plaintiff qualifies as a public figure under this standard.

If a conditional privilege applies, a defamation plaintiff, even a private figure, must prove that the defendant acted with actual malice. See McCracken, 246 S.E.2d at 361 ("A conditional privilege is lost if maliciously made." (citation omitted)).

The standard of proof for actual malice is extremely high. Cottrell, 788 S.E.2d at 772 (citation omitted). Actual malice

is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity. Actual or constitutional malice is different from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

**\*25** Id. (internal quotation marks omitted) (quoting Mills, 618 S.E.2d at 24). "Actual malice requires more than a departure from reasonable journalistic standards" or "a failure to investigate." Michel v. NYP Holdings, Inc., 816 F.3d 686, 703 (11th Cir. 2016) (citations omitted). "Rather there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." Id. The Supreme Court has further explained:

Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness

may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

St. Amant v. Thompson, 390 U.S. 727, 731 (1968). The existence of actual malice is generally a question for the jury. Speedway Grading Corp. v. Gardner, 425 S.E.2d 676, 678 (Ga. Ct. App. 1992); see also Reid v. Viacom Int'l Inc., No. 1:14-cv-1252, 2017 WL 11634619, at \*7 n.6 (N.D. Ga. Sept. 22, 2017) ("Because the question of actual malice involves subjective evaluations, the Court is reluctant to take the malice determination from a jury." (internal quotation marks and citation omitted)).

**B. Analysis**

Because the Court has determined that NBC's statements are conditionally protected by the public interest privilege, Plaintiff must provide clear and convincing evidence that NBC published the statements with a high degree of awareness that the statements were false. See Jacoby v. CNN, Inc., No. 21-12030, 2021 WL 5858569, at \*4 (11th Cir. Dec. 10, 2021). "[T]he appropriate question at summary judgment is 'whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.' " Klayman v. City Pages, 650 F. App'x 744, 750 (11th Cir. 2016) (quoting Anderson, 477 U.S. at 256–57).

**1. A jury could find that there were obvious reasons to doubt the accuracy of the reports.**

Plaintiff has presented sufficient evidence supporting a finding of actual malice in that there were obvious reasons to doubt the accuracy of NBC's statements.

"[E]vidence which shows that the statement was inherently implausible or that there were obvious reasons to doubt the veracity of the informant is relevant to establishing actual malice." Hunt v. Liberty Lobby, 720 F.2d 631, 643 (11th Cir. 1983) (citations omitted). "[A]n inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge." Id. at 645.

Plaintiff has presented evidence that NBC's statements were inherently implausible. The allegations that there were "mass hysterectomies," Plaintiff was a "uterus collector" or collected uteri, Plaintiff performed hysterectomies "for which no medical indication existed," and that Plaintiff performed hysterectomies on all or nearly all his patients are so implausible that a jury could infer actual malice. The implausibility of these statements is clear, given that NBC found evidence of only two hysterectomies.

*26 NBC's investigation did not yield evidence of more than two hysterectomies. Wooten told NBC she did not know how many women had had hysterectomies. Dkt. No. 133-3. An attorney source, Sarah Owings, told NBC that her team was not finding evidence of mass hysterectomies. Dkt. No. 122-26 at 48:2–5, 118:1–6. Another attorney source, Ben Osorio, told NBC that one client had had a hysterectomy that medical records revealed was medically necessary and another client believed she had had a hysterectomy, but no evidence supported this claim. Dkt. No. 122-27 at 5, 10. NBC's own reporter, Julia Ainsley, reinforced these facts when she texted her colleague: "But only two hysterectomies?" Dkt. No. 153-3 at 13. The attorney who told NBC that there were more than two hysterectomies, Andrew Free, also told NBC that those reports had not been confirmed and were still being vetted. Dkt. No. 132-3 at 15. Free even explicitly told NBC that he could confirm only one hysterectomy. Dkt. No. 132-6.

Nevertheless, NBC published statements that Plaintiff performed mass hysterectomies. Although NBC's own sources told it that there was evidence of only one hysterectomy, NBC stated as fact: "five different women ... had a hysterectomy done," dkt. no. 133-7 at 5; "as many as 15 immigrant women were given full or partial hysterectomies," dkt. no. 131-2 at 12; and "[e]verybody this doctor sees has a hysterectomy, just about everybody," dkt. no. 133-7 at 5. These statements contradict information known to NBC at the time of reporting. The same applies to the accusations that Plaintiff was a "uterus collector" or that detainees referred to him as such. Aside from Wooten's allegation, NBC lacked any evidence that could support the accusation that Plaintiff collected uteri or was known as the "uterus collector" at the ICDC. A jury could conclude that NBC knew these allegations were false. See Klayman v. Jud. Watch, Inc., 22 F. Supp. 3d 1240, 1252–53 (S.D. Fla. 2014) (finding that the plaintiff had presented evidence of actual malice by showing the defendant "may have had knowledge of the falsity").

Plaintiff has presented evidence that there were obvious reasons to doubt Wooten's reliability, credibility, and accuracy. In her interview with NBC, Wooten could not name Plaintiff, did not know what happened when detainees visited Plaintiff, and did not know how many women had received gynecological procedures. Dkt. No. 133-3. She even acknowledged this herself. Id. Wooten could not provide a number for how many women she had spoken to about gynecological care at the facility. Id. at 16. She told NBC that she had spoken to "several women" in the eight years she worked at the ICDC. Id. In essence, Wooten could provide only hearsay evidence to support her allegations. NBC's reporter, Jacob Soboroff, texted his colleague that one source had "heard mixed things about Wooten." Dkt. No. 153-3 at 13. NBC's deputy head of Standards was critical of Wooten because she "provide[d] no evidence to back up her claims," had "no direct knowledge of what she's claiming," and she could not "name the doctor involved." Dkt. No. 134-2 at 2. MSNBC's hosts also voiced concerns over Wooten's reliability. Rachel Maddow believed Wooten's whistleblower letter jumped to conclusions and "didn't want to assume it's true." Dkt. No. 133-1 at 4. Chris Hayes also criticized Wooten's letter because it was based on secondhand information and Wooten had "no factual, firsthand knowledge." Dkt. No. 132-15 at 12–13. Not only did NBC have reasons to doubt Wooten, but NBC actually doubted her.

On top of Wooten's lack of direct knowledge, her possible bias could also support a finding of actual malice. Bias alone does not support a finding of actual malice. See Reid, 2017 WL 11634619, at *5 (collecting cases). If a source's bias causes a defendant to doubt the veracity of the information provided, however, bias becomes relevant to the actual malice analysis. Id. (citing Harte-Hanks Commc'ns. v. Connaughton, 491 U.S. 657, 689–90 (1989)). Here, there is evidence of just that. The deputy head of NBC's Standards, Chris Scholl, said that the whistleblower letter "boils down to a single source—with an agenda—telling us things we have no basis to believe are true." Dkt. No. 134-2. He also later said that Wooten "has a beef" and "a whole separate agenda." Dkt. No. 132-15 at 8. As detailed above, Scholl interspersed these observations of Wooten's bias with doubts about the truth of Wooten's story. Id. While only a jury can determine whether Wooten was a credible or believable source, Plaintiff has submitted sufficient evidence that would enable a jury to find that she was not. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Issues of credibility and the weight afforded to certain evidence are determinations

appropriately made by a finder of fact and not a court deciding summary judgment.").

### 2. A jury could find that NBC expressed serious doubts as to the truth of the statements.

**\*27** Plaintiff has presented sufficient evidence supporting a finding of actual malice in that NBC's employees and decisionmakers expressed serious doubts regarding the truth of the statements.

Decisionmakers who approved NBC's publication of the statements expressed doubts as to the statements' truthfulness. Chris Scholl approved the initial news article written by Ainsley and Soboroff. Dkt. No. 134 at 2. He also worked on MSNBC's broadcasts of the statements. Id. at 11. As detailed above, Scholl expressed concerns over the veracity of the statements. He pointed out the lack of evidence to support the accusations, doubted Wooten as a credible source, and said that NBC had been unable to verify the accusations. Dkt. No. 134-2 at 2. Scholl even explicitly stated: "We don't know the truth." Dkt. No. 132-15 at 8. A jury could determine that Scholl expressed serious doubts. Maddow is responsible for the content of her show. Dkt. No. 133 at 1. She expressed what could amount to "serious doubt" when she criticized the whistleblower letter and said that she did not want to assume that the allegations against Plaintiff were true. Dkt. No. 133-1. While Maddow has since clarified what she meant, it is for the jury to determine what meaning to assign her statements. Hayes is also responsible for the content of his show. Dkt. No. 131 at 1. Hayes was the most critical of the statements' truth. He noted that the story went viral because it recalled Nazi Germany or the Jim Crow South, but, in reality, that was "not the case here." Dkt. No. 132-15 at 10. He also told his team that he had initially "discounted the whole thing." Id. at 12–13. Scholl agreed with Hayes as to this point. While Hayes said that he had less skepticism now, a jury could conclude that Hayes seriously doubted the statements' truth. Thus, a jury could find that Plaintiff has shown malice.

### 3. A jury could find that NBC did not act with actual malice.

A jury could conclude that Plaintiff has failed to prove the actual malice element.

Evidence undermining an actual malice finding does not wrest a defamation case from a jury. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) ("Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence. It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."). NBC argues that it did not act with actual malice because: it investigated and found corroborating information for the statements; it relied on reporting from other reliable news organizations; and it provided its audience information that contradicted the allegations. Dkt. No. 127.

First, NBC argues that "when a news organization investigates and finds corroborating information for challenged statements—as is the case here—it is 'antithetical' to a finding of actual malice." Id. at 27 (citing Berisha v. Lawson, 378 F. Supp. 3d 1145, 1162 (S.D. Fla. 2018)). "While a failure to investigate alone does not establish malice, the investigation which [a defendant undertakes] tends to corroborate his assertion of good faith and belief in the truth of the published statements." Stange, 440 S.E.2d at 506. That said, where a plaintiff shows that a defendant's "investigation uncovered facts that created a high degree of awareness of probable falsity or caused him to entertain serious doubts as to the truth of his publication," there is evidence of actual malice. Id. (citation omitted). While the evidence certainly does not show that NBC avoided further investigation into the allegations against Plaintiff—quite the opposite, in fact—a jury could conclude that NBC's investigation provided no corroborating evidence or even disproved the accusations. NBC was not obligated to find "only pure, unimpeachable sources of information" or to definitely verify its published statements. Berisha v. Lawson, 973 F.3d 1304, 1313–14 (11th Cir. 2020). But where NBC's investigation yielded evidence that seriously undermined the accusations and proved that only one hysterectomy could be confirmed, a jury might find actual malice. NBC found evidence that multiple women claimed to have received hysterectomies or other procedures. It also could not corroborate these claims, lacked medical records supporting the claims, and heard from multiple sources that only one hysterectomy could be confirmed. In the end, we are left with this: NBC investigated the whistleblower letter's accusations; that investigation did not corroborate the accusations and even undermined some; NBC republished the letter's accusations anyway. A jury could conclude that NBC did not act with actual malice because of its investigation. Or, it could conclude the opposite.

**\*28** Second, NBC argues that it did not act with actual malice because it relied on reporting done by other reliable,

reputable news organizations. Dkt. No. 127 at 28. "The law is clear that individuals are entitled to rely on 'previously published reports' from 'reputable sources.' " Berisha, 973 F.3d at 1313 (quoting Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1297 (D.C. Cir. 1988)); see also Rosanova v. Playboy Enters., 580 F.2d 859, 862 (5th Cir. 1978) ("The subjective awareness of probable falsity ... cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied."). Aside from bare assertions that NBC relied on previous reporting from other news sources, NBC has not provided sufficient evidence to warrant judgment as a matter of law on this issue. To succeed here, NBC must show that its statements were based on reports "which were not believed to be false." Rosanova, 580 F.2d at 862. NBC's reporting on the whistleblower letter consisted of reading verbatim portions of the letter on air, discussing NBC's own investigation with NBC reporters, and interviewing Wooten or replaying her interview with NBC. NBC has not shown what portions of its reporting came from previous reports by other news outlets. Further, the reports by other outlets simply republished identical portions of the whistleblower letter. See Dkt. No. 153-50 ¶¶ 25–29, 34–39. NBC does not have safe harbor from actual malice because it republished identical portions of the same whistleblower letter which other news outlets were also republishing. Finally, Plaintiff has submitted evidence that NBC believed the whistleblower letter's accusations—the same accusations republished by other outlets—to be false.

Third, NBC argues that it did not act with actual malice because it provided information contrary to the republished allegations. Dkt. No. 127 at 27–28. "Where the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of malice." Michel, 816 F.3d at 703 (citation omitted). Put differently, "[w]here a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has." Id. NBC included statements refuting the whistleblower letter's allegations in its reporting. NBC used portions of Plaintiff, ICE, and LaSalle Corrections's statements that countered the accusations. NBC was not required to provide information contradicting every allegation it published. See Michel, 839 F.2d at 704 (requiring only that a publisher provide "sufficient information" to allow its audience to weigh the veracity of a publication). Reporting a contrarian perspective helps rebut the presence of actual

malice. Id. Determining whether actual malice existed here, however, is a job for the jury.

When courts have granted summary judgment for a publisher defendant who provided opposing information, the plaintiff had already failed to submit sufficient evidence of actual malice. See, e.g., id. at 703–04 (finding that the plaintiff had failed to plead "facts giving rise to a reasonable inference that the defendants published the story knowing that it was false or with reckless disregard for whether it was false or not" in addition to the defendant publishing opposing information); Silvester v. American Broad. Cos., 839 F.2d 1491, 1498 (11th Cir. 1988) (finding that the plaintiffs could not prove actual malice and the defendant news channel undermined an actual malice finding by showing that it informed its audience that a source was biased); Klayman, 650 F. App'x at 750–51 (finding that a plaintiff could not prove actual malice because of a lack evidence in addition to evidence that a publisher provided opposing information). This case is different. Plaintiff has presented sufficient evidence that could enable a jury to find actual malice. A jury could also conclude that NBC did not act with actual malice given the evidence that it published opposing information. This duel of conflicting evidence must be resolved by a jury.

Because genuine disputes of material fact exist as to whether NBC acted with actual malice, Plaintiff and NBC's motions for summary judgment are **DENIED.**

## V. Element Four: Harm

The Court can make short work of this element. Plaintiff moved for summary judgment "on the 'actionable even in the absence of special harm' element of Georgia defamation law" because NBC's statements constitute defamation per se. Dkt. No. 156-1 at 26. NBC does not dispute that the statements are actionable in the absence of special harm "to the extent the Statements relate to Dr. Amin's trade, office, or profession." Id. The Court has determined that the statements do not impute crimes to Plaintiff but do relate to his profession pursuant to O.C.G.A. § 51-5-4(a). Because the parties agree as to the triable issues of this element, Plaintiff's motion is **GRANTED** in that NBC's statements are actionable even in the absence of special harm. Plaintiff must still prove that NBC's statements constitute defamation per se. If Plaintiff meets this burden, however, damage is inferred under Georgia law. O.C.G.A. § 51-5-4(b). If Plaintiff proves that the statements constitute defamation, but not defamation per se, he must prove actual damages. Id.

## VI. Plaintiff's Summary Judgment Motion for Certain Affirmative Defenses

**\*29**  Plaintiff also moves for summary judgment as to NBC's first, third, fourth, seventh, eleventh, and twelfth affirmative defenses. Dkt. No. 122 at 7–8. Those defenses are as follows:

- First Affirmative Defense: "The [First Amended Complaint] is barred because it fails to state a claim upon which relief can be granted." Dkt. No. 51 at 42.

- Third Affirmative Defense: "Plaintiff's claim is barred under New York Civil Rights Law Section 76-a(2) because this is an action involving public petition and participation, and Plaintiff cannot establish, by clear and convincing evidence, that NBCU acted with actual malice as to the publication of the challenged statements." Id. at 43.

- Fourth Affirmative Defense: "Plaintiff's claim is barred because the challenged statements are absolutely privileged under New York Civil Rights Law Section 74 as a fair and true report on an official proceeding." Id.

- Seventh Affirmative Defense: "Plaintiff's claim is barred because the challenged statements are true or substantially true and thus cannot be the basis for a defamation action." Id.

- Eleventh Affirmative Defense: "Plaintiff's claim is barred because the challenged statements are non-actionable statements of opinion." Id. at 44.

- Twelfth Affirmative Defense: "Plaintiff's claim is barred because he has not suffered any actual harm or damages proximately caused by any of the challenged statements." Id.

The Court previously ruled upon NBC's defense that Plaintiff failed to state a claim. Dkt. No. 59. Given the evidentiary pleading standard at summary judgment and trial, NBC cannot argue going forward that Plaintiff failed to state a claim under Federal Rule of Civil Procedure 12(b)(6)'s pleading standard. Plaintiff's motion as to NBC's first affirmative defense is, therefore, **DENIED as moot.** NBC agrees that Plaintiff is due summary judgment as to the third and fourth affirmative defenses. Dkt. No. 156-1 at 26. The Court, therefore, **GRANTS** Plaintiff's motion for summary judgment as to NBC's third and fourth affirmative defenses. NBC maintains the remaining defenses. Id. at 26–27. Plaintiff is due partial summary judgment as to NBC's eleventh

affirmative defense. Whether a statement is one of fact or opinion is a question of law for the Court. See Turner, 879 F.3d at 1262–63 (citations omitted) (applying materially similar Florida law); StopLoss Specialists, LLC v. VeriClaim, Inc., 340 F. Supp. 3d 1334, 1347 (N.D. Ga. 2018) (citation omitted) (applying Georgia law); Wilferd v. Digit. Equity, LLC, No. 1:20-cv-1955, 2021 WL 1814784, at \*7 (N.D. Ga. May 5, 2021) (citations omitted) (applying Georgia law). As the Court has determined which statements are non-actionable opinions or statements of fact, Plaintiff's motion as to NBC's eleventh affirmative defense is **GRANTED in part** and **DENIED in part** as outlined in this order. Plaintiff's motion is **DENIED** as to NBC's seventh and twelfth affirmative defenses because genuine issues of material fact exist regarding falsity and damages.

## CONCLUSION

For these reasons, the Court **GRANTS in part and DENIES in part** both Plaintiff's motion for partial summary judgment, dkt. no. 122, and Defendant NBC's motion for summary judgment, dkt. no. 127. [5]

**\*30**  The Parties are **ORDERED** to file a proposed consolidated pretrial order within **21 days** of the date of this Order.

**SO ORDERED** this 26th day of June, 2024.

## APPENDIX I

| Statement No. | Full Statement | Portion of Statement Plaintiff Alleges is Defamatory |
|---|---|---|
| 1 | "We are following breaking news today. It's about an alarming new whistleblower complaint that alleges, quote, high numbers of female detainees, detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody." Dkt. No. 130-8 at 11. | "High numbers of female detainees, detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody." Dkt. No. 49 ¶ 75(a). |
| 2 | "The nurse says that detained women told her they didn't fully understand why they were undergoing hysterectomies and that one doctor in particular raised red flags among the nurses at the facility." Dkt. No. 130-8 at 11. | "Detained women . . . didn't fully understand why they were undergoing hysterectomies." Dkt. No. 49 ¶ 75(b). |
| 3 | "Some said that they came back bruised, that he was overly harsh, they called him abusive in some of the allegations that the lawyers told us." Dkt. No. 130-8 at 11. | "Some said that they came back bruised and that he was overly harsh." Dkt. No. 49 ¶ 75(d). |
| 4 | "And in at least two cases, there were women who were told that they needed a hysterectomy because they had cancer. One of these women, her medical records [do] not indicate that she ever had a biopsy to indicate that she had cancer. In another case, a lawyer told me that his client had a hysterectomy because she was told she had stage four cervical cancer. And after the hysterectomy, when she went to an oncologist, the oncologist said, you do not have cancer. So, these are alarming allegations about this doctor. I personally called the doctor's office. As soon as I identified myself as a reporter, I heard a click, the phone hung up. Clearly, there are people reaching out with the same questions we have today." Dkt. No. 130-8 at 11. | "There were women who were told that they needed a hysterectomy because they had cancer. One of those women, her medical records [do] not indicate that she had a biopsy to indicate that she had cancer and another case, a lawyer told me that his client had a hysterectomy because she was told she had stage four cervical cancer and after the hysterectomy when she went to the oncologist, the oncologist said you do not have cancer, so these are alarming allegations about this doctor." Dkt. No. 49 ¶ 75(f). |
| 5 | "You're quoted in the complaint as saying, 'That's his specialty, he's the uterus collector.' Is that how people refer to this doctor?" Dkt. No. 130-8 at 12. | "This is his specialty, he's the uterus collector." Dkt. No. 49 ¶ 75(g). |
| 6 | "That's how the detainees referred to this physician. They referred to him as—I had a detainee that asked me, she said, well, what is he doing, Ms. Wooten? Collecting all | "Well, what is he doing . . . collecting all of our uteruses?" Dkt. No. 49 ¶ 75(h). |
| | of our uteruses? And I just looked at her puzzled because I didn't have an answer." Dkt. No. 130-8. | |
| 7 | "It seemed like they were getting way too much care from a gynecologist and perhaps doing very unnecessary procedures and not enough of what you would need in a short-term detention situation. We know that they aren't supposed to stay longer than six months. Why were they getting so much care on this one area?" Dkt. No. 130-8 at 11. | "And perhaps doing very unnecessary procedures and not what you would need in a short-term detention situation." Dkt. No. 49 ¶ 75(j). |
| 8 | Headline on Screen: "WHISTLEBLOWER: HIGH NUMBER OF HYSTERECTOMIES AT ICE DETENTION CTR." Dkt. No. 130-7 at 01:34:00–01:41:00. | Headline on Screen: "High number of hysterectomies at ICE Detention Ctr." Dkt. No. 49 ¶ 76. |
| 9 | "You have detained women—I had several detain[ed] women on numerous occasions that would come to me and say, Miss Wooten, I had [a] hysterectomy, why? I had no answers as to why they had those procedures. And one lady walked up to me here this last time . . . and she said, 'what is he? Is he the uterus collector? Does he collect uteruses?'" Dkt. No. 131-2 at 13. | "Is he the uterus collector?" Dkt. No. 49 ¶ 78(a). |
| 10 | "Yesterday, we learned about a whistleblower, a nurse working at a Georgia Immigrations and Customs Enforcement, ICE facility, leveling honestly ghastly allegations. Chief among them that women in that facility, migrant women, say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility, which again, is privately run." Dkt. No. 131-2 at 12. | "Migrant women say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility." Dkt. No. 49 ¶ 78(f). |
| 11 | "We've been chasing this story all day along with some of my colleagues here at NBC. Tonight, we can report a lawyer named Benjamin Osorio representing women at that very facility, told NBC News that indeed two of his clients received hysterectomies they believe may have been unnecessary." Dkt. No. 131-2 at 12. | "Two of his clients received hysterectomies they believe may have been unnecessary." Dkt. No. 49 ¶ 78(g). |
| 12 | "And tonight, we here on ALL IN spoke with another attorney who represents two different women who claim they also had unnecessary hysterectomies | "Two different women who claim they also had unnecessary hysterectomies while detained at this facility." |

| | | |
|---|---|---|
| | while detained at this facility."<br><br>Dkt. No. 131-2 at 12. | Dkt. No. 49 ¶ 78(h). |
| 13 | "That lawyer tells us that as many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed."<br><br>Dkt. No. 131-2 at 12. | "As many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed."<br><br>Dkt. No. 49 ¶ 78(i). |
| 14 | "You have detained women—I had several detain[ed] women on numerous occasions that would come to me and say, Miss Wooten, I had [a] hysterectomy, why? I had no answers as to why they had those procedures. And one lady walked up to me here this last time . . . and she said, 'what is he? Is he the uterus collector? Does he collect uteruses?'"<br><br>Dkt. No. 131-2 at 13. | "Is he the uterus collector? Does he collect uteruses?"<br><br>Dkt. No. 49 ¶ 78(j). |
| 15 | "And I asked her, what does she mean. And she says, 'everybody that I've talked to has had a hysterectomy.' And you just don't know what to say. I mean, I don't—I don't have an answer for why they would come to me and they would say, 'is he a uterus collector?'"<br><br>Dkt. No. 131-2 at 13. | "Everyone that I talked to has had a hysterectomy."<br><br>Dkt. No. 49 ¶ 78(k). |
| 16 | "And I asked her, what does she mean. And she says, 'everybody that I've talked to has had a hysterectomy.' And you just don't know what to say. I mean, I don't—I don't have an answer for why they would come to me and they would say, 'is he a uterus collector?'"<br><br>Dkt. No. 131-2 at 13. | "They would say is he the uterus collector?"<br><br>Dkt. No. 49 ¶ 78(l). |
| 17 | "And with the number of cases that Ms. Wooten and others alluded to, there's a lot—there's a large population of these—of these women, immigrants who've had this—who have been mistreated in this way, assaulted. And should—you know, there's a pool there that could come forward. Let's hope they do."<br><br>Dkt. No. 131-2 at 15. | "There's a large population of these—of these women, immigrants who've had this—who have been mistreated in this way, assaulted."<br><br>Dkt. No. 49 ¶ 78(m). |
| 18 | Headline on Screen:<br><br>"COMPLAINT: MASS HYSTERECTOMIES PERFORMED ON WOMEN AT ICE FACILITY."<br><br>Dkt. No. 131-1 at 00:31:55–00:40:50. | Headline on Screen:<br><br>"Mass hysterectomies performed on women at ICE facility."<br><br>Dkt. No. 49 ¶ 79. |
| 19 | "A nurse who works at an ICE detention facility in Georgia has just contributed to a whistleblower complaint. She says that in her time working at this ICE detention facility, it's a | "Immigrant women at that facility have told her that they routinely have been sent to a gynecologist who has performed unnecessary procedures on them, |

| | | |
|---|---|---|
| | detention center in Irwin County, Georgia. She says that immigrant women at that facility have told her they have routinely been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies."<br><br>Dkt. No. 133-7 at 5. | including hysterectomies."<br><br>Dkt. No. 49 ¶ 84(a). |
| 20 | "[T]he allegation here is that this is a federal facility and they have been sending immigrant women in their care, in their custody to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it."<br><br>Dkt. No. 133-7 at 5. | "They have been sending immigrant women in their care, in their custody, to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it."<br><br>Dkt. No. 49 ¶ 84(b). |
| 21 | "From the complaint [], quote, a detained [] immigrant told Project South that she talked to five different women detained at the Irwin County detention center between October and September 2019, five different women, between October, November and December 2019, over that three-month period, five different women that had had a hysterectomy done. When she talked to them about the surgery, the women, quote, reacted | "Five different women between October, November, and December 2019, over that three month period, five different women who'd had a hysterectomy done."<br><br>Dkt. No. 49 ¶ 84(c). |
| | confused when explaining why they had one done."<br><br>Dkt. No. 133-7 at 5. | |
| 22 | "The detainee said, quote, when I met all these women who had the surgeries I thought this was, like, an experimental concentration camp[;] it was like they're experimenting with our bodies."<br><br>Dkt. No. 133-7 at 5. | "I thought this was like an experimental concentration camp. It was like they're experimenting with our bodies."<br><br>Dkt. No. 49 ¶ 84(d). |
| 23 | "The nurse who contributed to this whistleblower complaint explains it like this, quote: Everybody this doctor sees has a hysterectomy, just about everybody."<br><br>Dkt. No. 133-7 at 5. | "Everybody this doctor sees has a hysterectomy, just about everybody."<br><br>Dkt. No. 49 ¶ 84(e). |
| 24 | "The nurse who contributed to this whistleblower complaint explains it like this, quote: Everybody this doctor sees has a hysterectomy, just about everybody. He's even taken out the wrong ovary on one detained immigrant woman. She was supposed to get her left ovary removed because she had a cyst on the left ovary. He took out the right one. She was upset. She had to go back to take the left and she wound up with a total hysterectomy[;] she still wanted children. She has to go back home now and | "He's even taken out the wrong ovary on one detained immigrant woman. She was supposed to get her left ovary removed because it had a cyst on the left ovary. He took out the right one. She had to go back to take out the left and wound up with a total hysterectomy."<br><br>Dkt. No. 49 ¶ 84(f). |

|    |    |    |
|----|----|----|
|    | tell her husband that she can't bear kids. She says she was not all the way out under anesthesia and heard the doctor tell the nurse that he took out the wrong ovary."<br><br>Dkt. No. 133-7 at 5-6. |    |
| 25 | "The nurse says she and her fellow nurses, quote, questioned among ourselves, like, goodness, he's taking everybody's stuff out, that's his specialty[,] he's the uterus collector. She says, quote, I know that's ugly. Is he collecting these things or something? Everybody he sees he's taking all their uteruses out or he's taking their tubes out, what in the world?"<br><br>Dkt. No. 133-7 at 6. | "He's taking everybody's stuff out, that's his specialty."<br><br>Dkt. No. 49 ¶ 84(g). |
| 26 | "The nurse says she and her fellow nurses, quote, questioned among ourselves, like, goodness, he's taking everybody's stuff out, that's his specialty[,] he's the uterus collector. She says, quote, I know that's ugly. Is he collecting these things or something? Everybody he sees he's taking all their uteruses out or he's taking their tubes out, what in the world?"<br><br>Dkt. No. 133-7 at 6. | "He's the uterus collector."<br><br>Dkt. No. 49 ¶ 84(h). |
| 27 | "The nurse says she and her fellow nurses, quote, questioned among ourselves, like, goodness, he's taking everybody's stuff out, that's his specialty[,] he's the uterus collector. She says, quote, I know that's ugly. Is he collecting these things or something? Everybody he sees he's taking all their uteruses out or he's taking their tubes out, what in the world?"<br><br>Dkt. No. 133-7 at 6. | "Is he collecting these things or something?"<br><br>Dkt. No. 49 ¶ 84(i). |
| 28 | "The nurse says she and her fellow nurses, quote, questioned among ourselves, like, goodness, he's taking everybody's stuff out, that's his specialty[,] he's the uterus collector. She says, quote, I know that's ugly. Is he collecting these things or something? Everybody he sees he's taking all their uteruses out or he's taking their tubes out, what in the world?"<br><br>Dkt. No. 133-7 at 6. | "Everybody he sees he's taking all their uteruses out or he's taking their tubes out."<br><br>Dkt. No. 49 ¶ 84(j). |
| 29 | "According to this nurse, this whistleblower, she alleges in this complaint that on several occasions, women told her that this doctor performed | "He removed the uteruses of these refugee women for no medical reason, without their proper informed consent." |
|    | hysterectomies, removed the uteruses of these refugee women for no medical reason without their proper informed consent."<br><br>Dkt. No. 133-7 at 6. | Dkt. No. 49 ¶ 84(k). |
| 30 | "According to NBC's reporting, one of the lawyers represents two women who were detained at the facility who say they received hysterectomies that they believe may have been unnecessary."<br><br>Dkt. No. 133-7 at 7. | "Two women who were detained at the facility say they received hysterectomies that they believe may have been unnecessary."<br><br>Dkt. No. 49 ¶ 84(L). |
| 31 | "According to NBC's reporting, one of the lawyers represents two women who were detained at the facility who say they received hysterectomies that they believe may have been unnecessary. Another lawyer represents a woman who says she went to this doctor's office for an exam. The exam left her with bruising."<br><br>Dkt. No. 133-7 at 7. | "She went to this doctor's office for an exam. The exam left her with bruising."<br><br>Dkt. No. 49 ¶ 84(m). |
| 32 | "And to be clear, the complaints here from these women and their lawyers who are speaking on their behalf is essentially that they-not that they never should have been sent out to see a gynecologist, but, rather, whatever was going on with them, they did not understand that the treatment was going to be a hysterectomy and then in some cases the allegation here is that the hysterectomies, whether or not the women consented to them in the first place, they were not medically necessary."<br><br>Dkt. No. 133-7 at 9. | "They [detainees] never should have been sent out to see a gynecologist, but, rather, whatever was going on with them, they did not understand that the treatment was going to be a hysterectomy and then in some cases the allegation here is that the hysterectomies, whether or not the women consented to them in the first place, they were not medically necessary."<br><br>Dkt. No. 49 ¶ 84(n). |
| 33 | "And there are other allegations of other procedures including pap smears where women are told you've got ovarian cysts or cancer, and that turned out not to be the case and those procedures happened anyway."<br><br>Dkt. No. 133-7 at 9. | "And there are other allegations of other procedures including pap smears where women are told you've got ovarian cysts or cancer, and that turned out not to be the case and those procedures happened anyway."<br><br>Dkt. No. 49 ¶ 84(o). |
| 34 | "And I think, you know, this-this statement that they considered him the uterus collector is graphic, it's hard to listen to, but that's what they're talking about, according to Ms. Woeten, inside this facility, and she's not the only one saying so."<br><br>Dkt. No. 133-7 at 10. | "They considered him the uterus collector."<br><br>Dkt. No. 49 ¶ 84(p). |
| 35 | "We've been bringing you the story of allegations of medical procedures performed on immigrant women without—many without consent at an ICE detention facility in | "We've been bringing you the story of allegations of medical procedures performed on immigrant women without—many without consent at an ICE |

| | | |
|---|---|---|
| | Georgia. Now, there is now a formal inquiry into those allegations in the Department of Homeland Security's Office of the Inspector General." Dkt. No. 131-5 at 13. | detention facility in Georgia." Dkt. No. 49 ¶ 86(a). |
| 36 | Headline on Screen: "INVESTIGATION ORDERED INTO CLAIMS OF UNNEEDED MEDICAL PROCEDURES ON IMMIGRANT WOMEN." Dkt. No. 153-50 at 133. | Headline on Screen: "Investigation ordered into claims of unnecessary medical procedures on immigrant women." Dkt. No. 49 ¶ 87. |
| 37 | "Learn more about the three women claiming they have received unnecessary hysterectomies here: on.msnbc.com/2FJlvra." Dkt. No. 122-29 at 3. | "Learn more about the three women claiming they have received unnecessary hysterectomies here: on.msnbc.com/2FJlvra." Dkt. No. 122 at 6. |
| 38 | "Three women claim they received unnecessary hysterectomies at ICE facility. 'I felt like I had no right to say anything. Dr. Amin just told me, you're gonna get a hysterectomy done, and schedule an appointment for that. I had no say on this.' on.msnbc.com/2FJlvra." Dkt. No. 122-30 at 3. | "Three women claim they received unnecessary hysterectomies at ICE facility. 'I felt like I had no right to say anything. Dr. Amin just told me, you're gonna get a hysterectomy done, and schedule an appointment for that. I had no say on this.' on.msnbc.com/2FJlvra." Dkt. No. 122 at 6. |
| 39 | "Nurse Dawn Wooten alleges mass hysterectomies performed at Georgia facilities: 'I had several detained women on numerous occasions that would come | "Nurse Dawn Wooten alleges mass hysterectomies performed at Georgia facilities: 'I had several detained women on numerous |

| | | |
|---|---|---|
| | to me and say, "Ms. Wooten, I had a hysterectomy. Why?" I had no answers as to why they had those procedures.'" Dkt. No. 122-31 at 3. | occasions that would come to me and say, "Ms. Wooten, I had a hysterectomy. Why?" I had no answers as to why they had those procedures.'" Dkt. No. 122 at 6. |

**APPENDIX II**

| Statement No. | Plaintiff's Motion | Defendant's Motion |
|---|---|---|
| 1 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 2 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 3 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 4 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 5 | Falsity: GRANTED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 6 | Falsity: GRANTED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 7 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 8 | Falsity: DENIED<br>Defamatory: DENIED | DENIED |

| | | |
|---|---|---|
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 9 | Falsity: GRANTED | DENIED |
| | Defamatory: GRANTED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 10 | Falsity: DENIED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 11 | Falsity: DENIED | GRANTED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 12 | Falsity: DENIED | DENIED |

| | | |
|---|---|---|
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 13 | Falsity: DENIED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 14 | Falsity: GRANTED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 15 | Falsity: GRANTED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |

| | | |
|---|---|---|
| 16 | Falsity: GRANTED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 17 | Falsity: DENIED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 18 | Falsity: DENIED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 19 | Falsity: DENIED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |

| | | |
|---|---|---|
| | Actionable Absent Special Harm: GRANTED | |
| 20 | Falsity: DENIED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 21 | Falsity: DENIED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 22 | Falsity: DENIED | GRANTED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |
| | Fault: DENIED | |
| | Actionable Absent Special Harm: GRANTED | |
| 23 | Falsity: GRANTED | DENIED |
| | Defamatory: DENIED | |
| | Concerning Plaintiff: GRANTED | |
| | Publication: GRANTED | |

| # | | |
|---|---|---|
| | Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | |
| 24 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 25 | Falsity: GRANTED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 26 | Falsity: GRANTED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 27 | Falsity: GRANTED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED | DENIED |

| # | | |
|---|---|---|
| | Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | |
| 28 | Falsity: GRANTED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 29 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 30 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | GRANTED |
| 31 | Falsity: DENIED<br>Defamatory: DENIED | DENIED |

| # | | |
|---|---|---|
| | Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | |
| 32 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 33 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 34 | Falsity: GRANTED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 35 | Falsity: DENIED | GRANTED |

| # | | |
|---|---|---|
| | Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | |
| 36 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | GRANTED |
| 37 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |
| 38 | Falsity: DENIED<br>Defamatory: DENIED<br>Concerning Plaintiff: GRANTED<br>Publication: GRANTED<br>Fault: DENIED<br>Actionable Absent Special Harm: GRANTED | DENIED |

| 39 | Falsity: DENIED | DENIED |
|----|----------------|--------|
|    | Defamatory: DENIED | |
|    | Concerning Plaintiff: GRANTED | |
|    | Publication: GRANTED | |
|    | Fault: DENIED | |
|    | Actionable Absent Special Harm: GRANTED | |

**All Citations**

Slip Copy, 2024 WL 3188768

### Footnotes

1       The Court previously granted NBC's motion for judgment on the pleadings as to all statements contained in the third broadcast See Dkt. No. 59 at 66. Therefore, the Court need not discuss the facts of this broadcast.

2       These statements have been numbered inconsistently over the course of litigation. To avoid any confusion and for ease of reference, the Court has re-numbered the statements. See Appendix I.

3       Plaintiff did not move for summary judgment on Statements 9 and 34. As NBC has moved for summary judgment on all statements, the Court will address these two statements as well.

4       Because Plaintiff did not move for summary judgment on Statements 9 and 34, he must prove their falsity at trial.

5       Appendix II is a breakdown of the Court's summary judgment rulings as to each contested statement.

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**     © 2024 Thomson Reuters. No claim to original U.S. Government Works.     33